**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| NOKSEL CELIK BORU SANAYI A.S., | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| *Defendant*, | ) |
| | ) |
| and | ) |
| | ) |
| NUCOR TUBULAR PRODUCTS INC. | ) |
| | ) |

<u>**NON-CONFIDENTIAL VERSION**</u>

Court No. 21-00140

Business Proprietary (Confidential)
Information Deleted from Pages 16 - 19.

**PLAINTIFF NOKSEL CELIK BORU SANAYI A.S.'S, MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT
TO RULE 56.2**

Matthew M Nolan
Leah N. Scarpelli

Arent Fox, LLP
1717 K Street, NW
Washington, DC 20006

September 3, 2021

AFDOCS/24519744.7

# TABLE OF CONTENTS

**Page**

I.     STATEMENT PURSUANT TO RULE 56.2(C)(1) ......................................................1

    A.    Administrative Record To Be Reviewed ...............................................1

    B.    Issues Presented And Summary Of Argument ........................................2

II.    STATEMENT OF FACTS ...................................................................................3

III.    STANDARD OF REVIEW .................................................................................5

IV.    ARGUMENT .....................................................................................................6

    A.    Noksel Is Entitled To A Full Duty Drawback Adjustment To U.S. Price..............6

        1.    The Turkish Drawback Program Satisfies Commerce's Criteria For Adjustment ...........................................................7

        2.    An IPC Is "Closed" When Imports And Exports Under That IPC Are Completed...........................................................10

        3.    Noksel Completed All Imports And Exports Under The Inward Processing Certificate ...................................................14

    B.    Section 232 Tariffs Are "Special" Tariffs That Should Not Be Deducted From Export Price ...........................................................19

        1.    The Statute Does Not Contemplate Adjustments For "Special" Tariffs...............................................................20

        2.    The Section 232 Tariffs On Steel Imports Are "Special" Tariffs............23

            a.    Section 232 Tariffs Are Remedial ...............................................24

            b.    Section 232 Tariffs Are Temporary...............................................29

            c.    Section 232 Tariffs Were Implemented Under Congress's Specific Delegation of Authority to the Executive......................31

        3.    There Is A Clear Interplay Between Section 232 Tariffs and Antidumping Duties Such That Deducting Section 232 Tariffs Imposes A Double Remedy ...................................................34

    C.    Any Deduction Should Be Limited to the 25% Tariffs Assessed Pursuant to Presidential *Proclamation 9705* ...................................................37

V.    PRAYER FOR RELIEF ...................................................................................40

AFDOCS/24519744.7

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AK Steel Corp. v. United States*,
  988 F. Supp. 594 (Ct. Int'l Trade 1997), *aff'd* 215 F.3d 1342 (Fed. Cir. 1999)...............22, 34

*Am. Inst. for Int'l Steel, Inc. v. United States*,
  376 F. Supp. 3d 1335 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed.
  Cir. 2020), *cert denied,* 139 S. Ct. 2748 (2020) ....................................................................28

*ArcelorMittal USA Inc. v. United States*,
  32 CIT 440 (2008) ..................................................................................................................8

*Asociacion Colombiana de Exportadores de Flores v. United States*,
  6 F. Supp. 2d 865 (1998) ........................................................................................................6

*Bethlehem Steel Corp. v. United States*,
  27 F. Supp. 2d 201 (Ct. Int'l Trade 1998) ............................................................................22

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
  494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021), *appeal docketed*, Fed. Cir. No.
  2021-2240 .......................................................................................................................*passim*

*Chang Tieh Indus. v. United States*,
  840 F. Supp. 141 (Ct. Int'l Trade 1993) ...............................................................................10

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ................................................................................................................6

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ................................................................................................................6

*De Samo {sic} v. Dep't of Com.*,
  761 F.2d 657 (Fed. Cir. 1985) ..............................................................................................18

*DuPont Teijin Films USA, LP v. United States*,
  407 F.3d 1211 (Fed. Cir. 2005) ..............................................................................................6

*Eregli Demir ve Celik Fabrikalari T.A.S v. United States*,
  357 F. Supp. 3d 1325 (Ct. Int'l Trade 2018) .........................................................................8

*Fed.-Mogul Corp. v. United States*,
  813 F. Supp. 856 (Ct. Int'l Trade 1993) ...............................................................................22

*Forest Lab'ys, Inc. v. United States,*
  403 F. Supp. 2d 1348 (Ct. Int'l Trade 2005), *aff'd,* 476 F.3d 877 (Fed. Cir.
  2007)......................................................................................................................32

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States,*
  361 F. Supp. 3d 1314 (Ct. Int'l Trade 2019) ..........................................................8

*Hoogovens Staal BV v. United States,*
  4 F. Supp. 2d 1213 (Ct. Int'l Trade 1998) ............................................................22

*Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States,*
  429 F. Supp. 3d 1353 (Ct. Int'l Trade 2020) ..........................................................8

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States,*
  28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ....................................................36, 39

*Jinko Solar Co. v. United States,*
  229 F. Supp. 3d 1333 (Ct. Int'l Trade 2017), *aff'd*, 961 F.3d 1177 (Fed. Cir.
  2020)......................................................................................................................18

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006) ..............................................................................6

*NMB Sing. Ltd. v. United States,*
  557 F.3d 1316 (Fed. Cir. 2009) .......................................................................13, 23

*Rebar Trade Action Coal. v. United States,*
  No. 19-268, 2015 WL 7573326 (Ct. Int'l Trade, Nov. 23, 2015) ..........................15

*Rhone Poulenc, Inc. v. United States,*
  899 F.2d 1185 (Fed. Cir. 1990) ............................................................................35

*Rhone-Poulenc, Inc. v. United States,*
  20 CIT 573, 927 F. Supp. 451 (1996)......................................................................6

*Saha Thai Steel Pipe (Pub.) Co. v. United States,*
  635 F.3d 1335 (Fed. Cir. 2011) .....................................................................7, 8, 14

*Toscelik Profil ve Sac Endustrisi A.S. v. United States,*
  348 F. Supp. 3d 1321 (Ct. Int'l Trade 2018) .........................................................13

*Transpacific Steel LLC v. United States,*
  466 F. Supp. 3d 1246 (Ct. Int'l Trade 2020), *rev'd and remanded*, 4 F.4th
  1306 (Fed. Cir. 2021) ......................................................................................38, 39

*Transpacific Steel LLC v. United States,*
  4 F.4th 1306 (Fed. Cir. 2021) ...................................................................29, 38, 39

*Union Steel v. United States*,
    713 F.3d 1101 (Fed. Cir. 2013) ................................................................... 6

*U.S. Steel Grp. v. United States*,
    15 F. Supp. 2d 892 (Ct. Int'l Trade 1998), *rev'd on other grounds*, 225 F.3d
    1284 (Fed. Cir. 2000) ........................................................................... 22

*Wheatland Tube Co. v. United States*,
    495 F.3d 1355 (Fed. Cir. 2007) ......................................................... *passim*

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................ 5

19 U.S.C. § 1671 ................................................................................. 25, 26

19 U.S.C. § 1673 ......................................................................... 20, 25, 26

19 U.S.C. § 1675 ................................................................................... 3

19 U.S.C. 1677(7)(C) ........................................................................... 25

19 U.S.C. § 1677a(a) ........................................................................... 20

19 U.S.C. § 1677a(b) ........................................................................... 20

19 U.S.C. § 1677a(c)(1)(B) ......................................................... 7, 10, 40

19 U.S.C. § 1677a(c)(2)(A) ............................................................. *passim*

19 U.S.C. § 1862 ............................................................................... 25

19 U.S.C. § 1862(b)(3)(A) .................................................................. 32

19 U.S.C. § 1862(c) ........................................................................... 33

19 U.S.C. § 1862(c)(1)(A)(ii) ......................................................... 29, 32

19 U.S.C. § 1862(d) ...................................................................... 25, 33

19 U.S.C. § 2251 .......................................................................... 25, 26

19 U.S.C. § 2251(a) ........................................................................... 25

19 U.S.C. § 2252 ............................................................................... 26

Trade Expansion Act of 1962 § 232 (19 U.S.C. § 1862) ..................... *passim*

**Constitutional Provisions**

U.S. Const. Article I, § 8 ............................................................................31, 32

**Presidential Documents**

*Proclamation 9705 of March 8, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11625 (Mar. 15, 2018) . *Proclamation 9705* ...................................27, 30

*Proclamation 9711 of March 22, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 13361 (Mar. 28, 2018)...................................................30

*Proclamation 9740 of April 30, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 20683 (May 7, 2018) .......................................*passim*

*Proclamation 9759 of May 31, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 25857 (Jun. 5, 2018)......................................28, 30

*Proclamation 9772 of August 10, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 40429 (Aug. 15, 2018)..............................37, 38, 39

*Proclamation 9886 of May 16, 2019: Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23421 (May 21, 2019), 84 Fed. Reg. 23421 (May 21, 2019)..................................................................................37, 38

*Proclamation 9894 of May 19, 2019: Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23987 (May 23, 2019) ...............................................30

*Proclamation 9980 of January 24, 2020: Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles Into the United States*, 85 Fed. Reg. 5281 (Jan. 29, 2020).................................................................30

**Administrative Determinations & Notices**

*Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61716 (Dep't Commerce Oct. 19, 2006) ..................................................................8

*Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea*, 62 Fed. Reg. 18404 (Dep't Commerce Apr. 15, 1997) (final AD results) ............................................................................................................20

*Certain Hot-Rolled Steel Flat Products from Australia*, 84 Fed. Reg. 68876 (Dep't of Commerce Dec. 17, 2019) (prelim. results 2017-2018), and accompanying Issues and Decision Memorandum ............................................36

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea*, 84 Fed. Reg. 68407 (Dep't of Commerce Dec. 16, 2019) (prelim. AD results & determ. of no shipments; 2017-2018), and accompanying Decision Memorandum ...............................36

*Certain Oil Country Tubular Goods From the Republic of Turkey*, 79 Fed. Reg. 41971 (Dep't Commerce July 18, 2014) (final LTFV determ., affirm. final determ. critical circum., in part), and accompanying Issues & Decision Memorandum .......................................................................................................9, 12

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey*, 81 Fed. Reg. 47355 (Dep't Commerce July 21, 2016) (final LTFV determ.), and accompanying Issues & Decision Memorandum ........................11

*Light-Walled Rectangular Pipe and Tube From Turkey*, 69 Fed. Reg. 53675 (Dep't Commerce Sept. 2, 2004) (final LTFV determ.), and accompanying Issues & Decision Memorandum ..................................................................................8

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 33739 (Dep't Commerce July 15, 2019) (initiation of 2018-2019 review).....................................................................................................................3

*Light-Walled Rectangular Pipe and Tube From Turkey*, 85 Fed. Reg. 44861 (Dep't Commerce July 24, 2020) (prelim. AD results, partial rescission & determ. of no shipments; 2018-2019).........................................................................4, 5

*Light-Walled Rectangular Pipe and Tube From Turkey:*, 86 Fed. Reg. 11230 (Dep't Commerce Feb. 24, 2021) (final AD results & final determ. no shipments; 2018-2019), and accompanying Issues & Decision Memorandum ..............*passim*

*Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40202 (Dep't Commerce Jul. 6, 2020) ..................19, 26, 27

*Procedures To Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6670 (USTR Feb. 14, 2018) ...........................................................................................30

*Requirements for Submissions Requesting Exclusions From the Remedies Instituted in Presidential Proclamations Adjusting Imports of Steel Into the United States and Adjusting Imports of Aluminum Into the United States; and the Filing of Objections to Submitted Exclusion Requests for Steel and Aluminum*, 83 Fed. Reg. 12106 (Dep't Commerce Mar. 19, 2018) .......................................28

*Stainless Steel Wire Rod from the Republic of Korea*, 69 Fed. Reg. 19153 (Dep't Commerce Apr. 12, 2004) (final AD results)......................................................20, 21, 24, 25

*Steel Concrete Reinforcing Bar From Turkey*, 79 Fed. Reg. 21986 (Dep't
Commerce Sept. 15, 2014) (final neg. LTFV determ., final determ. critical
circum.), and accompanying Issues & Decision Memorandum ...........................................9, 12

*Submissions of Exclusion Requests and Objections to Submitted Requests for Steel
and Aluminum*, 83 Fed. Reg. 46026 (Dep't Commerce Sept. 11, 2018) )
(interim final rule) .........................................................................................28, 30, 34

*Welded Line Pipe From the Republic of Turkey*, 80 Fed. Reg. 61362 (Dep't
Commerce October 13, 2015) (final LTFV determ.), and accompanying Issues
& Decision Memorandum ............................................................................9, 12, 17

**Other Authorities**

*Conversion of the Tariff Schedules of the United States Annotated Into the
Nomenclature Structure of the Harmonized System*, Inv. No. 332-131, USITC
Pub. 1400 (June 1983) ...........................................................................................31

HTSUS, Ch. 99...........................................................................................................31

Press Release, Secretary Ross Releases Steel and Aluminum 232 Reports in
Coordination with White House (Feb. 16, 2018) ....................................................27

S. Rep. No. 16, 67th Cong., 1st Sess. (1921) ................................................................21

S. Rep. No. 90-1385, pt. 2 (1968) ................................................................................31

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| NOKSEL CELIK BORU SANAYI A.S., | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| *Defendant*, | ) |
| | ) |
| and | ) |
| | ) |
| NUCOR TUBULAR PRODUCTS INC. | ) |
| | ) |

<u>**NON-CONFIDENTIAL VERSION**</u>

Court No. 21-00140

Business Proprietary (Confidential)
Information Deleted from Pages 16 - 19.

**PLAINTIFF NOKSEL CELIK BORU SANAYI A.S.'S, MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2**

Pursuant to the Court's Order dated June 8, 2021, ECF No. 21, Plaintiff Noksel Celik Boru Sanayi A.S. ("Noksel" or "Plaintiff"), a foreign manufacturer and foreign exporter of steel Light-Walled Rectangular Pipe and Tube ("LWRPT") from Turkey, hereby submits this memorandum of points and authorities in support of its motion for judgment on the agency record challenging the final affirmative determination as set forth below.

**I.     <u>STATEMENT PURSUANT TO RULE 56.2(C)(1)</u>**

**A.     Administrative Record To Be Reviewed**

This is an appeal from the final results of the U.S. Department of Commerce ("Commerce") in the administrative review of the antidumping duty ("AD") order on *Light-Walled Rectangular Pipe and Tube From Turkey*. The period of review ("POR") is May 1, 2018 through April 30, 2019. Commerce's final antidumping duty determination was published in the *Federal Register* on February 24, 2021. *Light-Walled Rectangular Pipe and Tube From Turkey*,

1

86 Fed. Reg. 11230 (Dep't Commerce Feb. 24, 2021) (final AD results & final determ. no

shipments; 2018-2019), ECF No. 18-4, P.R. 125 ("*Final AD Results*").[1] Commerce's factual and

legal conclusions underlying its final AD results are set forth in the 2018-2019 Antidumping

Duty Administrative Review of Light-Walled Rectangular Pipe and Tube From Turkey; Issues

and Decision Memorandum for the Final Results, ECF No. 18-5, P.R. 115 ("*Final I&D Memo*").

### B.    Issues Presented And Summary Of Argument

Plaintiffs raise the following three issues in this brief:

1.    Whether Commerce's decision to deny Noksel's claimed duty drawback

adjustment on the basis that its inward processing certificates ("IPCs") were not "closed" is

contrary to law and unsupported by substantial evidence on the record. Noksel has demonstrated

that it qualifies for a full duty drawback adjustment because all imports and exports under the

IPCs had been completed and Noksel was no longer permitted by the Government of Turkey

("GOT") to add import or export information. Accordingly, Commerce should have accepted

information related to Noksel's closed IPCs and increased Noksel's U.S. prices by a duty

drawback ratio.

2.    Whether Commerce's determination to deduct Section 232 tariffs paid from the

price of Noksel's U.S. sales is contrary to law and unsupported by substantial evidence on the

record. Section 232 tariffs are remedial and temporary "special" tariffs imposed pursuant to a

specific congressional delegation of tariff making authority to the executive branch, rather than

"ordinary" United States import duties within the meaning of the antidumping statute. As such,

Commerce's deduction of these special Section 232 tariffs from Noksel's U.S. price results in a

double remedy and artificially inflates the dumping margin calculated for Noksel.

---

[1] The Public Administrative Record Index was filed May 5, 2021, ECF No. 18. All public record citations to the record are designated as "P.R." and confidential record citations are designated as "C.R.".

2

3.      Whether Commerce's deduction of 50 percent tariffs assessed under *Proclamation 9772*, rather than the 25 percent tariffs assessed pursuant to Presidential *Proclamation 9705*, is contrary to law and unsupported by substantial evidence on the record. The additional tariffs applicable to Turkey alone are uniquely temporary and remedial such that they should be treated as "special" tariffs, rather than ordinary U.S. import duties. The legality of these tariffs is also still be considered by the reviewing courts. As such, these remedial and temporary "special" tariffs imposed on Turkish imports should not be deducted from Noksel's U.S. price in Commerce's dumping calculation.

## II.     <u>STATEMENT OF FACTS</u>

On July 15, 2019, Commerce published a notice of initiation of an administrative review of the AD order on LWRPT from Turkey covering shipments from May 1, 2018 through April 30, 2019. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 33739, 33748 (Dep't Commerce July 15, 2019) (initiation of 2018-2019 review), P.R. 123. Commerce initiated the review pursuant to Section 751 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675.

Noksel was selected as a mandatory respondent in Commerce's review. Noksel participated throughout the proceeding through the filing of questionnaire responses and submission of legal arguments. *See, e.g.*, Agir & Noksel Notification of Turkish Inflation Rate (Aug. 13, 2019), P.R. 27; Noksel Section A Questionnaire Response (Sept. 3, 2019), C.R. 3-8, P.R. 33; Noksel Request for Modifying Cost & Home Market Reporting Periods (Sept. 3, 2019), P.R. 37; Noksel Section B-D Questionnaire Response (Sept. 20, 2019), C.R. 15-60, P.R. 42 ("B-D QR"); Noksel Supplemental Section A Questionnaire Response (Nov. 29, 2019), C.R. 87, P.R. 48; Noksel Supplemental Section B Questionnaire Response (Jan. 3, 2020), C.R. 90-91, P.R. 58; Noksel Supplemental Section C Questionnaire Response (Jan. 7, 2020), C.R.92-95, P.R. 61;

Noksel Supplemental Section D Questionnaire Response (Jan. 28, 2020), C.R. 96-99, P.R. 68;

Noksel High Inflation Cost of Production & Constructed Value Questionnaire Response (Apr. 2,

2020), C.R. 112-114, P.R. 78-79; Noksel Supplemental 6 Questionnaire Response (June 18,

2020), C.R. 100-109, P.R. 89; Noksel Supplemental Sections A-B-C-D Questionnaire Response

(July 2, 2020), C.R. 117-121, P.R. 96 ("Supp. A-D QR"); Noksel Supplemental Section D

Questionnaire Response (July 7, 2020), C.R. 124-128, P.R. 98; Noksel's Case Brief (Aug. 24,

2020), P.R. 109 ("Noksel Case Brief").

On July 20, 2020, Commerce issued the preliminary determination calculating an AD

margin of 23.39 percent. *Light-Walled Rectangular Pipe and Tube From Turkey*, 85 Fed. Reg.

44861, 44862 (Dep't Commerce July 24, 2020) (prelim. AD results, partial rescission & determ.

of no shipments; 2018-2019), P.R. 124 ("*Preliminary AD Results*"). Commerce's factual and

legal conclusions underlying its preliminary results are set forth in the Decision Memorandum

for the *Preliminary AD Results*. Decision Memorandum for Preliminary Results of the

Antidumping Duty Administrative Review: Light-Walled Rectangular Pipe & Tube from Turkey;

2018-2019, P.R. 103 ("*Prelim. Decision Memo*"); Memorandum from T. Hanna to The File, re:

Preliminary Analysis Memorandum for Noksel Celik Boru Sanayi A.S. (July 20, 2020), C.R.

131, P.R. 105 ("Prelim. Analysis Memo").

In the *Preliminary AD Results*, Commerce did not make Noksel's claimed duty drawback

adjustment for POR shipments to the United States under inward processing certificates ("IPCs")

based on a finding that the IPCs were not closed. *Prelim. Decision Memo* at 9, P.R. 124.

Commerce also determined that Noksel did not provide record evidence to support its claim that

certain IPCs were related to exports of subject merchandise to the United States during the POR.

*See id.* at 8-9. Commerce further determined that additional tariffs paid on subject imports

pursuant to Section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862) should be

4

deducted from the export price of Noksel's U.S. sales as a movement expense along with ordinary customs duties. *See id.* at 8.

On February 16, 2021, Commerce issued its *Final AD Results*, calculating a final margin of 35.06 percent for Noksel. *Final AD Results*, 86 Fed. Reg. at 11231, ECF No. 18-4, P.R. 125. Commerce's calculations underlying its *Final AD Results* are discussed in the *Final I&D Memo* and the analysis memorandum for Noksel. *See* Memorandum from T. Hanna to The File, re: Final Results Analysis Memorandum for Noksel Celik Boru Sanayi A.S. (Feb. 16, 2021), C.R. 147, P.R. 117 ("Final Analysis Memo").

In the *Final AD Results*, Commerce continued to deny Noksel's claimed duty drawback adjustment to U.S. price on the basis the IPCs were not "closed." *Final I&D Memo* at 7, ECF No. 18-5, P.R. 115. Specifically, Commerce determined that an application for closure to the GOT does not meet the threshold for considering an IPC to be closed, even though all imports and exports under the IPC must be completed before such an application is made. *Id.* Commerce also continued to find that Section 232 tariffs are analogous to ordinary U.S. import duties that are properly deducted from U.S. price on the basis that they are not special remedial duties akin to antidumping or section 201 safeguards. *Id.* at 4. Though Section 232 tariffs are similarly focused on the economic wellbeing of the domestic industry, Commerce concluded that the function of antidumping duties is separate and distinct and that there is no overlap between the two such the tariffs would provide multiple remedies for the same situation. *Id.* at 5.

## III. <u>STANDARD OF REVIEW</u>

This Court must remand any administrative determination by Commerce which is "unsupported by substantial evidence on the record" as a whole, or is "otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

When reviewing whether Commerce's actions are unsupported by substantial evidence, the Court assesses whether the agency action is "unreasonable" given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Substantial evidence represents "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (internal quotations omitted)).

When reviewing Commerce's statutory interpretations, the Court applies the two-part framework set forth in the Supreme Court's opinion in *Chevron*. *Union Steel v. United States*, 713 F.3d 1101, 1106–07 (Fed. Cir. 2013) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, (1984)). Under *Chevron*, to determine whether an agency's interpretation of the statute is entitled to deference, the court conducts a two-part test. Under the first prong of this test, the court determines whether Congress has spoken directly to the question at issue, and if it has, the court and the agency must give effect to the unambiguously expressed intent of Congress. *See id.* Where the statute is vague or silent on an issue, the court upholds Commerce's interpretation only if the interpretation is reasonable. *See id*. at 843.

This Court has found Commerce's determinations unlawful "where Commerce has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. v. United States*, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996); *see also Asociacion Colombiana de Exportadores de Flores v. United States*, 6 F. Supp. 2d 865, 880 (1998).

## IV.   <u>ARGUMENT</u>

### A.   **Noksel Is Entitled To A Full Duty Drawback Adjustment To U.S. Price**

In the *Final AD Results*, Commerce did not grant Noksel a duty drawback adjustment to U.S. price. Commerce's failure to grant Noksel the full duty drawback adjustment to which it

was entitled is unsupported by record evidence, which demonstrates that Noksel's IPC was

closed because Noksel was no longer permitted to add import or export information after its

submission to the Government of Turkey ("GOT"). The Court should therefore grant Noksel a

full duty drawback adjustment to U.S. price.

1.       **The Turkish Drawback Program Satisfies Commerce's Criteria For Adjustment**

The duty drawback adjustment to U.S. price is guaranteed by the statute, which

unambiguously directs Commerce to increase export price ("EP") or constructed export price

("CEP") by:

> the amount of any import duties imposed by the country of exportation which
> have been rebated, or which have not been collected, by reason of the exportation
> of the subject merchandise to the United States{.}

19 U.S.C. § 1677a(c)(1)(B). In determining whether to grant a duty drawback adjustment

to U.S. price under 19 U.S.C. § 1677a(c)(1)(B), Commerce applies a two-prong test in

which the party requesting the adjustment must demonstrate:

> (1) that the rebate and import duties are dependent upon one another, or in the
> context of an exemption from import duties, that the exemption is linked to the
> exportation of the subject merchandise, and (2) that there are sufficient imports of
> the raw material to account for the duty drawback on the exports of the subject
> merchandise.

*Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1340 (Fed. Cir. 2011) (citation

omitted); *see also, Final I&D Memo* at 7, ECF No. 18-5, P.R. 115. While Commerce does "not

require that the imported material be traced directly from importation through exportation," it

does require that companies "meet {its} 'two-pronged' test in order for {the drawback}

adjustment to be made to U.S. price." *Final I&D Memo* at 7. Where, as here, an importer

satisfies both criteria, it has been Commerce's longstanding policy to grant a drawback

adjustment to EP and CEP for the amount of the duty foregone, allocating the "total amount of

duty drawback received across all exports that may have incorporated the duty-paid input in question, regardless of destination." *Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61716, 61723 (Dep't Commerce Oct. 19, 2006).

This methodology has been applied by Commerce in determinations addressing the Turkish drawback system for more than 15 years and Turkey's IPR system has not changed. *See, e.g., Light-Walled Rectangular Pipe and Tube From Turkey*, 69 Fed. Reg. 53675 (Dep't Commerce Sept. 2, 2004) (final LTFV determ.), and accompanying Issues & Decision Memorandum at 9 (Comment 1) ("The only limitation placed on the duty drawback adjustment is that the adjustment to the U.S. price may not exceed the amount of import duty actually paid."). Moreover, use of Commerce's two-prong test has been repeatedly acknowledged and upheld by the reviewing courts. *See, e.g., Saha Thai*, 635 F.3d at 1340; *Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 429 F. Supp. 3d 1353, 1362 (Ct. Int'l Trade 2020); *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*, 361 F. Supp. 3d 1314, 1319 (Ct. Int'l Trade 2019) (appeal to the Federal Circuit Court of Appeals, No. 21-1066, dismissed voluntarily by Appellants on June 4, 2021); *Eregli Demir ve Celik Fabrikalari T.A.S v. United States*, 357 F. Supp. 3d 1325, 1329 (Ct. Int'l Trade 2018). Any deviations from Commerce's standard methodology, including application of the two-prong test, have been categorically rejected by the reviewing courts. *See ArcelorMittal USA Inc. v. United States*, 32 CIT 440, 463 n.23 (2008) (rejecting allocation over total shipments); *see, e.g., Icdas*, 429 F. Supp. 3d at 1364 (rejecting allocation over total production).

During the POR, Noksel utilized the same drawback program considered by Commerce in previous administrative reviews involving Turkey – the Inward Processing Regime ("IPR"). *See* B-D QR at C-36-37 and Exh. C-17, C.R. 15, 19, P.R. 42. Commerce has analyzed the

Turkish IPR in numerous cases and consistently found it to satisfy Commerce's two-prong test. *See, e.g.*, *Welded Line Pipe From the Republic of Turkey*, 80 Fed. Reg. 61362 (Dep't Commerce October 13, 2015) (final LTFV determ.), and accompanying Issues & Decision Memorandum at 7 ("*Welded Line Pipe from Turkey*") ("the requirements under Turkey's duty drawback program known as the Inward Processing Regime (IPR), if met by Turkish companies, satisfied the statute with respect to duty drawback adjustments under U.S. law."); *Steel Concrete Reinforcing Bar From Turkey*, 79 Fed. Reg. 21986 (Dep't Commerce Sept. 15, 2014) (final neg. LTFV determ., final determ. critical circum.), and accompanying Issues & Decision Memorandum at 15 ("{T}he requirements under the IPR, if met by Turkish companies, satisfied the statute with respect to duty drawback adjustments under U.S. law.") ("*Rebar from Turkey*"); *Certain Oil Country Tubular Goods From the Republic of Turkey*, 79 Fed. Reg. 41971 (Dep't Commerce July 18, 2014) (final LTFV determ., affirm. final determ. critical circum., in part), and accompanying Issues & Decision Memorandum at 15 ("*OCTG from Turkey*") ("{T}he requirements under the IPR via DIIB documentation, if met by Turkish companies, satisfied the statute with respect to duty drawback adjustments under U.S. law.").

Consistent with these previous findings, the IPR program utilized by Noksel during the POR satisfies the first prong of Commerce's two-prong test because it "specifies and restricts that only exports that contain qualifying incorporated imported inputs may be used to claim drawback" and "strictly 'requires' that the exported product contain the imported raw material inputs to qualify for drawback," with the IPC number providing the necessary linkage for the imports and exports. *See* B-D QR at C-36-37 and Exh. C-17 (citing Turkish Inward Processing Law at Articles 2, 8), C.R. 15, 19, P.R. 42. As detailed below, record evidence demonstrates that Noksel received drawback on its U.S. exports and that there were sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise, satisfying

the statutory requirements of 19 U.S.C §1677a(c)(1)(B) and the second prong of Commerce's test. *See* B-D QR at C-35-37 and Exhs. C-15-17, C.R. 15, 19, P.R. 42.

Because Noksel satisfies Commerce's longstanding test for drawback eligibility, the denial of the claimed adjustment in this review is contrary to law and unsupported by the record evidence.

### 2.     An IPC Is "Closed" When Imports And Exports Under That IPC Are Completed

In the *Final AD Results*, Commerce declined to grant Noksel the duty drawback adjustment to which it was statutorily entitled under the Turkish IPR on the basis that there was "no documentation on the record indicating that the GOT closed the IPC at issue." *Final I&D Memo* at 7, ECF No. 18-5, P.R. 115. Specifically, Commerce found that "it was not appropriate to consider an IPC closed based on Noksel's application for closure" and that "{s}hort of certification from the GOT indicating that the IPC has been formally closed, the record does not demonstrate that Noksel is precluded from suspending its IPC application or modifying the application to add import or export information to the IPC." *Id.* at 7-8.

As an initial matter, Commerce's new requirement – that an IPC not be considered closed until a respondent can provide sufficient documentation establishing its closure by the GOT – adds a third prong to Commerce's established test and is therefore an unlawful "new hurdle to the drawback test that is not required by the statute." *Chang Tieh Indus. v. United States*, 840 F. Supp. 141, 147 (Ct. Int'l Trade 1993); *Id.* at 7. Because Noksel satisfies Commerce's well-established two-prong test, Noksel should have been granted the full duty drawback to U.S. price without further inquiry from Commerce as to the status of final liquidation from the GOT.

Commerce's finding is also inconsistent with findings in previous cases, Court precedent, and its own definition of "closed" in this review. First, in prior instances in which Commerce has

considered the closure of IPCs, which are also known as DIIBs, it has defined an IPC to be

closed "{f}or practical purposes . . . when the exporting company has applied to the Turkish

government for closure." *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From

the Republic of Turkey*, 81 Fed. Reg. 47355 (Dep't Commerce July 21, 2016) (final LTFV

determ.), and accompanying Issues & Decision Memorandum at 28 (footnote omitted) ("*HWRP

from Turkey*"). Though Commerce attempts to distinguish its finding in *HWRP from Turkey* on

the basis that an IPC may be suspended after the respondent had applied for closure, a

suspension is not equivalent to a modification and there is no evidence that a company's IPC

may be modified, nor that imports/ exports under the IPC may continue after it has been fulfilled,

expired, or submitted for closure. *Final I&D Memo* at 7-8, ECF No. 18-5, P.R. 115.

To the contrary, when the export commitment under an IPC is filled, the participant will

"close" the IPC, declaring it completed, and apply to the GOT for an official liquidation of the

closure by the Turkish Government. *See* B-D QR at C-35-36 (describing the drawback

calculation based on the "total amount of import duties corresponding to the imports made under

these IPC's to the total exports made as a commitment against the imports to close these IPCs"),

C.R. 15, P.R. 42. Commerce has consistently accepted that the "'closed' date is the date the DIIB

certificate expires." Memorandum from A. Maldonado to The File, re: Verification of the Sales

Response of Toscelik Profil ve Sac Endustrisi A.S. (Toscelik Profil) and Tosyali Dis Ticaret A.S.

(Tosyali) (collectively, Toscelik) in the Antidumping Duty Investigation of Welded Line Pipe

from Turkey (A-489-822), at 17 n.13 (Jul. 16, 2015) (ACCESS Barcode: 3291956-01) ("*Welded

Line Pipe Verification Report*"). Though petitioners argued that the drawback claims should be

denied because "the Turkish government has not given final approval to any of the import

certificates used in the calculations," Commerce has historically considered IPCs to be "closed"

based on the "documents {respondents} submitted to the GOT when they *closed out* the inward

11

processing certificate." *Welded Line Pipe from Turkey* at 5, 7 and 11 (emphasis added); *Rebar from Turkey* at 15.

For example, in *Welded Line Pipe from Turkey*, Commerce determined that IPCs were closed when "import certificates to which the company was no longer permitted by the Turkish government to add import or export information" were submitted, an interpretation Commerce noted was consistent with its determination in *Steel Concrete Reinforcing Bar From Turkey*. *See Welded Line Pipe from Turkey* at 7 (citing *Rebar from Turkey*). Indeed, Commerce extensively examined the closure of IPCs in *Rebar from Turkey* and granted a drawback adjustment to respondents on the basis that "{r}espondents submitted IPR certificates that were properly matched to specific exports and closed." *Rebar from Turkey* at 17. Commerce considered an IPC to be "closed" when respondents submitted documents to the GOT containing "a tally of the items imported and exported" to "close out" the IPC. *Id.* at 15. Similarly, in *OCTG from Turkey*, Commerce again examined closure of IPCs, and concluded that:

> {A}lthough neither company demonstrated final, approved duty and KKDF exemption amounts, because not all of the DIIBs with final import and export amounts had been closed and approved as of the latest DIIB information on the record, each respondent demonstrated that it met the requirements of the IPR via the DIIB documentation process, and there is nothing to indicate that they were not entitled to exemptions under the IPR.

*OCTG from Turkey* at 16.

Commerce has thus considered the closure of IPCs in several cases involving Turkey and concluded each time that that final government approval of the closure of IPCs was not required and that "there is nothing to indicate that {respondents'} were not entitled to exemptions under the IPR" in such a circumstance. *See id.* Contrary to Commerce's claims in the *Final Results*, its ruling is thus *not* "consistent with {its} past treatment of not-yet-closed IPCs." *Final I&D Memo* at 8, ECF No. 18-5, P.R. 115. Where, as here, Commerce has "establishe{d} a course of

action . . . {it} is obliged to follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary." *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009). Commerce has provided no such "reasoned analysis" in this case.

Second, this Court has also considered and found Commerce's attempts to change its policy with regard to closed IPCs to be unreasonable. Specifically, in *Toscelik Profil ve Sac Endustrisi A.S. v. United States*, the Court considered when an IPC closes and the reasonableness of Commerce's determination to exclude IPCs that "closed" outside the POI. 348 F. Supp. 3d 1321, 1325-26 (Ct. Int'l Trade 2018). The Court noted that Commerce "has struggled to identify a reasoned basis for its POI limitation," first claiming that that the policy "might thwart potential manipulation of 'information reflected on the DIIBs prior to their closure'" then claiming that "it reasonably allows Commerce to evaluate respondents' 'actual duty liability extinguished... during the POI'" and "helps to make computing respondents' duty drawback 'more administrable for Commerce.'" *Id.* at 1325 (citations omitted). Because Commerce was able to verify "the usage and closure of the DIIBs on the record, including those that closed after the POI," and because the accuracy of those DIIBs "is not in question," the Court found that "Commerce's imposition of the POI limitation in this matter unreasonably undercuts its stated goals of accuracy, transparency, and predictability by ignoring verified record information." *Id.* at 1327, 1328 (citations omitted). The Court instead concluded that "{t}he one reasonable thing to do here is calculate . . . duty drawback adjustments consistent with that verified information" – including IPCs that closed after the POI. *Id.* at 1328.

Finally, in this review, Commerce defines "closed IPC's" as "IPC's to which the company was no longer permitted by the GOT to add import or export information." *Final I&D Memo* at 8, ECF No. 18-5, P.R. 115. Commerce has recognized that, after the IPC expires or is fulfilled, Turkish companies "can no longer apply additional imports or exports to the DIIB." *Welded Line*

*Pipe Verification Report* at 17 n.13. Though Turkish Customs has three additional months from the expiration to "finalize the export quantities for each customs export declaration . . . used to close the DIIB before {a company} submits the formal application for closure to {the GOT}," the GOT may ultimately "take up to four years to formally approve the closed DIIBs." *Id.*

Having failed to eviscerate the drawback statute by modifying its calculations to allocate the adjustment over total production, rather than total exports, Commerce now attempts a new, similarly unlawful methodology to deny respondents the adjustment to which they are statutorily entitled. The Turkish drawback system does not require the GOT to reach a decision as to closure of a given IPC within a fixed time. The four-year time lag between application for closure and a final decision from the GOT makes it an unreasonable prerequisite for granting an drawback adjustment to Noksel in this case.

### 3.    Noksel Completed All Imports And Exports Under The Inward Processing Certificate

In denying Noksel's claimed duty drawback adjustment, Commerce noted that Noksel had failed to provide "documentation on the record indicating that the GOT closed the IPC at issue" and that, "{s}hort of certification from the GOT indicating that the IPC has been formally closed, the record does not demonstrate that Noksel is precluded from suspending its IPC application or modifying the application to add import or export information to the IPC." *Final I&D Memo* at 7-8, ECF No. 18-5, P.R. 115. Commerce's finding ignores record evidence demonstrating that "there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise" – satisfying the second prong of Commerce's two-prong test. *See Saha Thai*, 635 F.3d at 1340 (citation omitted); *Final I&D Memo* at 7.

The exemption from paying customs duties, VAT, and charges pursuant to the IPR drawback program in Turkey is conditional on the exportation of the products. *See* B-D QR at C-35, C.R. 15, P.R. 42. To ensure that there are sufficient imports and exports, participation in the IPR involves four key steps:

(1) *Issuance of the IPC* – The IPC is requested by the participant and issued by the GOT, which records the IPC with Turkish Customs. *See, e.g.*, *Rebar Trade Action Coal. v. United States*, No. 19-268, 2015 WL 7573326, at *3 (Ct. Int'l Trade, Nov. 23, 2015) ("To benefit from duty drawback, a firm must 'obtain a Domestic Processing Certificate/Authorization' (IPC)" (citation omitted));

(2) *Use of the IPC* – Participants make imports and exports under the issued IPC, which are recorded by Turkish Customs. *See, e.g.*, *Welded Line Pipe Verification Report* at 17 (noting that "the DIIB import and export information" is recorded in the "Turkish Customs online database").

(3) *Closing of the IPR* – When the import/ export allocation pursuant to an IPC is filled, the participant stops entering imports under that certificate and submits a completion report to the GOT, "closing out" the IPC. *See, e.g.,* B-D QR at C-35, C.R. 15, P.R. 42 ("Noksel must submit a completion report demonstrating the export of finished goods.").

(4) *Official Liquidation of the IPC* – The IPC is formally liquidated by the GOT issues, sometimes after a lag of up to 4 years. *See, e.g.*, *Welded Line Pipe Verification Report* at 17, n.13 ("Company officials stated that the {Turkey's Undersecretariat of Foreign Trade} can take up to four years to formally approve the closed DIIBs").

Here, Noksel "submit{ed} to the Customs authorities at the time of import a letter of guarantee or pledge of money covering the total of all duties and VAT that would otherwise be owed." B-D QR at C-35, C.R. 15, P.R. 42. Upon exportation, Noksel subsequently submitted "a

completion report demonstrating the export of finished goods." *Id.* Once the imports and exports

under its IPCs were completed, Noksel submitted an application to close the IPC to the Turkish

government. *Id.*

In its responses to Commerce, Noksel provided the realized import and export list of

IPCs used during the POR, as well as a copy of the IPCs under which exports were made during

the POR. *Id.* at Exhs. C-15, C-16, C.R. 15, 19, P.R. 42. As Noksel explained, the imports and

exports are made under the same IPC number, providing a linkage for the imports and exports

subject to the IPR, and Noksel certifies that imported inputs are used in the manufacture of the

exported merchandise in its closing application. *Id.* at C-37, C.R. 15, P.R. 42. The copy of the

IPC no. [       ] provided to Commerce lists the expiry dates for exports and imports as [

                              ]. *Id.* at Exh. C-16 (p. 5), C.R. 15, 19, P.R. 42. The fact that the IPC

expired during the POR highlights that imports and exports were not able to continue and the

IPC has been "closed out." *Id.* The closing ratio for IPC no. [       ] is [       ], further

confirming that Noksel has fulfilled its liabilities under the IPR by conservatively exporting

more than was required by the IPC. *See id.* at Exh. C-15, C.R. 15, P.R. 42; *see also* Noksel Case

Brief at 23, P.R. 109. Even if the GOT excludes a portion of Noksel's exports pursuant to the

liquidation process, which it has never done and is thus extremely unlikely, Noksel would still

meet the criteria for closure under IPC no. [       ] due to the [

       ]. B-D QR at Exh. C-15, C.R. 15, P.R. 42. In other words, even assuming, as Commerce

does, that Noksel's import-export ratio is subject to change, which it is not, the realized export

margin for IPC no. [       ] comfortably exceeds the reported yield ratios, ensuring that Noksel

still satisfies Commerce's criteria for a drawback adjustment. *See id.* at D-22, C.R. 19, P.R. 42.

The exclusion of some portion of Noksel's export would in fact increase Noksel's claimed

drawback adjustment.

16

Though the imports and exports under IPC no. [      ] have been completed and Noksel has "closed out" the expired IPC by submitting the completion report to the GOT, it is still awaiting final liquidation from the GOT. *Id.* In other words, Noksel has completed steps 1-3 above, but is still waiting official liquidation of the IPC from the Turkish government, a process that Commerce has acknowledged may take several years. *See Welded Line Pipe Verification Report* at 17, n. 13. Noksel has thus demonstrated that the IPC is closed for practical purposes in that the permissible volume of imports and exports under the IPC have been completed and the IPC is now expired. *See* Noksel Case Brief at 24, P.R. 109.

There is no evidence that Noksel has ever been denied a IPC closure where, as here, imports/exports under an IPC were fully satisfied, nor reason to question the reliability of import and export data under the control of Turkish Customs. In fact, Commerce has consistently found that the structure of the IPC is sufficient to ensure that participants satisfy Commerce's two-prong test – all IPC usage data is entered automatically from entry and exit documentation finalized by Turkish Customs and outside the control of participants, who can only download the data, not change it. *See Welded Line Pipe from Turkey* at 7, 11; *Rebar from Turkey* at 13-17; *OCTG from Turkey* at 16. The imports and exports in the IPCs reflect the *actual* imports and exports by Noksel, as formalized by Turkish Customs. The download of IPCs is fully verifiable, and Commerce has, in fact, verified it many times. *See, e.g.*, *Welded Line Pipe Verification Report* at 17.

In prior cases, Commerce has accepted evidence of "closure" similar to that submitted by Noksel for purposes of granting respondents' claimed drawback adjustment. For example, in *Rebar from Turkey*, Commerce obtained screen shots of from the "Turkish Customs on-line database" to confirm that the "inward processing certificates used during the POI by {respondent} {we}re closed." Memorandum from J. Lawska and G. McMahon to The File, re:

17

Verification of the Sales Response of Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. (Icdas) in

the 2012-13 Investigation of Steel Concrete Reinforcing Bar from Turkey at 22 (Jun. 27, 2014)

(ACCESS Barcode 3212338-01). At verification in *OCTG*, Commerce similarly noted that

Turkish "customs updates the actual quantities and percentages of each tariff number category,

tracks the 'fulfillment' of the original projected quantity for each tariff number category" which

enables respondents and Commerce "to view 'snap shots' of the DIIBs fulfillment status to

ensure it is on track for the import-to-export requirements to claim exemption on claimed

imported goods." Memorandum from B. Hansen to The File, re: Verification of the Sales

Response of Çayirova Boru Sanayi ve Ticaret A.Ş. and Yücel Boru Ithalat-Ihracat ve Pazarlama

A.Ş., Ltd., in the Less-Than-Fair-Value Investigation of Certain Oil Country Tubular Goods from

the Republic of Turkey (A-489-816), at 13 (Mar. 31, 2014) (ACCESS Barcode 3193110-01).

        Though Noksel was not afforded the same opportunity for on-site verification due to

travel restrictions resulting from the COVID-19 pandemic,[2] it provided similar fulfilment

documentation from Turkish customs demonstrating that imports and exports under IPC no.

[      ] have been completed (and in fact exceeded). *See* B-D QR at C-36 and Exhibits C-15 –

C-16, C.R. 15, 19, P.R. 42. The record evidence provided demonstrates that IPC no. [      ]

expired and was closed during the POR, prohibiting Noksel from adding additional import or

export information. Commerce accepted Noksel's reporting, as evidenced by the fact that they

did not conduct an on-site or virtual verification, nor ask a single question regarding the duty

---

[2] As the CIT has affirmed, physical meetings between company and Commerce officials enable
Commerce to make "credibility determinations in person during the verification procedure,"
which frequently support "Commerce's determination to accept the new information provided,"
such as the IPCs at issue here. *See, e.g., Jinko Solar Co. v. United States*, 229 F. Supp. 3d 1333,
1358 (Ct. Int'l Trade 2017), *aff'd*, 961 F.3d 1177 (Fed. Cir. 2020). These same credibility
determinations cannot be made "based on a cold paper record," as Noksel, by no fault of its own,
has in this review. *Id*. (quoting *De Samo {sic} v. Dep't of Com.*, 761 F.2d 657, 661 (Fed. Cir.
1985)).

drawback adjustment and the status of IPC no. [      ] in the eight supplemental questionnaires
issued to Noksel. Commerce's failure to grant Noksel the full duty drawback adjustment to
which it was entitled is therefore not supported by record evidence.

**B.    Section 232 Tariffs Are "Special" Tariffs That Should Not Be Deducted From Export Price**

Certain LWRPT imported by Noksel during the POR was subject to additional tariffs
imposed pursuant Section 232 of the Trade Expansion Act of 1962 ("Section 232"). 19 U.S.C.
§ 1862; *see also* Supp. C QR at Exh. S3-3 (App. V), C.R. 92, P.R. 61. Section 232 tariffs are
special tariffs imposed to remedy threats to national security – in this case a threat to the viability
of the U.S. steel industry. *See Publication of a Report on the Effect of Imports of Steel on the
National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of
1962, as Amended*, 85 Fed. Reg. 40202 (Dep't Commerce Jul. 6, 2020) ("*Section 232 Report*").

In its *Final AD Results*, Commerce concluded that "{s}ubtracting section 232 duties from
U.S. prices is consistent with section 772(c)(2)(A) of the Act." *Final I&D Memo* at 5, ECF No.
18-5, P.R. 115. However, Commerce's treatment of the Section 232 tariffs as regular U.S. import
duties, rather than special tariffs is unsupported by substantial evidence. Commerce's deduction
of the Section 232 tariffs from U.S. price, which effectively increases antidumping margins
solely on the basis of the special tariffs imposed, is contrary to Commerce's longstanding policy
of excluding adjustments for special tariffs, such as safeguards, antidumping, and countervailing
("CVD") duties, which has been consistently upheld by the reviewing courts, and unlawfully
results in a double remedy. *See, e.g.*, *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1363
(Fed. Cir. 2007).The Court previously considered treatment of Section 232 tariffs in *Borusan
Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, and found that, "{w}hile Section 232
duties are 'special' in some sense . . . they are still import duties" and the "the reasoning provided

19

by Commerce differentiating its treatment of Section 232 and Section 201 duties is {not} so lacking in merit that the court must say it is arbitrary." 494 F. Supp. 3d 1365, 1375-76 (Ct. Int'l Trade 2021), *appeal docketed*, Fed. Cir. No. 2021-2240. For the reasons that follow, the Court should reconsider its ruling and find that the special Section 232 tariffs are distinguishable from ordinary U.S. import duties and may not be deducted from EP and CEP.

### 1.    The Statute Does Not Contemplate Adjustments For "Special" Tariffs

Commerce calculates a margin of dumping based on a comparison between the price of the merchandise sold in the home market, *i.e.* the "normal value," and the price of merchandise sold in the United States. 19 U.S.C. § 1673. The export ("EP") or constructed export ("CEP") price in this comparison refers to ex-factory prices, which are adjusted based on specific factors outlined in the statute. *Id.* at §§ 1677a(a)-(b). Specifically, Commerce is statutorily mandated to, amongst other things, reduce the price used to establish both EP and CEP by:

> {T}he amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and *United States import duties*, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."

*Id.* § 1677a(c)(2)(A) (emphasis added). The statute does not define "United States import duties" and the reviewing courts have found that it is an "ambiguous phrase in the statute." *Borusan*, 494 F. Supp. 3d at 1372 (citing *Wheatland Tube*, 495 F.3d at 1359–60). Relying on the legislative history, Commerce has determined that the phrase "United States import duties" does not cover all U.S. customs duties imposed on imported merchandise, but rather excludes special or remedial remedies, including safeguards (Section 201) and trade remedies (AD/CVD), which should not be treated as "United States import duties" for purposes of calculating gross U.S. price. *Stainless Steel Wire Rod from the Republic of Korea*, 69 Fed. Reg. 19153, 19159 (Dep't Commerce Apr. 12, 2004) (final AD results) ("*SSWR Korea*"); *see also Certain Cold-Rolled and*

20

*Corrosion-Resistant Carbon Steel Flat Products From Korea*, 62 Fed. Reg. 18404, 18421 (Dep't Commerce Apr. 15, 1997) (final AD results) (distinguishing between "special" dumping duties and "ordinary" customs duties, and determining that "United States import duties" are limited to ordinary duties); *Borusan*, 494 F. Supp. 3d at 1372 ("Commerce relied on the legislative history of the Antidumping Act of 1921 to conclude there is a distinction between '*special* dumping duties' and '*normal* customs duties' (also referred to as 'United States import duties').").

For example, in *SSWR Korea*, Commerce specifically issued an interpretation of the statutory term "United States import duties" following formal notice and comment procedures. *SSWR Korea* at 19157-61. Upon examination of the legislative history of the Antidumping Act of 1921, from which section 1677a(c)(2)(A) derives, Commerce concluded that the term United Sates import duties was intended to apply only to regular customs duties and did not cover special tariffs such as antidumping duties. *SSWR Korea* at 19159; *see also Borusan*, 494 F. Supp. 3d at 1372 ("Congress intended that some duties implementing trade remedies, such as AD duties, are special duties to be distinguished from the normal duties that should be deducted from EP and CEP.").[3] Reasoning that Section 201 safeguards are remedial tariffs that are temporary in nature, the deduction of which would result in a double remedy by imposing the Section 201 tariffs a second time in the form of a dollar-for-dollar increase in antidumping duties, Commerce explicitly found that safeguards were special tariffs not to be deducted from U.S. price under section 1677a(c)(2)(A). *SSWR Korea* at 19159-61.

---

[3] Further support for the distinction is found in the Senate report regarding the Antidumping Act of 1921, which consistently refers to antidumping duties as "special dumping duties," while referring to ordinary customs duties as "United States import duties." *See* S. Rep. No. 16, 67th Cong., 1st Sess., at 4 (1921).

This Court has recognized Commerce's distinction between special dumping tariffs and ordinary customs duties on several occasions,[4] and the U.S. Court of Appeals for the Federal Circuit ("CAFC") has affirmed that this interpretation of "United States import duties" as not including special tariffs is reasonable. *Wheatland Tube*, 495 F.3d at 1365-66. In *Wheatland Tube*, the CAFC concluded that Congress did not intend all duties to be considered "United States import duties" and that Section 201 safeguards were properly considered special tariffs that should not be deducted from EP and CEP. *Id.* at 1361. Specifically, the CAFC found that:

> Like antidumping duties, Commerce found that § 201 safeguard duties are remedial duties that provide relief from the adverse effects of imports. Antidumping duties aim to remedy sales by a foreign exporter in the U.S. market at less than fair value. Similarly, § 201 safeguard duties aim to remedy the injurious effects on the U.S. industry of a significant surge in imports. Normal customs duties, in contrast, have no remedial purpose. They are imposed regardless of whether the U.S. industry is suffering adverse effects as a result of imports.

*Id.* at 1362 (citations omitted). The court noted with approval Commerce's observation that "antidumping duties and § 201 safeguard duties, unlike normal customs duties, are imposed based on almost identical findings that a domestic industry is being injured or threatened with injury due to the imported merchandise." *Id.* "Given the similarities between antidumping duties and § 201 safeguard duties," the CAFC held:

> {I}t was reasonable for Commerce to conclude that § 201 safeguard duties are more like antidumping duties "in purpose and function than they are like ordinary customs duties." Because of Commerce's finding that § 201 safeguard duties are like antidumping duties for purposes of § 1677a(c)(2)(A), it was reasonable for Commerce to treat § 201 safeguard duties as antidumping duties and not deduct them from the EP when calculating dumping margin.

---

[4] *See, e.g.*, *Borusan*, 494 F. Supp. 3d at 1372; *Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213, 1220 (Ct. Int'l Trade 1998); *Bethlehem Steel Corp. v. United States*, 27 F. Supp. 2d 201, 208 (Ct. Int'l Trade 1998); *U.S. Steel Grp. v. United States*, 15 F. Supp. 2d 892, 898–900 (Ct. Int'l Trade 1998), *rev'd on other grounds*, 225 F.3d 1284 (Fed. Cir. 2000); *AK Steel Corp. v. United States*, 988 F. Supp. 594, 608 (Ct. Int'l Trade 1997), *aff'd* 215 F.3d 1342 (Fed. Cir. 1999); *Fed.-Mogul Corp. v. United States*, 813 F. Supp. 856, 872 (Ct. Int'l Trade 1993).

*Id.* (citations omitted). Finally, the court affirmed as reasonable Commerce's finding that "if § 201 safeguard duties were included as 'United States import duties' for purposes of determining the EP pursuant to § 1677a(c)(2)(A), then in certain situations Commerce would improperly collect § 201 safeguard duties twice." *Id.*

Consistent with CAFC precedent, Commerce has interpreted 19 U.S.C. § 1677a(c)(2)(A) to provide for the deduction only of regular customs duties and not special remedial tariffs. Because special tariffs are distinct from ordinary customs duties, their deduction from U.S. price in calculating antidumping margins is not contemplated by the statute. 19 U.S.C. § 1677a(c)(2)(A). Where, as here, Commerce has "establishe{d} a course of action . . . {it} is obliged to follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary." *NMB Sing. Ltd.*, 557 F.3d at 1328. In finding the Section 232 tariffs to be ordinary customs duties, Commerce has departed from its consistent interpretation of the statute without adequately explaining its reasons for diverging from it. As Commerce has repeatedly found, and the CAFC has affirmed, 19 U.S.C. § 1677a(c)(2)(A) provides for the deduction only of regular customs duties and not special tariffs. Section 232 tariffs are remedial, temporary, and indistinguishable from the antidumping and Section 201 safeguards that Commerce and the reviewing courts have consistently found to be non-deductible United States import duties.

## 2.    The Section 232 Tariffs On Steel Imports Are "Special" Tariffs

In the *Final AD Results*, Commerce found that the "section 232 duties are analogous to U.S. import duties," are "treated as any other duties," and "are not special remedial duties akin to antidumping or section 201 duties." *Final I&D Memo* at 4, ECF No. 18-5, P.R. 115. However, Commerce has itself "acknowledge{d} the extraordinary nature of 232 duties," in the absence of which the U.S. "industry will continue to decline{.}" *See* Memorandum from C. Showers to P. Lee Smith, re: Issues and Decision Memorandum for the Final Normal Value Calculations to be

Effective from Release of the Final Normal Values through June 30, 2019, under the Agreement

Suspending the Antidumping Duty Investigation on Certain Oil Country Tubular Goods from

Ukraine (A-823-815), at 7 (Feb. 15, 2019) (ACCESS Barcode 3793809-01). It is clear that

Commerce and the Administration contemplated the Section 232 tariffs on steel as an alternate

means to remedy injury and/or threat of injury to a domestic industry, consistent with the

underlying purpose of other special tariffs. Moreover, similar to Section 201 safeguards and

antidumping duties, the Section 232 tariffs are remedial, temporary, and were implemented under

Congress's delegation of authority, providing additional support for their treatment as special

tariffs in dumping calculations.

a.      **Section 232 Tariffs Are Remedial**

In finding that Section 201 safeguards are properly characterized as special tariffs,

Commerce and the CAFC found it significant that Section 201 safeguards, like antidumping

duties, are remedial in nature. *SSWR Korea*, 69 Fed. Reg. at 19159; *Wheatland Tube*, 495 F.3d at

1362. By contrast, ordinary customs duties, which are imposed "regardless of whether the U.S.

industry is suffering adverse effects as a result of imports," have "no remedial purpose."

*Wheatland Tube*, 495 F.3d at 1362.

In the *Final AD Results*, Commerce found that the Section 232 tariffs "are not special

remedial duties" because they "focus on threats to national security," rather than "provid{ing}

relief to U.S. companies from imports that threaten or injure their businesses." *Final I&D Memo*

at 4, ECF No. 18-5, P.R. 115. This is a distinction without a difference. Contrary to Commerce's

claims, Section 232 tariffs, as well as Section 201 and antidumping duties, "are all directed at the

same overarching purposes – protecting the bottom line of domestic producers." *Id.* (quoting

*Wheatland Tube*, 495 F.3d at 1364). Though Commerce reasons that the 232 tariffs are

specifically tailored to prevent "leaving the United States at risk of becoming reliant on foreign

producers of steel to meet {its} national security needs," *Final I&D Memo* at 4, its conclusion

ignores the text and operation of the Section 232 statute, as well as the articulated rationale of

Commerce and the President in implementing the tariffs.

Like other special tariffs, the Section 232 tariffs are imposed "in response to trade

practices in specific instances in which the welfare of key domestic industries is impacted by

foreign trade." *Borusan*, 494 F. Supp. 3d at 1374. Unlike import duties imposed in the normal

course of trade, Section 201, antidumping and countervailing, and Section 232 tariffs may only

be imposed following investigations establishing the existence of particular conditions. *See* 19

U.S.C. §§ 2251, 1671, 1673, 1862. Factors considered by the International Trade Commission

("ITC") in antidumping and Section 201 cases are similar to those considered pursuant to the

Section 232 statute, which directs Commerce and the President to consider, amongst other

things, "the impact of foreign competition on the economic welfare of individual domestic

industries;" "any substantial unemployment . . . loss of skills or investment;" and "other serious

effects resulting from the displacement of any domestic products by excessive imports." *Id.*

§ 1862(d). In assessing material injury in antidumping investigations, the ITC likewise looks to

conditions of competition in the U.S. market, U.S. producers' financial experience and

employment levels, and other effects related to displacement from imports, including U.S.

production, shipments, apparent consumption, market shares, and pricing data. *Id.* § 1677(7)(C).

In Section 201 proceedings, the Commission considers whether "an article is being imported into

the United States in such increased quantities as to be a substantial cause of serious injury, or the

threat thereof, to the domestic industry." *Id.* § 2251(a). Under each provision, the amount of

tariffs imposed is related directly to the extent of the particular conditions determined to exist

with regards to the domestic industry. *See id.* §§ 1862(d), 1677(7)(C), 2251(a). In other words,

the remedy provided by these measures "is the same—the imposition of duties on foreign

exports, which is intended to raise the United States market price for the subject merchandise and thereby increase sales and profits of domestic producers." *Wheatland Tube*, 495 F.3d at 1364.

While, as Commerce notes, the Section 232 tariffs "focus on threats to national security," *Final I&D Memo* at 4, the remedial purpose of "adjust{ing}" imports to safeguard national security does not make the Section 232 tariffs more like ordinary customs duties than other special tariffs. To the contrary, comparing the Section 232 tariffs with special tariffs like Section 201 and AD/CVD duties reveals a nearly identical underlying purpose—protection of the domestic industry via adjustment of imports. Indeed, like Section 232, each of the special tariff provisions require an additional finding beyond injury to domestic producers, *i.e.* a surge in imports (Section 201), that imports are sold at below fair value (AD), or that imports causing injury benefit from government subsidies (CVD). These additional factors do not obscure the same primary focus of each special measure to protect the economic welfare of U.S. domestic industries. *See* 19 U.S.C. §§ 2251-2252, 1673, 1671; *see also Wheatland Tube*, 495 F.3d at 1363-64 ("While all of these three types of duties remedy 'distinct harms' they are all directed at the same overarching purpose—protecting the bottom line of domestic producers.").

The Section 232 statue is likewise broadly focused on the economic impact of imports on domestic producers and industries, as evidenced by Commerce's investigation, which considered, amongst other things, the "loss of domestic opportunities" and the "financial distress" of the domestic industry in the face of "{r}ising levels of imports." *Section 232 Report* at 40216-18. Commerce's analysis included many of the same factors weighed by the ITC in determining injury in Section 201 and antidumping cases, including the profit margins, net income, revenue, capacity utilization rates, and capital expenditures of the domestic industry. *Id.* As in those cases, Commerce's recommendation "that the President take immediate action by adjusting the level of imports" was based on its conclusion that "the present quantities and

circumstance of steel imports are 'weakening our internal economy,'" most notably the "financial viability" of U.S. steel producers. *Id.* at 40204, 40225-26.

Commerce's *Section 232 Report* to the President highlights not only the special nature of the tariffs, but also their connection to antidumping orders, which are repeatedly referenced throughout the report. *See Section 232 Report* at 40204, 40210-11, and 40216. Indeed, then U.S. Secretary of Commerce Wilbur Ross emphasized that Commerce's recommendations were "intended to increase domestic steel production" to "achieve long-term economic viability through increased production," a remedial purpose comparable to that of antidumping and Section 201 tariffs. *See, e.g.*, Noksel Case Brief at 13, P.R. 109 (quoting Press Release, Secretary Ross Releases Steel and Aluminum 232 Reports in Coordination with White House (Feb. 16, 2018)).

In implementing the 25 percent tariffs, the President similarly emphasized that, as with other special tariffs, the Section 232 tariffs were being imposed "in response to specific requests from affected domestic parties" for the explicit purpose of protecting "domestic steel producers" and preventing "further closures of domestic steel production facilities. *Proclamation 9705 of March 8, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11625 (Mar. 15, 2018) ("*Proclamation 9705*"). *Proclamation 9705*, which implemented the tariffs, explained that the "tariff is necessary and appropriate to address the threat that imports of steel articles" due to Commerce's findings that those imports are "weakening our internal economy, resulting in the persistent threat of further closures of domestic steel production facilities." *Id.* at 11625. In other words, the Section 232 tariffs were recommended and implemented to serve the remedial purpose of providing relief to the domestic steel industry from the adverse effects of imports.

The remedial effect of the Section 232 tariffs is further illustrated by the varied forms of relief imposed by the President following Commerce's initial recommendation and report. While

imports of steel products from Turkey remain subject to Section 232 tariffs, imports from other countries, including Argentina, Australia, Brazil, Canada, Mexico and South Korea, are not. *See* Noksel Case Brief at 13. The President exercised his discretion to determine the appropriate remedy to protect the domestic steel industry and, in certain instances, implemented quotas or alternative means to address steel imports. *See, e.g.*, *Proclamation 9740 of April 30, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 20683, 20684 (May 7, 2018) ("*Proclamation 9740*"); *Proclamation 9759 of May 31, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 25857, 25858 (Jun. 5, 2018) ("*Proclamation 9759*"). This tailored approach highlights the President's use of the tariffs as means to remedy specific injury from steel imports.

As the Court recently noted, "the purpose of Section 232 duties is . . . remedial in a broad sense." *Borusan*, 494 F. Supp. 3d at 1374. That is especially true, where, as here, Commerce and the President viewed the Section 232 tariffs as an alternate means to remedy injury to a domestic industry, equivalent to special tariffs like antidumping and Section 201 tariffs. Indeed, both the Court and Commerce have recognized the Section 232 tariffs as "remedial" outside the context of antidumping calculations. *Am. Inst. for Int'l Steel, Inc. v. United States,* 376 F. Supp. 3d 1335, 1343 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed. Cir. 2020), *cert denied,* 139 S. Ct. 2748 (2020); *Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46026, 46054-55 (Dep't Commerce Sept. 11, 2018) (interim final rule) ("*Submission of Exclusion Requests and Objections*") (noting that "the President is implementing these remedial actions" and that "any delay in implementing these remedial actions (as described Proclamations 9704 and 9705 of March 8, 2018) would further undermine U.S. national security interests"); *Requirements for Submissions Requesting Exclusions From the Remedies Instituted in Presidential Proclamations Adjusting Imports of Steel Into the United*

*States and Adjusting Imports of Aluminum Into the United States; and the Filing of Objections to*

*Submitted Exclusion Requests for Steel and Aluminum*, 83 Fed. Reg. 12106, 12109 (Dep't

Commerce Mar. 19, 2018) (interim final rule). Given this reality, Commerce's claim that that the

Section 232 tariffs are now "separate and distinct" from other special, remedial safeguard

provisions *is* "completely bereft of logic." *Final I&D Memo* at 5, ECF No. 18-5, P.R. 115;

*Borusan*, 494 F. Supp. 3d at 1374.

Because remedying the impact of the imports on the economic welfare of U.S. domestic

industries is the primary focus of the Section 232 statute, as with both antidumping and Section

201 safeguards, the Court should find that the Section 232 tariffs have a remedial purpose.

b.    **Section 232 Tariffs Are Temporary**

In *Wheatland Tube*, the CAFC agreed with Commerce that Section 201 tariffs, which are

temporary in nature, are distinguishable from ordinary custom duties, which have no termination

provision and are permanent unless modified by Congress. *Wheatland Tube*, 495 F.3d at 1362.

Like other special tariffs, the Section 232 tariffs are temporary in nature and do not require

congressional action to be modified.

The Section 232 statute provides authority for the President to determine the "nature and

duration of the action" taken to adjust imports, 19 U.S.C. § 1862(c)(1)(A)(ii), which the CAFC

has found to include "coverage of a plan implemented over time, including options for

contingency-dependent choices." *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1321

(Fed. Cir. 2021). Even though Section 232 tariffs do not have a fixed termination date, this broad

"authority to pursue a continuing course of action, with adjustments (including additional

impositions) adopted over time," highlights the temporary nature of the tariffs, which can be

modified or suspended by the President at any time. *Transpacific Steel*, 4 F.4th at 1324; *see also*

*Borusan*, 494 F. Supp. 3d at 1374-75 ("Section 232 duties may be terminated any time the President believes their purpose has ended." *Id.* at 1374).

Here, the Section 232 tariffs were only found to be "necessary and appropriate" under the "current circumstances." *Proclamation 9705*, at 11626. The proclamation implementing the Section 232 tariffs expressly directs the Secretary of Commerce to continue to monitor imports of steel articles and to periodically review the status to inform the President of any circumstances that might require modifications or circumstances that might indicate that the tariffs would no longer be necessary. *Id.* at 11628.

The Section 232 tariffs have been subject to repeated change and adjustment during their temporary implementation. Noksel Case Brief at 15. Since the publication of *Proclamation 9705*, the President has modified the Section 232 tariffs on steel articles on multiple occasions, including by changing the number of countries covered, by raising and then lowering the applicable duty rates, and by expanding the scope to include certain downstream derivative products. *See Proclamation 9711 of March 22, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 13361 (Mar. 28, 2018); *Proclamation 9740*, at 20683; *Proclamation 9759*, at 25857; *Proclamation 9894 of May 19, 2019: Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23987 (May 23, 2019); *Proclamation 9980 of January 24, 2020: Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles Into the United States*, 85 Fed. Reg. 5281 (Jan. 29, 2020). As with Section 201 safeguards, specific products can also be excluded from the Section 232 tariffs for a one-year period of time. *Compare Submissions of Exclusion Requests and Objections* at 46026 (exclusion request procedures for Section 232 tariffs), *with Procedures To Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6670 (USTR Feb. 14, 2018) (exclusion request procedures for Section 201 tariffs).

30

Finally, as detailed below, the fact that the Section 232 tariffs are temporary is further evidenced by their placement in Chapter 99 of the Harmonized Tariff Schedule of the United States ("HTSUS"). *See Proclamation 9740*, at 20687 ("To Modify Certain Provisions of Chapter 99"). When Chapter 99 was created, the ITC issued a report explaining that "Chapter 99 is designed for the incorporation of legislation, proclamations, and administrative actions, which, because of their *temporary* or collateral nature, are not assimilated into the main body of the tariff schedule." *Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature Structure of the Harmonized System*, Inv. No. 332-131, USITC Pub. 1400, at 16 n.1, 28 (June 1983) (emphasis added). Thus, from the outset, Congress and the ITC envisioned Chapter 99 as a location for temporary tariffs, separate and distinguishable from the ordinary Customs duties included in Chapters 1-97 of the HTSUS.

This Court has previously found Section 232 tariffs to be "temporary in that no Congressional action is needed to end them," which is "a clear difference from normal customs duties, which are enacted by Congress." *Borusan*, 494 F. Supp. 3d at 1374. This "lack of permanenc{y}" aligns the Section 232 tariffs more closely with other special tariffs than with ordinary customs duties. *Id.* at 1375. The Court should thus continue to find that Section 232 tariffs, like antidumping and Section 201 safeguards, are temporary in nature.

c.    **Section 232 Tariffs Were Implemented Under Congress's Specific Delegation of Authority to the Executive**

The special nature of Section 232 tariffs is further emphasized by constitutional principles, which "vests in Congress the sole authority to impose tariffs" but allows the President to impose special tariffs such as under the Trade Expansion Act of 1962. S. Rep. No. 90-1385, pt. 2, at 13 (1968). Specifically, the U.S. Constitution provides that Congress is responsible for levying and collecting taxes and duties. U.S. Const. art. I, § 8. The reviewing courts have

31

interpreted this authority such that "{t}he general power to modify the HTSUS belongs exclusively to Congress," with the President given by Congress "limited authority to make modifications to the HTSUS based solely within the framework of statutorily defined objectives." *Forest Lab'ys, Inc. v. United States*, 403 F. Supp. 2d 1348, 1352 (Ct. Int'l Trade 2005), *aff'd*, 476 F.3d 877 (Fed. Cir. 2007).

The ability of the Executive Branch to impose tariffs pursuant to Section 232 thus flows directly from an express delegation of authority through legislation from Congress. U.S. Const. art. I, § 8. This delegation of limited authority, which authorizes the President to apply special tariffs only where certain conditions are found to exist, is consistent with antidumping and Section 201 tariffs. *See* 19 U.S.C. § 1862. In each case, the Executive Branch may implement special tariffs for the remedial purposes specified in the statute. This is in stark contrast to ordinary U.S. import duties, which are determined and imposed by Congress pursuant to the United States' World Trade Organization ("WTO") obligations. While Congress has delegated to the Executive Branch the limited authority to apply special tariffs in certain circumstances, Congress has never delegated to the President any general or blanket authority to modify duty rates or to set ordinary customs duties. This power lies solely with Congress. Any authority delegated by Congress to the President to impose tariffs, as it has done here, is by definition a special duty implemented to fulfill specific statutory objectives.[5]

Here, Congress delegated its exclusive authority to the Executive Branch, allowing it to "determine the nature and duration of the action that, in the judgment of the President, must be

---

[5] Pursuant to 19 U.S.C. § 1862(c)(1)(A)(ii), (b)(3)(A) Congress delegated its authority to the President to "determine the nature and duration of the action that . . . must be taken to adjust the imports of the {imported} article and its derivatives" if the Secretary of Commerce finds that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security."

taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c). Congress's delegation is limited to "safeguarding national security," including the "economic welfare of individual domestic industries." *Id.* at § 1862(d). This delegation is distinguishable from ordinary customs duties set by Congress, and indicates that these special tariffs imposed by the Executive Branch should not be "treated as any other duties." *Final I&D Memo* at 4, ECF No. 18-5, P.R. 115. Indeed, the antidumping, Section 201, and Section 232 laws each involve a delegation of legislative authority to the Executive Branch to investigate the consequences of increased imports and the resulting economic harm. *Wheatland Tube*, 495 F.3d at 1363-64.

This legal distinction is carried through to the classification of duties in the HTSUS. Though Commerce cites the Annex to *Proclamation 9740*, which does not "expressly provide that section 232 duties receive different treatment," as evidence of the President's intent that the 232 tariffs be treated as U.S. import duties, *Final I&D Memo* at 4 and n.14, the placement of the modification in HTSUS Chapter 99 further highlights its special nature. *See Proclamation 9740*, at 20687. Chapters 1 to 97 of the HTSUS are used for ordinary customs duties, whereas Chapter 99 is specifically reserved for special tariffs imposed under "Temporary Legislation, Temporary Modifications Established Pursuant to Trade Legislation, {and} Additional Import Restrictions{.}" HTSUS, Ch. 99.

The HTSUS designation is not simply a matter of organization or nomenclature, but rather, reflects the critical legal distinction between regular customs duties imposed by Congress, and special duties imposed by the Executive Branch. Even Commerce has acknowledged that Chapter 99 "is reserved for special or temporary duties" and regarded the designation of Section 201 tariffs in Chapter 99 as significant to its distinction of those tariffs from ordinary customs duties. *SSWR Korea*, 69 Fed. Reg. at 19160. Having previously recognized placement in Chapter

33

99 as a signifier that tariffs are special, it is unreasonable for Commerce to take a different

position with respect to the Section 232 tariffs in this case without further explanation.

Consistent with both Congress's delegated authority and the history of Chapter 99 of the

HTSUS, the Court should find the Section 232 tariffs to be special tariffs.

### 3. There Is A Clear Interplay Between Section 232 Tariffs and Antidumping Duties Such That Deducting Section 232 Tariffs Imposes A Double Remedy

The reviewing courts have found that the deduction of special tariffs from U.S. price in

the calculation of dumping margins results in double-counting. *See, e.g.*, *AK Steel Corp. v.*

*United States*, 988 F. Supp. at 607 (treating remedial tariffs as costs "would create the same

double-counting issue Commerce is seeking to avoid in its refusal to consider countervailing and

antidumping duties to be U.S. import duties" *Id.* at 608 n.12). As the CAFC confirmed, because

safeguards "may reduce or eliminate the injury that is required for an antidumping duty to

continue and because deducting . . . safeguard duties from the EP may create an artificial

dumping margin," their deduction from the calculation of dumping margins would result in the

punitive collection of additional duties in contravention of the statute. *Wheatland Tube*, 495 F.3d

at 1365. Indeed, "{t}o assess both a safeguard duty and an antidumping duty on the same

imports without regard to the safeguard duty, would be to remedy substantially overlapping

injuries twice." *Id.*

In its prior review of the Section 232 tariffs, the Court's decision turned on the extent of

the "statutory interplay" between Section 232 and antidumping duties, *i.e.* whether Section 232

tariffs are "related to and complimentary to antidumping duties." *Borusan*, 494 F. Supp. 3d at

1375. In its *Final AD Results*, Commerce claimed that there was no such "overlap" because the

Section 232 and antidumping duties "do not provide multiple remedies for the same situation."

*Final I&D Memo* at 5, ECF No. 18-5, P.R. 115. Contrary to Commerce's claims that "the

function of antidumping duties and section 232 duties are separate and distinct," *id.*, the President and Commerce have frequently indicated that the Section 232 tariffs were contemplated as an alternative to other special trade remedies, most notably antidumping duties. For example, in its Report to the President, Commerce noted that "{d}espite efforts to level the playing field through AD/CVD orders, there are numerous examples of U.S. steel producers being unable to fairly compete with foreign suppliers." *Section 232 Report* at 40216. Commerce clearly viewed the Section 232 tariffs as commensurate with other special provisions, stating that "{s}maller steel manufacturers are financially unable to afford {AD/CVD} cases, or are hesitant to file cases in light of possible market entry retaliation in foreign markets for finished steel products." *Id.* at 40211.

The CAFC's finding in *Wheatland Tube* that "deducting the 201 duties from U.S. prices effectively would collect the 201 duties twice-first as 201 duties, and a second time as an increase in that dumping margin," *Wheatland Tube*, 495 F.3d at 1363 (citation omitted), thus applies with equal force to Commerce's deduction of Section 232 tariffs in this proceeding. To the extent that there is any preexisting dumping margin, Commerce's methodology results in a dollar-for-dollar increase in that margin equal to the amount of the Section 232 duty; if there is no preexisting dumping margin, Commerce's methodology would create one. This result is contrary both to the remedial purpose of the antidumping statue, as well as Commerce's obligation to calculate dumping margins "as accurately as possible." *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

Because certain countries are subject to the Section 232 tariffs, while other have been excluded or assigned alternate remedies like quotas, Commerce's methodology, which does not include deductions in the case of quotas or other types of adjustments, also treats parties disparately in violation of its position that consistency of agency action is a "substantial and

legitimate" concern. *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F. Supp. 3d

1317, 1340 n.113 (Ct. Int'l Trade 2014); *see, e.g.*, *Certain Hot-Rolled Steel Flat Products From

the Republic of Korea*, 84 Fed. Reg. 68407 (Dep't of Commerce Dec. 16, 2019) (prelim. AD

results & determ. of no shipments; 2017-2018), and accompanying Decision Memorandum;

*Certain Hot-Rolled Steel Flat Products from Australia*, 84 Fed. Reg. 68876 (Dep't of

Commerce Dec. 17, 2019) (prelim. results 2017-2018), and accompanying Issues and Decision

Memorandum; *see also* Noksel Case Brief at 13-14.

   Commerce's attempts to mask the double remedy inherent in its methodology by citing to

a statement in the Annex to *Proclamation 9740* that "{a}ll anti-dumping or countervailing duties,

or other duties and charges applicable to such goods shall continue to be imposed, except as may

be expressly provided herein" is unavailing. *Final I&D Memo* at 4 n.14 (citing *Proclamation

9740*, at 20687), ECF No. 18-5, P.R. 115. The issue is not whether antidumping duties should

continue to apply to steel imports like LWRPT, but rather whether Commerce should be

permitted to collect Section 232 tariffs a second time in the form of an increased antidumping

margin based on their collection. Commerce's rationale does not confirm that Section 232 tariffs

are to be treated as regular customs duties, nor resolve the direct conflict between its

methodology and the CAFC's determination in *Wheatland Tube*. Contrary to the Court's finding

in *Borusan*, there are no "crucial differences" between Section 201 and Section 232 justifying

disparate treatment by Commerce. *Borusan*, 494 F. Supp. 3d at 1376. Both Section 201 and

Section 232 tariffs are special tariffs, more akin to antidumping duties than to ordinary customs

duties. *See Wheatland Tube*, 495 F.3d at 1362 (finding Section 201 duties to be special duties

because "they are more like AD {antidumping duties} in purpose and function than they are like

ordinary customs duties" (citation omitted)).

Because the purpose and function of both Section 232 tariffs and antidumping duties is to remedy injury to a domestic industry, deduction of the Section 232 tariffs in the dumping calculation presents the same "unique circularity issue," *Borusan*, 494 F. Supp. 3d at 1373, identified by the CAFC in *Wheatland Tube*.

### C.   Any Deduction Should Be Limited to the 25% Tariffs Assessed Pursuant to Presidential *Proclamation 9705*

As detailed above, Section 232 tariffs are indistinguishable from the antidumping duties and the Section 201 safeguards Commerce has consistently found to be non-deductible United States import duties. As was true of those special tariffs, Section 232 tariffs cannot properly be considered regular customs duties and should not be deducted from U.S. price. Though Noksel maintains that *no* Section 232 tariffs should be deducted from Commerce's antidumping calculations, any contemplated deduction should not exceed the standard 25 percent rate of the Section 232 tariffs applicable to all countries.

During the POR, the President increased the Section 232 tariffs on steel imports from Turkey, including LWRPT, to 50 percent in August 2018, then decreased the tariffs back to 25 percent nine months later in May 2019. *See Proclamation 9772 of August 10, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 40429 (Aug. 15, 2018) ("*Proclamation 9772*"); *Proclamation 9886 of May 16, 2019: Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23421 (May 21, 2019) ("*Proclamation 9886*"). During this period, Noksel was forced to pay tariffs of 50 percent on imports of LWRPT to the United States, including for a shipment that was already in route to the United States when the tariff rate was increased. *See* Supp. A-D QR at S7-12, Exh. S7-7, C.R. 124, P.R. 98.

The Court previously found that the "decision to increase the tariffs on imported steel products from Turkey, and Turkey alone, without any justification, is arbitrary and irrational" and

declared *Proclamation 9772* to be unlawful. *Transpacific Steel LLC v. United States*, 466 F.

Supp. 3d 1246, 1258 (Ct. Int'l Trade 2020), *rev'd and remanded*, 4 F.4th 1306 (Fed. Cir. 2021).

While the legality of *Proclamation 9772* is still being considered on appeal,[6] it is clear that the

additional 25 percent tariffs applicable only to Turkish imports are more akin to special tariffs

than to ordinary customs duties.

First, to the extent that the additional tariffs on Turkish imports have a legitimate

government purpose, that purpose is remedial. Though Noksel takes the position that the Section

232 tariffs on Turkish imports lack a nexus to the statute's national security objective,

*Transpacific Steel*, 466 F. Supp. 3d at 1254, the tariffs are remedial in the sense that they are

specifically targeted at imports from Turkey. *See Proclamation 9772* at 40429. In implementing

the additional tariffs, the President noted his intent "further reduce imports of steel articles and

increase domestic capacity utilization," highlighting that Turkey was being targeted because it "is

among the major exporters of steel to the United States for domestic consumption." *Id.* As

detailed above, the protection of a domestic industry from imports is a purpose consistent with

that of other special tariffs, including antidumping duties and Section 201 safeguards. As such, in

considering the additional tariffs pursuant to *Proclamation 9772*, the CAFC repeatedly referred

to them as "remedial measures." *See, e.g.*, *Transpacific Steel LLC*, 4 F.4th at 1326.

Second, the additional 25 percent tariffs on Turkish imports were uniquely temporary in

nature, as they were only applied during the nine month period from August 2018 to May 2019.

*See Proclamation 9772*, at 40429; *Proclamation 9886* at 23421. During this period, Noksel was

forced to pay tariffs of 50 percent on a shipment that was already in route to the United States

when the tariff rate was increased. *See* Supp. A-D QR at S7-12 and Exh. S7-7, C.R. 124, P.R. 98.

---

[6] *See* Combined Petition for Panel Rehearing and Rehearing *En Banc* of Plaintiffs-Appellees
(Aug. 23, 2021), *Transpacific Steel LLC v. United States*, No. 20-2157 (Fed. Cir. Aug. 23, 2021),
ECF No. 68.

As Noksel explained, for this shipment, the doubled rate of duty "was not foreseen and therefore it was not included in the invoice." *Id.* at S7-12. The fact that Noksel was required to pay twice the tariffs expected with essentially two days' notice emphasizes the temporary nature of the additional Section 232 tariffs applied to subject imports from Turkey. *Id.; see also Proclamation 9772*, at 40431.

Third, there is a clear interplay between the additional Section 232 tariffs on imports from Turkey and antidumping duties such that deducting those additional tariffs imposes a double remedy. As with antidumping duties, the articulated purposed of the additional tariffs on imports from Turkey is to "ensur{e} the viability of the domestic steel industry." *Proclamation 9772*, at 40429. Because both tariffs serve the same purpose, the deduction of the 50 percent Section 232 tariffs for a second time in the form of an increased antidumping margin based on their collection is unlawful and uniquely prejudicial to Turkey, the only country subject to the additional tariffs. *See, e.g.*, *Jiangsu*, 28 F. Supp. 3d at 1340 n.113 (finding "consistency of agency action" to be a "substantial and legitimate" concern).

Finally, the lawfulness of the tariffs imposed on Turkish imports pursuant to *Proclamation 9772* remains an unsettled legal question. While this Court found the additional tariffs to be "unlawful and void," *Transpacific Steel*, 466 F. Supp. 3d at 1249, a majority of the CAFC panel subsequently reversed the decision and remanded the case on appeal. *Transpacific Steel*, 4 F.4th at 1336. The CAFC is now considering a Petition for Rehearing and Rehearing *En Banc*, requesting that the panel rehear the case and find the additional tariffs to be unlawful, consistent with the dissent issued by Judge Reyna. *Id.* (J. Reyna, dissenting), . Given the outstanding question regarding the lawfulness of the additional tariffs, the difference between any tariffs collected pursuant to *Proclamation 9772* and the 232 tariff that would otherwise apply should be excluded from Commerce's calculations. Alternatively, the Court should stay this

proceeding pending a final decision regarding the legality of the additional tariffs on imports

from Turkey in *Transpacific Steel.*

## V.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Noksel respectfully requests that this Court:

(a)    Hold that Commerce's determination in the *Final AD Results* is not in accordance

with law and is unsupported by substantial record evidence with respect to the

claims advanced by Noksel in this appeal and in a manner consistent with the

opinion of this Court;

(b)    Remand the *Final AD Results* to Commerce with instructions to recalculate

Noksel's U.S. prices to include a duty drawback adjustment as required by 19

U.S.C. § 1677a(c)(1)(B);

(c)    Remand the *Final AD Results* to Commerce with instructions to recalculate

Noksel's U.S. prices to eliminate the deduction of the Section 232 tariffs on steel

imports during the POR consistent with 19 U.S.C. § 1677a(c)(2)(A), which only

permits the deduction of United States import duties;

(d)    Alternatively, remand the *Final AD Results* to Commerce with instructions to

recalculate Noksel's U.S. prices to eliminate the deduction of the additional

Section 232 tariffs pursuant to *Proclamation 9772*, which applied only to steel

imports from Turkey;

(e)     Alternatively, stay this proceeding pending a final holding regarding the legality

of the additional Section 232 tariffs pursuant to *Proclamation 9772* in

*Transpacific Steel LLC v. United States*, Fed. Cir. No. 21-2157;

(f)     Grant such additional relief as the Court may deem just and proper.


                                    Respectfully submitted,


                                    **/s/ Matthew M. Nolan**
                                    Matthew M. Nolan
                                    Leah N. Scarpelli

                                    Arent Fox LLP
                                    1717 K Street, NW
                                    Washington, DC 20006
                                    Tel: (202) 857-6013

                                    *Counsel for Noksel Celik Boru Sanayi A.S.*

September 3, 2021

41

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiff's 56.2 Motion for Judgment on the Agency Record filed on September 3, 2021 complies with the word limitation requirement. The word count for Plaintiff's 56.2 Brief, as computed by Arent Fox LLP's word processing system is 13,010.


  **/s/ Leah N. Scarpelli**
Leah N. Scarpelli

*Counsel for Noksel Celik Boru Sanayi A.S.*