NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **NOKSEL CELIK BORU SANAYI A.S.,**<br><br>      **Plaintiff,**<br><br>v.<br><br>**UNITED STATES,**<br><br>      **Defendant,**<br><br>  and<br><br>**NUCOR TUBULAR PRODUCTS INC.,**<br><br>      **Defendant-Intervenor.** | **Before:  Hon. Jane A. Restani,**<br>      **Senior Judge**<br><br>**Court No. 21-00140**<br><br><u>**NON-CONFIDENTIAL VERSION**</u><br><br>Business Proprietary Information<br>Removed from Pages 5, 13, 19, 22, and<br>23 |

## <u>DEFENDANT-INTERVENOR NUCOR TUBULAR PRODUCTS INC.'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Theodore P. Brackemyre, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Tubular Products Inc.*

Dated: December 3, 2021

Ct. No. 21-00140                                    NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    STATEMENT OF FACTS ................................................................................... 1

III.    SUMMARY OF ARGUMENT ............................................................................ 8

IV.    ARGUMENT ....................................................................................................... 9

    A.    The Court Should Decline to Consider Noksel's References to Facts/Documents Not on the Agency Record ............................................ 9

    B.    Commerce's Denial of Noksel's Duty Drawback Claim Should be Affirmed ............................................................................................... 11

        1.    Turkey's Duty Drawback Program Only Satisfies Commerce's Criteria for Adjustment When an IPC is Closed .............................................................................. 12

        2.    Commerce's Practice is to Require Evidence that the Turkish Government Has Approved Closure of an IPC ......................................... 15

        3.    Commerce Reasonably Treated Noksel's IPCs As Open ......................... 19

        4.    Conclusion ................................................................................. 23

    C.    Commerce's Treatment of Section 232 Duties as "United States Import Duties" Should Be Affirmed ...................................................... 24

        1.    Commerce Acted Appropriately in Treating Section 232 Duties as Deductible from Export Prices ................................... 25

        2.    Noksel Failed to Exhaust Its Challenge to Commerce's Treatment of the "Additional" Section 232 Duties on Turkish LWR ............................................................................ 28

        3.    Even if the Court Considers Noksel's Challenge to the Deduction of the "Additional" Duties, that Challenge is Unpersuasive ............................................................................. 30

        4.    Conclusion ................................................................................. 30

V.    CONCLUSION ................................................................................................. 31

Ct. No. 21-00140                                          NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acciai Speciali Terni S.p.A. v. United States*,
   24 CIT 1211, 120 F. Supp. 2d 1101 (2000) ................................................................... *passim*

*Boomerang Tube LLC v. United States*,
   856 F.3d 908 (Fed. Cir. 2017) ........................................................................................11, 29

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
   494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) ................................................................ *passim*

*Corus Staal BV v. United States*,
   502 F.3d 1370 (Fed. Cir. 2007) ..........................................................................................29

*Essar Steel Ltd. v. United States*,
   678 F.3d 1268 (Fed. Cir. 2012) .............................................................................2, 8, 9, 10

*Habaş Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*,
   439 F. Supp. 3d 1342 (Ct. Int'l Trade 2020) ...............................................................20, 21

*NMB Sing. Ltd. v. United States*,
   557 F.3d 1316 (Fed. Cir. 2009) ..........................................................................................17

*Nueweg Fertigung GmbH v. United States*,
   16 CIT 724, 797 F. Supp. 1020 (1992) ..................................................................2, 8, 9, 10

Pet. for Writ of Cert., *Transpacific Steel LLC v. United States*,
   No. 21-721 (U.S. Nov. 12, 2021) .......................................................................................30

*Saha Thai Steel Pipe (Pub.) Co. v. United States*,
   635 F.3d 1335 (Fed. Cir. 2011) ........................................................................................3, 4

*Transpacific Steel LLC v. United States*,
   4 F.4th 1306 (Fed. Cir. 2021) ...........................................................................................30

*Wheatland Tube Co. v. United States*,
   495 F.3d 1355 (Fed. Cir. 2007) ...................................................................................24, 25

**Statutes**

19 U.S.C. § 1516a(b)(2) ...........................................................................................................8

19 U.S.C. § 1516a(b)(2)(A) .................................................................................................2, 10

Ct. No. 21-00140                                         NON-CONFIDENTIAL VERSION

19 U.S.C. § 1677a ......................................................................................................3

19 U.S.C. § 1677a(c)(2)(A) ................................................................................... *passim*

19 U.S.C. § 1677b(a) ...............................................................................................3

19 U.S.C. § 1677b(b) ...............................................................................................3

19 U.S.C. § 1677f-1(d) .............................................................................................3

**Regulations**

19 C.F.R. § 351.309(c)(2) .......................................................................................29

**Administrative Materials**

*Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61,716 (Dep't Commerce Oct, 19, 2006) ............................................................3, 4

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey*, 81 Fed. Reg. 47,355 (Dep't Commerce July 21, 2016)...........5, 13, 14, 16

*Light-Walled Rectangular Pipe and Tube from the Republic of Turkey*, 82 Fed. Reg. 47,477 (Dep't Commerce Oct. 12, 2017) ............................................14, 15, 16, 17

*Light-Walled Rectangular Pipe and Tube from Turkey*, 83 Fed. Reg. 5,987 (Dep't Commerce Feb. 12, 2018) .........................................................................16, 17

*Light-Walled Rectangular Pipe and Tube from Turkey*, 83 Fed. Reg 24,278 (Dep't Commerce May 25, 2018) ................................................................................16

*Light-Walled Rectangular Pipe and Tube From Turkey*, 83 Fed. Reg. 62,561(Dep't Commerce Dec. 4, 2018) ...................................................................................17

*Proclamation No. 9705 of March 8, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018) .....................................6, 24, 27

*Proclamation No. 9772 of August 10, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 40,429 (Aug. 15, 2018) ......................................... *passim*

*Proclamation No. 9886 of May 16, 2019: Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23,421 (May 21, 2019).................................................6, 24

*Steel Concrete Reinforcing Bar from Turkey*, 86 Fed. Reg. 28,574 (Dep't Commerce May 27, 2021) ................................................................................14

Ct. No. 21-00140                                          NON-CONFIDENTIAL VERSION

*Welded Line Pipe from the Republic of Turkey*, 80 Fed. Reg. 61,362 (Dep't
    Commerce Oct. 13, 2015)..........................................................................................18

Ct. No. 21-00140                                    NON-CONFIDENTIAL VERSION

## I.      INTRODUCTION

On behalf of Nucor Tubular Products Inc ("Nucor Tubular"), a defendant-intervenor in this action, we respectfully submit the following response to the September 3, 2021 opening brief filed by plaintiff Noksel Celik Boru Sanayi A.S. ("Noksel" or "Plaintiff"). *See* Pl. Noksel Celik Boru Sanayi A.S.'s Mem. of Law in Supp. of Mot. for J. on the Agency R. Pursuant to Rule 56.2 (Sept. 3, 2021), ECF No. 24-1 ("Noksel's Brief").

## II.     STATEMENT OF FACTS

This appeal arises from an administrative review of the antidumping order covering light-walled rectangular pipe and tube ("LWR") from Turkey. The period of review ("POR") extended from May 1, 2018 through April 30, 2019. *See* Preliminary Decision Memorandum accompanying *Light-Walled Rectangular Pipe and Tube from Turkey*, 85 Fed. Reg. 44,861 (Dep't Commerce, July 24, 2020) (prelim. results of antidumping duty admin. rev., partial recission, and prelim. deter. of no shipments; 2018-2019) at 1, P.R. 103 ("Preliminary IDM"). The U.S. Department of Commerce ("Commerce") selected Noksel for individual examination. *Id.* at 2. Commerce issued its initial questionnaires to Noksel on July 30, 2019. *See* Antidumping Request for Information, *Light-Walled Rectangular Pipe and Tube from Turkey*, Sections A-D (July 30, 2019) at 1, P.R. 17-18. Noksel submitted its response to Commerce's initial questionnaire in September 2019. Preliminary IDM at 2. From December 2019 through July 2020, Commerce issued supplemental questionnaires to Noksel and received timely responses. *Id.* The final results were published in the *Federal Register* on February 24, 2021. *Light-Walled Rectangular Pipe and Tube From Turkey*, 86 Fed. Reg. 11,230 (Dep't Commerce Feb. 24, 2021) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2018-2019), P.R. 125, and accompanying Issues and Decision Memorandum at 1, P.R. 115 ("Final IDM").

1

Ct. No. 21-00140                                        NON-CONFIDENTIAL VERSION

#### A.      **Noksel's Use of Non-Record Information**

After Commerce issued the final results of the appeal at bar, Noksel filed its appeal and subsequently submitted its opening brief to the Court. In its opening brief, Noksel challenges Commerce's treatment of the company's claim for a duty drawback adjustment. Noksel's arguments regarding this issue relies on information not on the record of the proceeding below. *See* Noksel's Brief at 11, 14, 15, 17 (citing Memorandum from A. Maldonado to The File, re: *Verification of the Sales Response of Toscelik Profil ve Sac Endustrisi A.S. (Toscelik Profil) and Tosyali Dis Ticaret A.S. Tosyalı) (collectively, Toscelik) in the Antidumping Duty Investigation of Welded Line Pipe from Turkey (A-489-822)* (July 16, 2015) (ACCESS Barcode: 3291956-01); Memorandum from J. Lawska and G. McMahon to The File, re: *Verification of the Sales Response of Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. (Icdas) in the 2012-13 Investigation of Steel Concrete Reinforcing Bar from Turkey* (June 27, 2014) at 22 (ACCESS Barcode 3212338-01); Memorandum from B. Hansen to The File, re: *Verification of the Sales Response of Çayirova Boru Sanayi ve Ticaret A.Ş. and Yücel Boru Ithalat-Ihracat ve Pazarlama A.Ş., Ltd., in the Less-Than-Fair-Value Investigation of Certain Oil Country Tubular Goods from the Republic of Turkey (A-489-816)* (Mar. 31, 2014) at 13 (ACCESS Barcode 3193110-01)).

As explained further below, because this appeal is one from the agency record, *see* 19 U.S.C. § 1516a(b)(2)(A), Noksel's reliance on documents that are not on the administrative record is inappropriate. The Court should decline to consider Noksel's arguments to the extent that they are rooted in non-record information. *See, e.g.*, *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277 (Fed. Cir. 2012); *see also Nueweg Fertigung GmbH v. United States*, 16 CIT 724, 726, 797 F. Supp. 1020, 1022 (1992) ("This Court's review of a final determination in an administrative review is limited to a review of the administrative record developed in that administrative

Ct. No. 21-00140                                                    NON-CONFIDENTIAL VERSION

review."). At the very least, the Court should find such arguments without merit, given that

arguments that are "unsupported by the administrative record" can "have no weight" in a litigation

that is based on the administrative record. *See Acciai Speciali Terni S.p.A. v. United States*, 24 CIT

1211, 1217, 120 F. Supp. 2d 1101, 1107 (2000). [1]

    **B.**    **Duty Drawback**

    Commerce determines antidumping duty margins by comparing the prices at which

companies sell subject goods in their home markets against the prices that they charge in the United

States. *See, e.g.*, 19 U.S.C. § 1677f-1(d); *see also id.* §§ 1677a, 1677b(a), 1677b(b). The Tariff Act

of 1930 requires Commerce to make certain adjustments to home market and U.S. prices before

comparing them. One such adjustment calls for U.S. prices (*i.e.*, the export price or constructed

export price) to be increased by "the amount of any import duties imposed by the country of

exportation which have been rebated, or which have not been collected, by reason of exportation

of the subject merchandise to the United States." *See id.* § 1677a(c)(1)(B). This adjustment is

known as a duty drawback adjustment.

    In assessing whether a company is eligible for a duty drawback adjustment, Commerce

applies a two-prong test. *See* Preliminary IDM at 8; *Antidumping Methodologies: Market Economy

Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*,

71 Fed. Reg. 61,716, 61,723 (Dep't Commerce Oct, 19, 2006) ("*Methodologies*"); *see also Saha

Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1340-41 (Fed. Cir. 2011). The first

prong requires that the import duty and its rebate or exemption are directly linked to – and

---

[1]    Nucor Tubular has not moved to strike the portions of Noksel's opening brief referring to
and relying on non-record information in view of *Acciai Speciali*. There, the Court found that a
litigant's proper course of action when faced with an opposing party brief that relies on non-record
information is to argue the point in a brief, rather than to move to strike. 120 F. Supp. 2d at 1106-
07.

dependent upon – one another, or that the exemption from import duties is linked to exportation. The second prong requires that the company demonstrate that there were sufficient imports of the imported raw materials to account for the duty drawback granted for the export of the manufactured product. *See* Preliminary IDM at 8; *Methodologies*, 71 Fed. Reg. at 61,723; *see also Saha Thai*, 635 F.3d at 1340-41.

In its questionnaire responses, Noksel claimed that it was eligible for a duty drawback adjustment. *See* Letter from Trade Resources Company to Sec'y Commerce, re: *Light-Walled Rectangular Pipe And Tube from Turkey: Noksel Section B-D Questionnaire Response* (Sept. 20, 2019) at C-35 – C-37, C.R. 15-60, P.R. 42 ("Noksel B-D IQR"); Letter from Trade Resources Company to Sec'y Commerce, re: *Light-Walled Rectangular Pipe And Tube from Turkey: Noksel High Inflation Cost of Production and Constructed Value Questionnaire Response* (Apr. 2, 2020) at HID-22 – HID-23, Exhibit D-25, C.R. 100-109, P.R. 78-79. Specifically, Noksel reported that it imported inputs under inward processing certificates ("IPCs") issued pursuant to Turkey's inward processing regime ("IPR"), which is the country's official duty drawback system. *See* Noksel B-D IQR at C-35. Noksel reported that it had applied for closure of at least one of these IPCs, and that it would "submit the documentation substantiating the IPR completion reports" after the "closing is approved." *Id.* Noksel requested that Commerce grant it a drawback adjustment based on the IPC for which it had filed a closure application. *Id.* at C-35 – C-37.

Under Turkey's IPR, the Turkish Government issues importers IPCs to cover the inputs needed to produce specific quantities of goods for export. *See, e.g.*, *id.* at C-35 and Exhibit C-16 (providing copies of specific IPCs issued to Noksel). After the inputs are imported and sufficient exports are made to account for them, the company must file an application with the Turkish Government to close the IPC. *See id.* at C-35. While the closure application is pending before the

**Business Proprietary Information Has Been Deleted**

Turkish Government, the IPC may be suspended or modified. Final IDM at 7. Closure formally extinguishes the contingent liability for import duties inherent in an IPC; closure also prevents the company from adding import or export information to the closed IPCs. *Id.*; *see also* Issues and Decision Memorandum accompanying *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey*, 81 Fed. Reg. 47,355 (Dep't Commerce July 21, 2016) (final deter. of sales at less than fair value) at 27-28 ("*Heavy-Walled* IDM").

By the time of the preliminary results, Noksel had not provided any documentation to show that the Turkish Government had approved any IPC closure applications that Noksel may have filed. *Compare* Noksel B-D IQR at C-35, *with* Preliminary IDM at 9.[2] Consistent with its practice, Commerce did not make a duty drawback adjustment for Noksel in its preliminary results because Noksel had not demonstrated that the IPC on which it based its drawback claim was closed. Preliminary IDM at 9. As Commerce explained, with respect to Turkey's IPR, "Commerce only uses closed IPCs for purposes of calculating a duty drawback adjustment" and "Noksel stated that the IPC used in its calculation is not closed." Preliminary IDM at 9; Noksel B-D IQR at C-35 – C-37 and Exhibit C-15 (showing IPC Nos. [

]).

In its case brief, Noksel argued that Commerce should have treated the IPC at issue as "closed" based upon Noksel's submission of an application for closure. Letter from Trade Resources Company to Sec'y Commerce, re: *Light-Walled Rectangular Pipe And Tube from Turkey: Noksel's Case Brief* (Aug. 24, 2020) at 20-24, P.R. 109 ("Noksel's Case Brief"). Nucor

---

[2]      While Noksel submitted copies of certain IPCs, [
            ], and Turkey's drawback law, the company does not appear to have submitted [
                         ]. Noksel B-D IQR at Exhibits C-15 – C-17. Rather, it simply asserted
that it had filed at least one such application. *Id.* at C-35.

NON-CONFIDENTIAL VERSION

Tubular filed a rebuttal brief, in which it argued that Commerce's practice was to use only closed IPCs in its drawback calculations, and that applications for closure did not suffice to establish that closure had taken place. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Light-Walled rectangular Pipe and Tube from Turkey: Nucor Tubular's Rebuttal Brief* (Aug. 31, 2020) at 4-9, C.R. 146, P.R. 111 ("Nucor Tubular's Rebuttal Brief"). In its final results, Commerce continued to deny Noksel a duty drawback adjustment. Final IDM at 7-8. Commerce reasoned that its practice was only to include in its calculations IPCs that had formally been closed, and noted that it had previously rejected the argument that an application for closure evinced actual closure. *Id.* Rather, Commerce explained, it had previously found that after a closure application had been submitted, it was still possible for IPCs to be amended or suspended, indicating that the closure application was not, itself, synonymous with closure. *Id.*

    **C.**    <u>Section 232</u>

In addition to calling for duty drawback adjustments (where appropriate), the Tariff Act of 1930 requires U.S. prices to be reduced by the amount of any "United States import duties" included in those prices. 19 U.S.C. § 1677a(c)(2)(A). Turkish LWR was subject to Section 232 duties of 25% from March to August 2018, and 50% from August 2018 through May 15, 2019 (*i.e.*, beyond the end of the POR). *Proclamation No. 9705 of March 8, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018) ("*Proclamation 9705*"); *Proclamation No. 9772 of August 10, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 40,429 (Aug. 15, 2018) ("*Proclamation 9772*"); *Proclamation No. 9886 of May 16, 2019: Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23,421 (May 21, 2019) ("*Proclamation 9886*").

In the preliminary results, Commerce deducted Section 232 duties from Noksel's U.S. prices pursuant to 19 U.S.C. § 1677a(c)(2)(A). Preliminary IDM at 8. Noksel argued in its case brief that Commerce should treat 232 duties as non-deductible, because they were "special," temporary duties that had a remedial purpose, and because deducting them would impose a double remedy. Noksel's Case Brief at 6-20. Nucor Tubular filed a rebuttal brief in which it explained that, unlike Section 201 or antidumping duties, Commerce reasonably treats Section 232 duties as deductible from U.S. price. Nucor Tubular's Rebuttal Brief at 9-22. Nucor Tubular explained that the Section 232 duties are neither remedial nor temporary in the manner of Section 201 or antidumping duties, and that deducting them from U.S. price would not result in double-counting. *Id.*

In the final results, Commerce concluded that Section 232 duties were unlike "special" Section 201 duties or antidumping duties that are not deducted from U.S. price. Final IDM at 4-5. Commerce noted that Section 232 focuses on threats to national security rather than providing relief to a U.S. industry threatened with imports that threaten or injure their businesses. *Id.* Additionally, Commerce stated that the President, in imposing the Section 232 duties, referred to them as "ordinary" customs duties that should be levied in addition to antidumping duties. *Id.* at 4 n.14. While Noksel argued that deducting Section 232 duties from U.S. prices risks imposing a double remedy, Commerce explained that the function of antidumping duties and Section 232 duties are separate and distinct, such that they do not provide multiple remedies for the same purpose. *Id.* at 4-5. Finally, Commerce noted that deducting Section 232 duties from U.S. price was consistent with its practice. *Id.* at 5.

## III.   SUMMARY OF ARGUMENT

The Court should affirm Commerce's determination regarding the issues subject to Noksel's appeal.

As an initial matter, in reaching its determination, the Court should decline to consider Noksel's claims that are grounded in non-record evidence. As the Court of Appeals for the Federal Circuit ("CAFC") has previously found, the record of a specific administrative review does not include documents from other Commerce proceedings unless those documents are timely placed on the record. *See, e.g.*, *Essar Steel*, 678 F.3d at 1277; *see also Nueweg Fertigung GmbH*, 16 CIT at 726, 797 F. Supp. at 1022 ("This Court's review of a final determination in an administrative review is limited to a review of the administrative record developed in that administrative review."); 19 U.S.C. § 1516a(b)(2) (defining the "record for review"). In its opening brief, Noksel relies on documents from other proceedings – documents that it neither cited in its agency briefing nor placed on the record of the review. *Compare* Noksel's Case Brief at 6-24, *with* Noksel's Brief at 11, 14, 15, and 17. Because this appeal is one from the record, the Court should decline to consider such arguments. In any event, it should find that Noksel's arguments that are grounded in non-record documents are "unsupported by the administrative record" and thus have "no weight" in a litigation that is based on the administrative record. *See Acciai Speciali Terni*, 24 CIT at 1217, 120 F. Supp. 2d at 1107.

Second, the Court should affirm Commerce's decision to reject Noksel's request for a duty drawback adjustment to its U.S. prices. Commerce's longstanding practice is to include in its drawback calculations only Turkish IPCs that have been closed. As Commerce has found, until the Turkish Government has confirmed closure, IPCs may be suspended or modified. Moreover, until closure is approved by the Turkish Government, Commerce cannot confirm that the

importer's import duty liability has been fully extinguished, or that it has made imports and exports with the appropriate linkage. Here, while Noksel stated that it had presented to the Turkish Government an application to close at least one IPC, it conceded that the Turkish Government had not yet closed the IPC, thereby officially forgiving the company's import duty obligations.

Third, the Court should affirm Commerce's deduction of Section 232 duties from Noksel's U.S. prices. Commerce explained and supported its conclusion that Section 232 duties are "United States import duties" for purposes of 19 U.S.C. § 1677a(c)(2)(A), and thus deductible from U.S. prices. Final IDM at 4-5. Commerce's decision is also consistent with this Court's determination in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021). To the extent that Noksel argues that Commerce erred by not limiting its Section 232 deduction to 25%, even when the duties applicable to Turkish LWR were 50%, Noksel has failed to exhaust this argument. Further, the argument fails for the same reasons as Noksel's challenge to the deduction of Section 232 duties generally.

## IV.   ARGUMENT

### A.   The Court Should Decline to Consider Noksel's References to Facts/Documents Not on the Agency Record

Noksel's brief relies on documents that are not on the record of the administrative review under appeal. Specifically, Noksel cites several verification reports issued in other cases, and that were not placed on the record of the review a bar, in arguing that it was entitled to a duty drawback adjustment. Noksel's Brief at 11, 14, 15, 17.

As both the CAFC and this Court have held, the record of a specific administrative review does not include documents and factual information from other Commerce proceedings unless those documents are separately placed on the record in a timely fashion. *Essar Steel*, 678 F.3d at 1277; *see also Nueweg Fertigung GmbH*, 16 CIT at 726, 797 F. Supp. at 1022. "The trial court {}

reviews the record, which consists of 'a copy of all information presented to or obtained by {Commerce} during the court of the administrative proceeding.'" *Essar Steel*, 678 F.3d at 1277 (quoting 19 U.S.C. § 1516a(b)(2)(A)). "This Court's review of a final determination in an administrative review is limited to a review of the administrative record developed in that administrative review." *Nueweg Fertigung GmbH*, 16 CIT at 726, 797 F. Supp. at 1022. Further, Noksel had the burden of putting before the agency all of the information that it felt was relevant to its case. *See, e.g.*, *Essar Steel*, 678 F.3d at 1277.

Noksel did not place the documents it now cites on the record of the review. Yet Noksel now endeavors to shoehorn these documents into this appeal, quoting and otherwise relying on them for the first time in its opening brief. But because this appeal is one from the agency record, *see* 19 U.S.C. § 1516a(b)(2)(A), Noksel's reliance on non-record documents is improper. The Court should therefore decline to consider Noksel's claims to the extent that they are rooted in the non-record information. In any event, the Court should find that Noksel's arguments that are grounded in non-record documents are "unsupported by the administrative record" and thus have "no weight" in a litigation that is based on the administrative record. *See Acciai Speciali Terni*, 24 CIT at 1217, 120 F. Supp. 2d at 1107.

Nucor Tubular notes that, beyond failing to place these documents on the record below, Noksel did not rely on these documents, or any factual assertions based on them, in its arguments to Commerce. *Compare* Noksel's Case Brief at 6-24, *with* Noksel's Brief at 11, 14, 15, 17.[3]

---

[3]     In its case brief, Noksel relied on certain public issues and decision memoranda and case law for the proposition that Turkey's IPR system is, as a general matter, consistent with the first prong of the agency's two-prong test. Noksel's Case Brief at 21 n.49. Certain of these decision memoranda appear to have been issued in proceedings in which the non-record verification reports were issued, but there were no references to the verification reports themselves, or any reliance on them. *Id.* at 20-24; *see also* discussion *supra* at 2, identifying the non-record documents.

Ct. No. 21-00140                                          NON-CONFIDENTIAL VERSION

Exhaustion of remedies is required in appeals of Commerce's antidumping duty determinations. *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912-13 (Fed. Cir. 2017).[4] Here, while Noksel argued in its case brief that Commerce should treat the IPC that was the basis for its claim as closed, it made no assertions or claims grounded in the non-record documents that it now cites. The Court should accordingly consider assertions and claims that rely on those documents unexhausted, in addition to being not properly before the Court by reason of relying on non-record information.

However, should the Court nonetheless determine to consider Noksel's factual and legal assertions based on non-record information, it remains that Noksel has failed to demonstrate that Commerce erred in rejecting Noksel's drawback claim, as explained below. Noksel's arguments that are grounded in non-record documents are "unsupported by the administrative record" and thus without weight in this record-based litigation, as further described below. *See Acciai Speciali Terni*, 24 CIT at 1217, 120 F. Supp. 2d at 1107.

    **B.**    <u>**Commerce's Denial of Noksel's Duty Drawback Claim Should be Affirmed**</u>

As explained above, in assessing whether a company is eligible for a duty drawback adjustment, Commerce applies a two-prong test. *See, e.g.*, Preliminary IDM at 8. The first prong requires that the import duty and its rebate or exemption are directly linked to – and dependent upon – one another, or that the exemption from import duties is linked to exportation. *Id.* The second prong requires that the company "demonstrate that there were sufficient imports of the imported raw materials to account for the duty draw back or exemption granted for the export of the manufactured product." *See, e.g.*, *id.*

---

[4]    *See* discussion *infra* at 29-30, regarding Noksel's failure to exhaust its arguments regarding "additional" Section 232 duties.

In this case, Noksel reported receiving exemptions from import duty payments under IPCs that were issued pursuant to Turkey's IPR program. *See* Noksel B-D IQR at C-35. In its initial questionnaire response, Noksel stated that it had filed applications with the Turkish Government for closure of at least one of these IPCs, and that it would "submit the documentation substantiating the IPR completion reports" after "closing is approved." *Id.* Noksel did not, however, submit such documentation. *See, e.g.*, Preliminary IDM at 9; Final IDM at 7-8. Commerce denied Noksel a drawback adjustment in its final results, reasoning that its practice was only to include in its calculations IPCs that had formally been closed. Final IDM at 7-8. In making its determination, the agency specifically addressed Noksel's argument that the company's application for closure of an IPC should be deemed sufficient. *Id.* at 7. Commerce explained that after a closure application had been submitted, it was still possible for IPCs to be suspended or amended, indicating that the closure application was not, itself, synonymous with closure. *Id.*

In its opening brief, Noksel argues that the requirement that the IPC's be "closed" before a company is granted a duty drawback adjustment "adds a third prong to Commerce's established test." *See* Noksel's Brief at 10. Noksel also claims that Commerce departed from its prior practice in finding that an importer's submission of a closure application is insufficient proof of closure. *Id.* at 11-12. Last, Noksel argues that Commerce's determination that the IPC that formed the basis for its application was not closed is inadequately explained and inadequately grounded in the record. *Id.* at 13-19. As explained below, these arguments are without merit.

### 1.    Turkey's Duty Drawback Program Only Satisfies Commerce's Criteria for Adjustment When an IPC is Closed

As noted above, in assessing whether a company is eligible for a duty drawback adjustment, Commerce applies a two-prong test. *See, e.g.*, Preliminary IDM at 8. The first prong requires that the import duty and its rebate or exemption are directly linked to – and dependent

**Business Proprietary Information<br>Has Been Deleted**

upon – one another, or that the exemption from import duties is linked to exportation. The second prong requires that the company "demonstrate that there were sufficient imports of the imported raw materials to account for the duty draw back or exemption granted for the export of the manufactured product." *See, e.g.*, *id.*

According to Noksel, it satisfied the first prong of Commerce's duty drawback test by showing that Turkey's IPR "specifies and restricts that only exports that contain qualifying incorporated imported inputs may be used to claim drawback' and 'strictly 'requires' that the exported product contain the imported raw material inputs to qualify for drawback' with the IPC number providing the necessary linkage for imports and exports." Noksel's Brief at 9. Noksel argues that Commerce's decision to deny Noksel a duty drawback because it could not show that the Turkish government had closed the IPCs at issue adds a "new hurdle to the drawback test that is not required by the statute" and that Commerce should have granted the drawback on the basis of Noksel's application to close the IPC to the Turkish government. *Id.* at 10.[5]

Noksel, however, is wrong. Commerce has not created an unanticipated "third prong," but has required Noksel to demonstrate that its claim for a drawback adjustment complies with the standard two-prong test. As the agency explained in denying Noksel's request for an adjustment in a prior review and in the *Heavy-Walled* IDM, closure of an IPC implicates the agency's two-prong test because "1) Turkish companies are liable for the amount of duties forgone until satisfying the export requirements under a{n IPC}; and 2) we cannot be certain that a company has satisfied the export requirements under a{n IPC} until the {IPC} is closed." Issues and Decision Memorandum accompanying *Light-Walled Rectangular Pipe and Tube from the*

---

[5]     Again, it does not appear that Noksel [<br>]. *See supra* note 2.

*Republic of Turkey*, 82 Fed. Reg. 47,477 (Dep't Commerce Oct. 12, 2017) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2015-2016) at 16 ("*LWR Turkey 15-16* IDM"); *see also* Final IDM at 7-8; *Heavy-Walled* IDM at 28; Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from Turkey*, 86 Fed. Reg. 28,574 (Dep't Commerce May 27, 2021) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2018-2019) at 16 (stating that it "is only when the government closes the IPC that the duty liability is extinguished. Until the government extinguishes the duty liability, the duty has not been drawn back and does not qualify for inclusion in the duty drawback adjustment.") As such, closure is relevant to the question of whether the respondent has in fact been exempted from import duties, and the degree to which any such exemption is linked to exports of goods sufficient to account for the raw material imports on which the duties were allegedly forgone. *See*, *e.g.*, Final IDM at 7-8.

Further, as Commerce explained in its final results, granting a duty drawback adjustment on the basis of an application for closure would be inappropriate because "a company's application to close an IPC maybe modified or suspended even after it has been submitted to the {Turkish Government}." *Id.* at 7. Because open IPCs may be suspended or modified, the link between the import duty and its rebate is severed and thus cannot satisfy Commerce's test. Noksel itself referred to "{b}oth Noksel's certification with the closing *applications* and *Government's approval* certifying imported inputs are used in the manufacture of the exported merchandise" as evidence showing that "imports and exports are linked." Noksel B-D IQR at C-37 (emphasis added). The lack of the Turkish government's approval is therefore indicative of a failure to satisfy the established two-prong test.

Indeed, without formal closure, the agency cannot be sure that import duties have truly been exempted. *See, e.g.*, *LWR Turkey 15-16* IDM at 16-17. The law underpinning Turkey's duty drawback system underscores the fact that formal government action is required before a company's duty liability is fully extinguished. Under the law, firms must provide a guarantee equal to what their tax liability would have been, absent the IPR. *See* Noksel B-D IQR at Exhibit C-17, p. 4. It is only after an IPC is formally closed that the Turkish Government releases that guarantee, thus finally extinguishing a company's duty liability. *Id.* at Exhibit C-17, p. 12.

### 2. Commerce's Practice is to Require Evidence that the Turkish Government Has Approved Closure of an IPC

Next, Noksel claims that Commerce departed from its prior practice by requiring evidence that the Turkish Government has formally approved an importer's application for closure of an IPC. Noksel's Brief at 11. Noksel argues that Commerce has "historically" considered IPCs to be closed based on a participant's application for closure, without requiring a showing of government approval. *Id.* at 11-12. In making this argument, Noksel mischaracterizes Commerce's practice, inclusive of its practice in prior segments of the antidumping duty order on Turkish LWR.

As Noksel appears to concede, Commerce's "practice with regard to the Turkish {IPR} . . . is to use only closed {IPCs} (*i.e.*, import certificates to which the company was no longer permitted by the Government of Turkey to add import or export information) for purposes of calculating a duty drawback adjustment." Preliminary IDM at 9; Noksel's Brief at 12. But contrary to Noksel's claim, Commerce's current practice is not to treat a respondent's application for closure as sufficient to demonstrate that an IPC has been closed. Instead, Commerce requires evidence that the Turkish Government has acted on the closure application, and specifically, that the Turkish Government has approved closure.

For example, in the 2015-2016 review of the Turkish LWR order, Commerce explained that it was denying Noksel's claim for a duty drawback adjustment because while Noksel had applied for closure of its IPCs, Noksel could not show that the Turkish Government had acted on the applications. *See LWR Turkey 15-16* IDM at 16-17. Similarly, Commerce denied a duty drawback adjustment to the mandatory respondent in the 2016-2017 administrative review of the order because it had not shown that the IPCs at issue were closed. *See* Issues and Decision Memorandum accompanying *Light-Walled Rectangular Pipe and Tube from Turkey*, 83 Fed. Reg. 5,987 (Dep't Commerce Feb. 12, 2018) (prelim. results of antidumping duty admin. rev. and final deter. of no shipments; 2016-2017) at 8 ("*LWR Turkey 16-17* IDM"), *unchanged in Light-Walled Rectangular Pipe and Tube from Turkey*, 83 Fed. Reg 24,278 (Dep't Commerce May 25, 2018) (final results of antidumping duty admin. rev.; 2016-2017).

While Noksel relies on the *Heavy-Walled* IDM to support its claim that Commerce's practice is to treat IPCs as closed upon application, this precedent does not support Noksel's claim. Noksel's Brief at 10-11. In the *Heavy-Walled* IDM, Commerce stated that while it includes only closed IPCs in its drawback calculations, it treated IPCs as closed "for practical purposes . . . when the exporting company has applied to the Turkish government for closure." *Heavy-Walled* IDM at 28. But as Commerce explained here and in denying Noksel's request for a drawback adjustment in the 2015-2016 review, to assert that the *Heavy-Walled* IDM supports treating an IPC as closed upon application would "ignore{} critical facts." *See LWR Turkey 15-16* IDM at 16-17; *see also* Final IDM at 7. "Notably, the duty drawback adjustment that Commerce {granted} for the respondent in {the *Heavy-Walled* case} was for the only IPC that had been closed by the {Turkish Government}." Final IDM at 7; *see also LWR Turkey 15-16* IDM at 16-17.

Commerce also explained that in the *Heavy-Walled* IDM, it "disallowed two of the three IPCs under which the respondent requested a duty drawback adjustment" because one was open and the other had been suspended after the company had already applied for closure. Final IDM at 7; *see also LWR Turkey 15-16* IDM at 16-17. Here, in requiring demonstration of closure by the Turkish Government, rather than mere application for closure, Commerce acted consistently with not just the *Heavy-Walled* IDM, but with the two immediately preceding administrative reviews of the Turkish LWR order. *See* Final IDM at 7; *LWR Turkey 15-16* IDM at 16-17; *LWR Turkey 16-17* IDM at 7-8.[6]

Beyond relying on the *Heavy-Walled* IDM, Noksel also points to decisions and documents issued in several Commerce proceedings in 2014 and 2015. Noksel's Brief at 9, 11-14, 17-18. These decisions and documents pre-date the agency's 2018 final determination in the 2015-2016 review of the order on Turkish LWR. The timing is relevant. To the extent that these documents/memoranda suggest that, at one time, Commerce's practice was not to require evidence of the Turkish Government's action on a closure application, Commerce is not bound to follow a practice in perpetuity. Rather, the agency has the discretion to alter its practice so long as it "provides a sufficient, reasoned analysis explaining why a change is necessary." *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009).

In its 2018 determination regarding the 2015-2016 review of the order on Turkish LWR, Commerce explained that it would not treat Noksel's applications for IPC closure as sufficient to demonstrate compliance with the two-prong test, because IPCs could be suspended or even modified after a closure application was submitted. *LWR Turkey 15-16* IDM at 16-17. Commerce

---

[6]     There was no 2017-2018 review of the order on Turkish LWR. *See Light-Walled Rectangular Pipe and Tube From Turkey*, 83 Fed. Reg. 62,561(Dep't Commerce Dec. 4, 2018) (rescission of antidumping duty admin. rev.; 2017-2018).

also noted that "the record does not demonstrate that Noksel is precluded from suspending its {IPC} applications or modifying the applications to add import or export information to the {IPC}." *Id.* at 17. Commerce followed the same approach here, again explaining that it did not consider Noksel's application for closure of its IPCs sufficient to demonstrate actual closure because "a company's application to close an IPC may be modified or suspended even after it has been submitted to the {Turkish Government}." Final IDM at 7. Commerce likewise noted that in the review at bar, Noksel had not demonstrated that the company was precluded from suspending or modifying its IPC pending confirmation of closure by the Turkish Government. *Id.* at 7-8.

Even in one of 2015 decision memoranda on which Noksel relies, Commerce noted that the question of whether a particular IPC should be treated as closed was "a complex area of practice" and one that it expected to continue to evaluate. *See* Issues and Decision Memorandum accompanying *Welded Line Pipe from the Republic of Turkey*, 80 Fed. Reg. 61,362 (Dep't Commerce Oct. 13, 2015) (final deter. of sales at less than fair value) at 8 ("*Welded Line Pipe* IDM"). While Commerce appears to have treated a closure application as sufficient to demonstrate compliance with its two-prong test in the *Welded Line Pipe* IDM, it signaled that this was not a settled matter. *Id.* at 7-8. Commerce's subsequent determination in the 2015-2016 review of the LWR order reflects the agency's continued consideration of a complex area, and explains the basis for the agency's evolution in practice.

In sum, Commerce has explained that until an IPC is closed, it lacks sufficient basis to find that a company has either exported sufficient goods to account for exempted duty payments, or that it has been finally excused from those duty payments. Further, in the review at bar and in prior reviews, that it is only upon the Turkish Government's official closure of an IPC that companies are barred for modifying or suspending an IPC. Thus, Commerce's practice is to allow a drawback

**Business Proprietary Information Has Been Deleted**

adjustment only where the respondent provides evidence that the Turkish Government has formally approved a respondent's closure application. Noksel's claims that Commerce departed from its practice rely on stale precedent that has been superseded by Commerce's more recent, consistent approach to duty drawback.

### 3.    Commerce Reasonably Treated Noksel's IPCs As Open

As explained above, Commerce's requirement that respondents' demonstrate the Turkish Government's approval of an IPC closure application neither adds an unlawful "third prong" to the agency's drawback test, nor departs from the agency's established practice. Further, Commerce acted reasonably and with the support of substantial record evidence in treating the IPC that formed the basis for Noksel's drawback claim as not closed.

Noksel reported to Commerce that [                          ] were open during Commerce's review and that the [      ] IPC, which formed the basis for its drawback claim, was not yet closed. *See* Noksel B-D IQR at C-35 – C-37; *id.* at Exhibit C-15 (showing IPC Nos [                                                    ]). In the same response, Noksel also stated that it would "submit the documentation substantiating the IPR completion reports" after the "closing is approved." *Id.* at C-35. It did not submit such documentation.

Nonetheless, Noksel argues that Commerce's requirement that a respondent demonstrate that the Turkish Government has approved a closure application is unreasonable. In this regard, Noksel argues that this Court has previously found that it is unreasonable for Commerce to refuse to include IPCs that close outside of a review period in its calculations. Noksel's Brief at 13. Relying on non-record verification reports, Noksel asserts that government approval of a closure application can lag application significantly and, in any case, an IPC cannot be altered or modified

beyond a specific period after "expiration." *Id.* at 13-14. Finally, Noksel argues that the evidence it submitted showed that it completed all imports and exports required by its IPCs. *Id.* at 14-19. Noksel's claims are unconvincing.

Noksel begins by citing *Toscelik Profil ve Sac Endustrisi A.S. v. United States* for the proposition that it is unreasonable for Commerce to refuse to include IPCs that close outside of a POR in its calculations. Noksel's Brief at 13 (citing *Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 348 F. Supp. 3d 1321 (Ct. Int'l Trade 2018)). But *Toscelik* is distinguishable. In that case, all parties conceded that Commerce could properly limit its drawback adjustment to "closed" IPCs. *Toscelik*, 348 F. Supp. 3d at 1325. However, they disagreed about whether the closure had to happen within the POR under review. *Id.* The Court remanded after finding that Commerce had not advanced any sensible explanation for refusing to include IPCs that were officially closed prior to Commerce's verification within its drawback calculations. *Id.* The case did not, however, turn on what evidence Commerce requires to demonstrate that closure has occurred. Indeed, besides confirming that this question was not at issue in the appeal, the *Toscelik* Court expressly noted that this was an evolving area of Commerce's practice. *Id.* at 1325 n.1.[7]

Moreover, this Court has previously rejected the argument that *Toscelik* requires Commerce to grant duty drawback adjustments for open IPCs. In *Habaş Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*, the Court stated that "*Toscelik* cannot fairly be read to support the proposition that Commerce must include all IPCs reflecting {period of investigation} exports in its margin calculations regardless of whether record evidence demonstrates closure."

---

[7]      *Toscelik* arose from the 2015 investigation into welded line pipe from Turkey. *Toscelik,* 348 F. Supp. 3d at 1323. As noted above, Commerce specifically noted in its decision memorandum in that case that it was continuing to review and assess the question of when closure of an IPC should be considered to have finally occurred. *Welded Line Pipe* IDM at 8.

*Habaş Sinai ve Tibbi Gazlar Istihsal v. United States*, 439 F. Supp. 3d 1342, 1348-49 (Ct. Int'l Trade 2020).[8] As the Court explained, "Commerce reasonably predicates its inclusion of IPCs on evidence of closure as demonstrating final duty exemption," *id.* at 1349, accepting Commerce's rationale that it "'will not provide credit for an open IPC' because the record lack{ed} evidence 'that the Turkish government has forgiven the input import duty liability under those open IPCs.'" *Id*. at 1347.

Next, Noksel relies on several non-record verification reports for factual assertions regarding the nature of Turkey's IPR system. Noksel's Brief. at 13-14. As explained above, the Court should decline to consider Noksel's arguments that are grounded in non-record information. For that matter, Noksel cannot credibly argue that Commerce unreasonably failed to take into account information that was not on the record. *See Acciai Speciali Terni*, 24 CIT at 1217, 120 F. Supp. 2d at 1107. Moreover, as explained above, the non-record verification reports on which Noksel relies were all issued in 2014 and 2015, and they necessarily relate to review periods that predate 2014 and 2015. The decision on appeal now was issued in 2021, and relates to sales made in 2018-2019. Noksel's references to non-record documents provide no insight into how Turkey's IPR operated during the 2018-2019 POR.

Noksel's references to these non-record documents also fail to establish that Commerce was required to accept the documentation that Noksel submitted in the review at bar as demonstrating its eligibility for a drawback adjustment. While Noksel argues that the non-record

---

[8]     *Habaş* arose from Commerce's 2017 investigation into steel concrete reinforcing bars from Turkey. *Habaş*, 439 F. Supp. 3d at 1345. At issue was Commerce's decision not to grant duty drawback adjustments in connection with two IPCs. While the Court found that Commerce erred in its decision to deny an adjustment related to one IPC that had been closed but that Commerce "mistakenly omitted," the Court sustained Commerce's decision to deny a drawback for the other contested IPC because it remained open during Commerce's investigation. *Id.* at 1347.

documents show that Commerce has previously granted drawback adjustments based on documentation "similar to that submitted by Noksel" in this review, Noksel's Brief at 17, that assertion does not hold water. The non-record documents to which Noksel cites indicate, to the extent that they are accurately quoted, that Commerce reviewed official Turkish Government systems and documentation that reflected the Turkish Government's own assessment of the status of specific IPCs as closed, in-progress, etc. *Id.* at 17-18.

The documentation that Noksel submitted in support of its claim here consists of three items:

(1)     [          ] spreadsheet [                    ] that lists imports and exports and that notes that [       ] Noksel's [
];

(2)     copies of Noksel's IPCs; and

(3)     Turkey's duty drawback law, with an English translation.[9]

Noksel B-D IQR at Exhibits C-15 – C-17. None of these documents appear to reflect a final assessment by the Turkish Government of the status of any of the IPCs. While Noksel implies that the IPCs document their own closure, stating that they "reflect the actual imports and exports by Noksel, as formalized by Turkish Customs," this does not appear to be the case. Noksel's Brief at 17 (emphasis removed). To be sure, the IPCs were issued by the Turkish Government. Noksel B-D IQR at Exhibit C-16. They also [

---

[9]     The Turkish duty drawback law indicates that there are regulations that provide more detail about how the country's duty drawback system works in practice. *See* Noksel B-D IQR at Exhibit C-17, p. 12 ("The procedures and principles concerning the actions to be taken in cases where the processed products committed to be exported under {an IPC} are delivered in Turkey to the firms holding that Certificate or where the goods exported under the Certificate/Authorization are returned by their consignee *shall be set forth in a Communiqué to be published pursuant to this Resolution*.") (emphasis added). Noksel, however, did not put these regulations on the record. Nor, for that matter, [
]. *See supra* note 2.

**Business Proprietary Information**
                                  **Has Been Deleted**

].

*Id.* But IPC [        ], for example, is dated [                ]. *Id.* This is [                ] on which

Noksel claims to have made imports or exports under that IPC. *Compare id.* at Exhibit C-16, *with*

*id.* at Exhibit C-15.

      Noksel does not explain how a [                        ] importation of inputs or

exportation of related products can reflect the Turkish Government's final approval of Noksel's

compliance with the conditions of the permit. Noksel's Brief at 17. And again, Noksel itself

reported that [                ] IPCs were [        ] and the [        ] was only [

      ]. Rather than show that the IPC that formed the basis of Noksel's drawback claim

"expired and was closed" during the POR, *id.* at 18, the record at most indicates that the Turkish

Government issued that IPC to Noksel [                    ] to cover a certain quantity of

identified imported inputs and exported end products [                    ]. Noksel B-D IQR

at Exhibit C-16. The record does not show that the Turkish Government confirmed [

                        ] and had been formally forgiven any duty liability. As such,

the record does not indicate that Commerce acted unreasonably in denying Noksel's drawback

claim.

      **4.**     **Conclusion**

      In sum, Commerce's decision to deny Noksel's claim for a duty drawback adjustment

should be affirmed. Noksel has not shown that Commerce's requirement that the company

demonstrate the Turkish Government's approval of a closure application adds an inappropriate

new prong to the agency's traditional two-prong test. Rather, as Commerce has repeatedly

explained, evidence of the Turkish Government's formal closure of an IPC is required to ensure

that a drawback claim conforms to the established, two-prong test. Nor has Noksel demonstrated

that Commerce inappropriately deviated from its current practice. At best, Noksel has shown that Commerce altered its practice with respect to evidence of closure years before the final results were issued in the case at bar, and that the agency appropriately explained its basis for doing so. Finally, Noksel has not shown that Commerce otherwise erred in denying its drawback claim. Rather, Commerce's decision was reasonable and supported by substantial record evidence. The Court should accordingly affirm Commerce's decision to deny Noksel's duty drawback claim.

### C.   Commerce's Treatment of Section 232 Duties as "United States Import Duties" Should Be Affirmed

As explained above, in addition to calling for duty drawback adjustments (where appropriate), the Tariff Act of 1930 requires U.S. prices to be reduced by the amount of any "United States import duties" included in those prices. 19 U.S.C. § 1677a(c)(2)(A). Turkish LWR was subject to Section 232 duties of 25% on from March to August 2018 and 50% from August 2018 through May 15, 2019 (*i.e.*, beyond the end of the POR). *Proclamation 9705*, 83 Fed. Reg. at 11,630; *Proclamation 9772*, 83 Fed. Reg. at 40,432; *Proclamation 9886*, 84 Fed. Reg. at 23,421-22. In its opening brief, Noksel challenges Commerce's determination to deduct Section 232 duties from its U.S. prices as a general matter, Noksel's Brief at 19-37, and also challenges the agency's determination not to limit the deduction to 25% for sales that entered during the period when Turkey was subject to 50% duties imposed under Section 232. *Id.* at 37-40.

Noksel's arguments that Commerce erred in deducting Section 232 duties from the company's export prices are unpersuasive. As this Court has previously found, the deduction of such duties from U.S. prices is consistent with the statute and the CAFC's determination in *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1363 (Fed. Cir. 2007). With respect to Noksel's argument that any deduction should have been limited to 25%, Noksel failed to adequately brief this claim before Commerce. The claim is thus unexhausted and not properly

before this Court. In any event, the claim fails for the same reasons that Section 232 duties are deductible from U.S. price as a general matter.

### 1.   Commerce Acted Appropriately in Treating Section 232 Duties as Deductible from Export Prices

As noted above, 19 U.S.C. § 1677a(c)(2)(A) calls upon Commerce to reduce a respondent company's U.S. prices by the amount of any "United States import duties" included in those prices. In determining whether a particular duty is deductible under this statutory provision, the Courts have considered factors such as the remedial purpose of the duty, whether the duty has a set termination date, and whether the purpose of the duty overlaps with that of antidumping duties. *Wheatland Tube*, 495 F.3d at 1362-63, 1365. 19 U.S.C. § 1677a(c)(2)(A). Final IDM at 4-5.

Commerce determined here to treat Section 232 duties as "United States import duties" for purposes of 19 U.S.C. § 1677a(c)(2)(A). Final IDM at 4-5. Commerce found that Section 232 duties are not focused on remedying imports that threaten or injure a domestic industry, or, to quote *Wheatland Tube*, "protecting the bottom line of domestic producers." *Id.* at 5. Rather, Section 232 duties are imposed for national security reasons. *Id.* at 4. Commerce also found that Section 232 duties are not imposed for a purpose that overlaps with that of antidumping duties. *Id.* at 4-5. Commerce noted that, in imposing Section 232 duties, the President referred to them as "ordinary" customs duties. *Id.* at 4.

Noksel challenges Commerce's decision to treat Section 232 duties as "United States import duties" as unreasonable and inconsistent with law. Noksel's Brief at 19-34. Noksel argues that Section 232 duties are not ordinary customs duties, but special duties that are remedial and temporary in nature, and imposed pursuant to a Congressional delegation of authority to the Executive Branch. *Id.* at 20-34. Noksel faults Commerce for not having, in Noksel's view, appropriately applied the factors called out in *Wheatland Tube* in analyzing the treatment of

Section 232 duties here. *Id.* at 19-20. Noksel also argues that the deduction of Section 232 duties from its export prices imposed a double remedy. *Id.* at 34-37. Noksel therefore argues that Commerce's treatment of Section 232 should be remanded with instructions that the agency must treat the duties as non-deductible from U.S. price. *Id.* at 40.

Noksel's claims are unconvincing, and should be rejected by this Court, consistent with the Court's holding in *Borusan.* There, a Turkish producer and importer of circular welded pipe argued that Section 232 duties could not reasonably be treated as "United States import duties" because they are remedial and temporary in nature. *Borusan*, 494 F. Supp. 3d. at 1372. The Court found otherwise, reasoning that the purpose behind the statutory deduction of "United States import duties" from U.S. price is to obtain an ex-factory price that is comparable with the price of goods in the home market, which are not subject to import duties. *Id.* at 1373.

The Court found that, unlike Section 201 duties (which Commerce has previously found to be "special duties" that are not deductible from U.S. prices), Section 232 duties are not necessarily remedial in the manner of antidumping duties. *Id.* at 1374. The Court explained that antidumping duties are not deducted from export prices because the purpose of such duties is to remedy injury to a U.S. industry by bringing U.S. price to the level it would likely be absent dumping behavior – *i.e.*, up to a level comparable to the ex-factory home market price. *Id.* at 1374-75. Similarly, Section 201 duties are not deducted because those duties are also imposed to remedy injury to a U.S. industry. *See, e.g.*, *id.* at 1374. Importantly, the Court reasoned, double-counting does not result from treatment of Section 232 duties as "United States import duties." *Id.* at 1375. While there is a "clear . . . interplay between Section 201 duties and antidumping duties," there is no "requirement of complimentary treatment with normal unfair trade laws in Section 232." *Id.*

Ct. No. 21-00140                                              NON-CONFIDENTIAL VERSION

The Court accordingly upheld Commerce's treatment of Section 232 duties as "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A). *Id.* at 1375-76.

While Noksel acknowledges the existence of the *Borusan* decision, it asserts that the Court should "reconsider" its ruling and find that Section 232 tariffs are distinguishable from ordinary U.S. import duties. Noksel's Brief at 19-20. However, the arguments that it makes in favor of such a result are not substantively distinct from those that the Court considered and rejected in *Borusan*. In particular, Noksel argues that Section 232 duties "remedial" and "temporary." Noksel's Brief at 20-31. But as the Court has previously found, while Section 232 duties may be temporary and remedial in some sense, they are sufficiently dissimilar from antidumping duties that it is reasonable for Commerce to treat them as "United States import duties." *Borusan*, 494 F. Supp. 3d at 1374-76. Section 232 duties address a different problem than antidumping duties and, importantly, there is nothing within Section 232 or its legislative history that indicates that antidumping duties are to be considered when setting Section 232 duties, or that Section 232 duties are complementary to antidumping duties. *Id.* at 1375. As Commerce recognized in its final results, the purpose of the Section 232 duties was to promote national security interests. Final IDM at 4-5. And as Commerce noted, the President referred to the Section 232 duties as "ordinary" customs duties when imposing them. *Id.* at 4. Indeed, *Proclamation 9705* and *Proclamation 9772* state that the Section 232 duties in effect during the POR were to be collected in addition to, and not in lieu of, "any other duties, fees, exactions, and charges" applicable to affected imports, including anti-dumping duties. *Proclamation 9705*, 83 Fed. Reg. at 11,627, 11,629; *Proclamation 9772*, 83 Fed. Reg. at 40,430.

Noksel argues that Section 232 duties should be treated as non-deductible because they are imposed by the Executive Branch pursuant to a delegation from Congress. Noksel's Brief at 31-

34. Noksel argues that this distinguishes Section 232 duties from "United States import duties," making it unlawful for Commerce to have treated them as such. *Id.* This particular claim was not addressed in *Borusan*, but the *Borusan* Court observed that there is no statutory definition of "United States import duties," and the phrase is "broad enough to include all import duties except antidumping duties . . ." *Borusan*, 494 F. Supp. 3d at 1371, 1375. Thus, the particular manner in which the duties are imposed does not compel Commerce to conclude that Section 232 duties are special duties that cannot be deducted from U.S. prices.

Rather, the salient question is whether Section 232 duties overlap so closely with antidumping duties that deducting them would result in the same policy concerns that have driven Commerce to treat Section 201 duties as non-deductible under 19 U.S.C. § 1677a(c)(2)(A). Here, while Noksel argues that the answer is yes, Noksel's Brief at 31-35, the Court's decision in *Borusan* indicates otherwise. Rather, Commerce reasonably concluded that Section 232 duties do not overlap with antidumping duties in the manner of Section 201 duties, so that they are reasonably and lawfully treated as "United States import duties" for purposes of 19 U.S.C. § 1677a(c)(2)(A). Final IDM at 3-5. Noksel's arguments to the contrary should be dismissed.

### 2. Noksel Failed to Exhaust Its Challenge to Commerce's Treatment of the "Additional" Section 232 Duties on Turkish LWR

During the review period, Section 232 duties on Turkish steel products were increased from 25% to 50%. *See generally Proclamation 9772*. In its case brief, Noksel referred to the increase to bolster its argument that Section 232 duties are inherently temporary. Noksel's Case Brief at 16. Specifically, Noksel argued that the increase, and subsequent decrease of the duties back to 25%, "proves that Section 232 duties are temporary in nature" as a general matter. *Id.* Referencing the decrease of the duties from 50% back to 25%, Noksel then stated that "Commerce, at the very least should not deduct the additional 25% from the export price, which was imposed during the POR.

Thus the additional 25% of Section 232 duties were clearly temporary." *Id.* at 16 and 25. This was the entirety of Noksel's argument to Commerce regarding what it terms the "additional" 25% duties.

Noksel devotes an entire section of its opening brief in this appeal to arguing against the deduction of these "additional" duties. Noksel's Brief at 37-40. But as demonstrated above, Noksel did not develop this argument before Commerce, alluding to it in only the most cursory way. This offhand treatment did not suffice to exhaust Noksel's remedies with respect to its specific claim that the "additional" 25% duties were sufficiently distinguishable from the initial Section 232 duties as to require Commerce to maintain the "additional" duties in Noksel's export prices.

Exhaustion of remedies is required in appeals of Commerce's antidumping duty determinations. *Boomerang Tube*, 856 F.3d at 912-13. Further, Commerce's regulations require parties to include within their case briefs all arguments that they deem relevant to the agency's final results. *See* 19 C.F.R. § 351.309(c)(2); *see also Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007). Here, Commerce's preliminary results indicated that it intended to deduct the full amount of the Section 232 duties from U.S. price. Preliminary IDM at 8. Noksel had the opportunity, and the obligation, to fully develop and present any argument that Commerce should limit its deductions to 25% in its case brief. Yet, Noksel failed to develop these arguments, instead confining itself to a conclusory statement that the deduction should be limited. Because Noksel failed to exhaust its remedies, the Court should decline to consider the section of the company's opening brief that argues against deduction of the "additional" duties. However, as explained below, even if the Court determines to consider Noksel's arguments on this issue, those arguments are unpersuasive.

### 3.  Even if the Court Considers Noksel's Challenge to the Deduction of the "Additional" Duties, that Challenge is Unpersuasive

Even if the Court were to treat Noksel's arguments regarding the "additional" duties as appropriately exhausted, they would not be compelling. Noksel essentially makes the same arguments with respect to the "additional" Section 232 duties that it does with respect to all of the Section 232 duties – that they are "special" and should not be deducted from U.S. price because they are remedial, temporary, and provide a double remedy. Noksel's Brief at 37-39. But as explained above and in the Court's determination in *Borusan*, Section 232 duties are imposed for a different reason than Section 201 or antidumping duties, such that their deduction from U.S. price does not provide a double remedy. *Borusan*, 494 F. Supp. 3d. at 1372-73. Rather, their deduction from U.S. price serves the overall goal of ensuring that the export and home market prices used in the antidumping duty calculations are presented on a comparable basis. *Id.* at 1373.

Finally, while Noksel asserts that "the lawfulness of the tariffs imposed on Turkish imports pursuant to *Proclamation 9772* remains an unsettled legal question," Noksel does not appear to argue that the legal status of the *Proclamation 9772* tariffs should have affected Commerce's analysis. Noksel's Brief at 37-40. In any event, the CAFC recently held that these additional duties were indeed lawful. *Transpac.fic Steel LLC v. United States*, 4 F.4th 1306, 1310 (Fed. Cir. 2021).[10]

### 4.  Conclusion

This Court should affirm Commerce's deduction of Section 232 duties from Noksel's U.S. prices. That deduction was consistent with the overall purpose of 19 U.S.C. § 1677a(c)(2)(A), as well as with this Court's determination in *Borusan*. And while the Court should decline to consider

---

[10]     Turkish producers/importers in that action have filed a petition for a writ of certiorari at the Supreme Court. *See* Pet. for Writ of Cert., *Transpac.fic Steel LLC v. United States*, No. 21-721 (U.S. Nov. 12,2021).

NON-CONFIDENTIAL VERSION

Noksel's arguments with respect to what it terms the "additional" Section 232 duties on the exhaustion grounds, those arguments are unpersuasive for the same reasons that fatally undermine Noksel's arguments against the deduction of Section 232 duties in general.

## V.   <u>CONCLUSION</u>

For the reasons detailed above, Nucor Tubular respectfully requests that this Court affirm Commerce's decision to deny Noksel a duty drawback adjustment and its deduction of Section 232 duties from Noksel's U.S. prices.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Theodore P. Brackemyre, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
202-719-7000

*Counsel for Nucor Tubular Products, Inc.*

Dated: December 3, 2021

## CERTIFICATE OF COMPLIANCE

Pursuant to Scheduling Order (June 8, 2021), ECF No. 21, the undersigned certifies that this brief complies with the word limitation requirement. The word count for Nucor Tubular's Response Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 9,821 words.

_/s/ Alan H. Price_
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Nucor Tubular Products Inc.
(Representative Of)

December 3, 2021
(Date)