## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | | |
|---|---|---|
| NOKSEL CELIK BORU SANAYI A.S., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | Court No. 21-00140 |
| | ) | |
| Defendant, | ) | **PUBLIC VERSION** |
| and | ) | |
| | ) | |
| NUCOR TUBULAR PRODUCTS INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## MOTION FOR JUDGMENT UPON THE AGENCY RECORD

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:
Ashlande Gelin
Staff Attorney
Office of the Chief Counsel
for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

In K. Cho
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0463
Facsimile:  (202) 305-7644
Email: In.K.Cho@usdoj.gov

December 3, 2021

*Attorneys for Defendant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

STATEMENT PURSUANT TO RULE 56.2 ........................................................................ 1

I.  Administrative Determination Under Review .......................................................... 1

II.  Statement Of The Issues ......................................................................................... 2

STATEMENT OF FACTS ................................................................................................... 2

ARGUMENT .......................................................................................................................... 8

I.  Standard Of Review ................................................................................................ 8

II.  Commerce's Deduction Of Section 232 Duties From U.S. Price Is Supported
By Substantial Evidence And In Accordance With Law ....................................... 10

   A.  Commerce Reasonably Determined That Section 232 Duties Are
   "United States Import Duties" That Must Be Deducted From Export Price ................... 10

   B.  Commerce's Decision Not To Characterize Section 232 Duties As
   "Special Duties" Is In Accordance With Law ................................................. 11

   C.  Commerce Did Not Err By Failing To Limit Section 232 Deductions
   To 25 Percent ............................................................................................. 22

III. Commerce's Denial Of Noksel's Request For A Duty Drawback Adjustment Is
Supported By Substantial Evidence And In Accordance With Law ...................... 24

   A.  Noksel Failed To Provide Record Evidence To Demonstrate That
   Its IPC Had Been "Closed" .......................................................................... 25

   B.  Commerce Did Not Err By Not Addressing Whether Noksel Had Satisfied
   The Second Part Of The Duty Drawback Test ................................................ 31

CONCLUSION ................................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**

*AK Steel Corp. v. United States*,
   988 F. Supp. 594 (Ct. Int'l Trade 1997) ................................................................ 12

*Am. Inst. for Int'l Steel, Inc. v. United States*,
   806 F. App'x. 982 (Fed. Cir. 2020) ....................................................................... 20

*Apex Exports v. United States*,
   777 F.3d 1373 (Fed. Cir. 2015) .............................................................................. 10

*Arcelormittal USA Inc. v. United States*,
   32 C.I.T. 440 (Ct. Int'l Trade 2008) ..................................................................... 25

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ............................................................................... 8

*Bethlehem Steel Corp. v. United States*,
   27 F. Supp. 2d 201 (Ct. Int'l Trade 1998) ........................................................... 12

*Boomerang Tube LLC v. United States*,
   856 F.3d 908 (Fed. Cir. 2017) ................................................................................ 22

*Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*,
   494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) ................................................ passim

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ................................................................................................ 8

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ................................................. 8

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ................................................................................................ 8

*Dorbest Ltd. v. United States*,
   604 F.3d 1363 (Fed. Cir. 2010) .............................................................................. 22

*Federal Mogul Corp. v. United States*,
   813 F. Supp. 856 (Ct. Int'l Trade 1993) ............................................................... 12

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ................................................................................ 25

*Fujitsu General, Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ................................................................................. 9

*Hoogovens Staal BV v. United States*,
   4 F. Supp. 2d 1213 (Ct. Int'l Trade 1998) ........................................................... 12

*JBF RAK LLC v. United States*,
   790 F.3d 1358 (Fed. Cir. 2015) ............................................................................... 9

*Maverick Tube Corp. v. United States*,
   163 F. Supp. 3d 1345 (Ct. Int'l Trade 2016) .................................................. 25, 27

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ............................................................................... 8

*PQ Corp. v. United States*,
   652 F. Supp. 724 (Ct. Int'l Trade 1987) ............................................................... 12

*Saha Thai Steel Pipe (Pub.) Co. v. United States*,
   635 F.3d 1335 (Fed. Cir. 2011) .......................................................................... 24, 25

*Timken Co. v. United States*,
   354 F.3d 1334 (Fed. Cir. 2004) ........................................................................... 9, 11

*Toscelik Profil v. Sac Endustrisi A.S.*,
   321 F. Supp. 3d 1270 (Ct. Int'l Trade 2018) .......................................................................... 26
*Transpacific Steel LLC v. United States*,
   4 F.4th 1306 (Fed. Cir. 2021) ................................................................... 14, 15, 17, 23
*U.S. Steel Grp. v. United States*,
   96 F.3d 1352 (Fed. Cir. 1996) ........................................................................................ 9, 12
*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ............................................................................................................ 8, 9
*Wheatland Tube Co. v. United States*,
   495 F.3d 1355 (Fed. Cir. 2007) ..................................................................................... passim
*Zenith Electronics Corp. v. United States*,
   77 F.3d 426 (Fed. Cir. 1996) .................................................................................................. 11

**Statutes**

19 U.S.C. § 2132 ......................................................................................................................... 17
19 U.S.C. § 1516a ......................................................................................................................... 8
19 U.S.C. § 1675 ......................................................................................................................... 17
19 U.S.C. § 1677a ................................................................................................................. passim
19 U.S.C. § 1677b ....................................................................................................................... 10
19 U.S.C. § 1862 .................................................................................................................. passim
19 U.S.C. § 2251 .................................................................................................................... 16, 17
28 U.S.C. § 2637 ......................................................................................................................... 22

**Other Authorities**

*Proclamation 9705 of March 8, 2018 Adjusting Imports of Steel Into the United States*,
   83 Fed. Reg. 11,625 (Mar. 15, 2018) ................................................................................ passim
*Proclamation 9772 of August 10, 2018 Adjusting Imports of Steel Into the United States*,
   83 Fed. Reg. 40,429 (Aug. 15, 2018) ................................................................... 4, 7, 20, 22
*Proclamation 9886 of May 16, 2019 Adjusting Imports of Steel Into the United States*,
   84 Fed. Reg. 23,421 (May 21, 2019) ...................................................................................... 5
*Publication of a Report on the Effect of Imports of Steel on the National Security: An
   Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962*,
   85 Fed. Reg. 40,202 (Dep't of Commerce Jul. 6, 2020) ...................................................... 21

**Regulations**

19 C.F.R. § 351.309 ..................................................................................................................... 22

**Administrative Determinations**

*Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review,*
   69 Fed. Reg. 61,649 (Dep't of Commerce Oct. 20, 2004) ....................................................... 13

*Light-Walled Rectangular Pipe and Tube: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016,*
   82 Fed. Reg. 47, 477 (Dep't of Commerce Oct. 12, 2017) ................................................ 27, 28

*Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review,*
   69 Fed. Reg. 19,153, 19,159 (Dep't of Commerce Apr. 12, 2004).............................. 13, 14, 19

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| _____ ) | |
| NOKSEL CELIK BORU SANAYI A.S., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Court No. 21-00140 |
| ) | |
| Defendant, ) | **PUBLIC VERSION** |
| and ) | |
| ) | |
| NUCOR TUBULAR PRODUCTS INC., ) | |
| ) | |
| Defendant-Intervenor. ) | |
| _____ ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully submits this opposition to the motion for judgement upon the agency record filed by plaintiff, Noksel Celik Boru Sanayi A.S. (Noksel).  Plaintiff challenges several aspects of the United States Department of Commerce's final results in the 2018-2019 administrative review of the antidumping duty order on light-walled rectangular pipe and tube (LWRPT) from Turkey.  As we demonstrate below, the Court should deny plaintiff's motion because Commerce's final results are supported by substantial evidence and in accordance with law.

**STATEMENT PURSUANT TO RULE 56.2**

I.   **Administrative Determination Under Review**

The administrative determination under review is the final results of the 2018-2019 administrative review of the antidumping duty order on LWRPT from Turkey.  *See Light-Walled*

*Rectangular Pipe and Tube from Turkey*, 86 Fed. Reg. 11,230 (Dep't of Commerce Feb. 24, 2021) (final admin. review) (Final Results) (P.R. 125), and accompanying Issues and Decision Memorandum (IDM) (P.R. 115).  The period of review is May 1, 2018, through April 30, 2019.

## II.   <u>Statement Of The Issues</u>

1.      Whether Commerce's deduction of Section 232 duties from Noksel's U.S. price is supported by substantial evidence and in accordance with law.

2.      Whether Commerce erred by failing to limit Section 232 reductions to 25 percent when Noksel never requested Commerce to do so.

3.      Whether Commerce's decision not to grant Noksel's request for a duty drawback adjustment is supported by substantial evidence and in accordance with law.

## <u>STATEMENT OF FACTS</u>

On March 8, 2018, pursuant to his authority under Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, the President imposed a 25 percent *ad valorem* tariff on imports of steel articles from all countries, except Canada and Mexico.  *See Proclamation 9705 of March 8, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018).  The Secretary of Commerce published a January 2018 investigative report and found that steel articles were being imported into the United States in such quantities and under such circumstances as to threaten to impair the country's national security.  *Id.*; *see* 19 U.S.C. § 1862(b)(3)(A).  The Secretary determined that excessive steel imports were weakening the domestic steel industry and shrinking the U.S. ability to meet national security steel production requirements in a national emergency.  *Proclamation 9705*, 83 Fed Reg. at 11,625.  The President concurred with the Secretary's report, and in response, implemented Section 232 duties on certain steel articles entered on or after March 23, 2018.  *See id.* at 11,627-28.  The goal of the 25 percent tariff was to reduce imports to a level that would "ensure that domestic producers can

continue to supply all the steel necessary for critical industries and national defense." *Id.* at

11,625-26.  The President stated that the new 25 percent tariff applied "in addition to any other

duties, fees, exactions, and charges applicable to such imported steel articles." *Id.* at 11,627.

To establish the tariff, the President modified subchapter III, chapter 99, of the

Harmonized Tariff Schedule of the United States (HTSUS) to add a new heading, 9903.80.01,

which provided for an additional 25 percent tariff for "products of iron or steel provided for in

the tariff headings or subheadings enumerated in note 16 to this subchapter, except products of

Canada {or} of Mexico . . . or any exclusions that may be determined and announced by the

Department of Commerce."  HTSUS, Revision 2, Chapter 99, subheading 9903.80.01 (posted

Mar. 29, 2018).  The President also added a new Note 16, subsection (a) which provided:

> Heading 9903.80.01 sets forth the *ordinary customs duty* treatment
> applicable to all entries of iron or steel products from all countries, except
> products of Canada and of Mexico, classifiable in the headings or
> subheadings enumerated in this note.  Such goods shall be subject to duty
> as provided herein.  No special rates of duty shall be accorded to goods
> covered by heading 9903.80.01 under any tariff program enumerated in
> general note 3(c)(i) to the tariff schedule.  *All anti-dumping,*
> *countervailing, or other duties and charges applicable to such goods*
> *shall continue to be imposed.*

*Proclamation 9705*, Annex (U.S. Note 16(a) (emphasis added)).  Consistent with the President's

instructions, the following row was added to the HTSUS:

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 9903.80.01 | 1/ | Products of iron or steel provided for in the tariff headings or subheadings enumerated in note 16 to this subchapter, except products of Canada, of Mexico, of Australia, of Argentina, of South Korea, of Brazil, or of the member countries of the European Union or any exclusions that may be determined and announced by the Department of Commerce.................... | 1/ | 25% | | The duty provided in the applicable subheading + 25% |

Noksel was therefore subject to a 25 percent tariff rate for imports of LWRPT entered on or after March 23, 2018.

   *Proclamation* 9705 also directed the Secretary to continue monitoring the imports of steel and to "inform the President of any circumstances that . . . might indicate the need for further action." *Proclamation 9705*, 83 Fed. Reg. at 11,628.  Several months following the initiation of *Proclamation 9705*, the Secretary informed the President that the capacity utilization of the domestic steel industry had improved, although still below target levels.  *See Proclamation 9772 of August 10, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 40,429 (Aug. 15, 2018).  To address this concern, the President considered the Secretary's initial January 2018 report's recommendation to "{apply} a higher tariff to a list of specific countries." *Id*. at 40,429.  Turkey was among this list of countries because of its role as a major exporter of steel to the United States.  *Id*.  On August 10, 2018, the President further declared that "{t}o further reduce imports of steel articles and increase domestic capacity utilization," he determined it "necessary and appropriate to impose a 50 percent ad valorem tariff on steel articles imported from Turkey, beginning on August 13, 2018."  *Id.*

   To establish the tariff, the President modified subchapter III, chapter 99, of the Harmonized Tariff Schedule of the United States (HTSUS) to add a new heading, 9903.80.02, which provided for an additional 50 percent tariff for "products of iron or steel that are the product of Turkey provided for in the tariff headings or subheadings enumerated in note 16(b) to this subchapter, except any exclusions that may be determined and announced by the products of Department of Commerce."  HTSUS, Revision 9, Chapter 99, subheading 9903.80.02.  The President also added a new Note 16, subsection (a)(ii) of which provided:

> Heading 9903.80.02 provides the *ordinary customs duty* treatment of iron
> or steel products of Turkey, pursuant to the article description of such

heading.  For any such products that are eligible for special tariff treatment under any of the free trade agreements or preference programs listed in general note 3(c)(i) to the tariff schedule, *the duty provided in this heading shall be collected in addition to any special rate of duty* otherwise applicable under the appropriate tariff subheading . . . .

*Proclamation 9772*, Annex (U.S. Note 16(a)(ii) (emphasis added)).  Consistent with the President's instructions, row 9903.80.02 was added to the HTSUS:

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 9903.80.01 | 1/ | Products of iron or steel provided for in the tariff headings or subheadings enumerated in note 16 to this subchapter, except products of Australia, of Argentina, of South Korea, of Brazil, of Turkey or any exclusions that may be determined and announced by the Department of Commerce.......................... | 1/ | The duty provided in the applicable subheading + 25% | | The duty provided in the applicable subheading + 25% |
| 9903.80.02 | 1/ | Products of iron or steel that are the product of Turkey and provided for in the tariff headings or subheadings enumerated in note 16(b) to this subchapter, except any exclusions that may be determined and announced by the Department of Commerce.......................... | 1/ | The duty provided in the applicable subheading + 50% | | |

The 50 percent *ad valorem* tariff on Turkish steel was in place for just under nine months before reverting to 25 percent on May 21, 2019.  *See Proclamation 9886 of May 16, 2019 Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23,421 (May 21, 2019). Monitoring the effects of *Proclamation 9772*, the administration determined that the domestic steel industry's capacity utilization had improved to target levels.  *Id*. at 23,421-22.  However, the administration also determined that "{m}aintaining the existing 25 percent ad valorem tariff on most countries {was} necessary and appropriate . . . to address the threatened impairment of the national security that the Secretary found in the January 2018 report."  *Id*. at 23,422.  The 50 percent *ad valorem* tariff in *Proclamation 9772* and the return to the 25 percent *ad valorem* tariff pursuant to *Proclamation 9886* were in effect during the period of review.

On July 15, 2019, Commerce initiated the administrative review of the antidumping duty order on LWRPT from Turkey for the period of review of May 1, 2018, through April 30, 2019. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 33,739, 33,748 (Dep't of Commerce July 15, 2019).  On July 24, 2020, Commerce published the preliminary results of its review.  *See Light-Walled Rectangular Pipe and Tube From Turkey*, 85 Fed. Reg. 44861 (Dep't of Commerce July 24, 2020) (prelim. admin. review) (Preliminary Results) (P.R. 124) and accompanying Preliminary Decision Memorandum (PDM) (P.R. 103). In the *Preliminary Results*, Commerce determined that Section 232 duties fell within "U.S. movement expenses" and deducted them from Noksel's United States price, in accordance with 19 U.S.C. § 1677a(c)(2)(A).  PDM at 8; *see also* PDM at 4 (P.R. 105).  Commerce made this deduction because Noksel reported paying Section 232 duties on U.S. sales during the period of review.  *Id*.; *see also* Section C Supplemental Questionnaire Response at Exh. S3-3 (P.R. 61) (C.R. 92).

In the *Preliminary Results*, Commerce also denied Noksel's request for duty drawback adjustment, consistent with 19 U.S.C. § 1677a(c)(1)(B).  PDM at 8-9.  Commerce denied this adjustment because Noksel failed to base its claim on a "closed {inward processing certificate}" under the Turkish Inward Processing Regime.  PDM at 9; *see also* Section B-D Questionnaire Response at C-35-37 and Exhs. C-15-17 (P.R. 42) (C.R. 15, 19).

In the *Final Results*, Commerce continued to deduct Section 232 duties from Noksel's U.S. price, determining that Section 232 duties were "United States import duties."  IDM at 10-13, 15-16; *see also* 19 U.S.C. § 1677a(c)(2)(A).  Commerce considered the Federal Circuit's decision in *Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007), which sustained Commerce's determination not to adjust U.S. price in antidumping proceedings for

6

Section 201 safeguard duties.  IDM at 4.  Commerce determined, however, that Section 232

duties are different from Section 201 and antidumping duties, and, therefore, *Wheatland Tube*

does not require a different outcome to this case.  *Id.* (concluding that "Section 232 duties are not

special remedial duties akin to antidumping or section 201 duties" but those duties focused on

"threats to national security").  Moreover, the Annex to *Proclamation* 9705, which is the

Presidential Proclamation that established the nature and treatment of Section 232 duties,

referred to Section 232 duties as "ordinary" customs duties applicable to all steel imports.

*Proclamation 9705*, Annex (U.S. Note 16(a)); *see also* HTSUS, Revision 2, Chapter 99,

subheading 9903.80.01 (Posted Mar. 29, 2018) (table referring to 25 percent rate as "general,"

not "special"); *Proclamation 9772*, Annex (U.S. Note 16(a)(ii)) (referring to Section 232 duties

as "ordinary" custom duties and explaining that any duties pursuant to this heading shall be

collected in addition to any special rate of duty).[1]  Accordingly, Commerce determined that

Section 232 duties are "treated as any other duties" that should be deducted from Noksel's

United States price.  IDM at 4-5.  Commerce also continued to deny Noksel a duty drawback

adjustment.  IDM at 6.  Commerce found that Noksel's application for closure did not show that

an inward processing certificate (Turkish acronym, DIIB) had been closed and explained that an

IPC could be modified or suspended even after an application for closure was submitted to the

Turkish government.  *Id.* at 7.  Thus, because the record failed to demonstrate that Noksel was

---

[1] *See also Proclamation 9711 of March 22, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 13361 (Mar. 28, 2018); *Proclamation 9740 of April 30, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 20,683 (May 7, 2018); *Proclamation 9759 of May 31, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 25857 (Jun. 5, 2018); *Proclamation 9772*; *Proclamation 9886*; *Proclamation 9894 of May 19, 2019: Adjusting Imports of Steel Into the United States, 84 Fed. Reg. 23987*.  The proclamations modifying *Proclamation 9705* do not expressly provide that section 232 duties receive different treatment and or are classified as "special duties."

"precluded from suspending its IPC application or modifying the application to add import or export information to the IPC," Commerce continued to deny Noksel's request for a duty drawback adjustment.  IDM at 7-8.

## ARGUMENT

### I.   Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence upon the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Thus, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions.  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court examines the lawfulness of Commerce's statutory interpretations, it employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  The Court first examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency must comply with Congress's clear intent.  *Id*. at 842-43.  If, however, "the statute is silent or ambiguous with respect to the specific

issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843.  In such cases, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *Eurodif*, 555 U.S. at 316 (citation omitted). The Court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11.  Indeed, "the whole point of Chevron is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Eurodif*, 555 U.S. at 316 (citation and quotation marks omitted).

   This Court affords Commerce an especially great deal of deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)).  In that circumstance, "Commerce 'may perform its duties in the way it believes most suitable.'" *Id*. (quoting *U.S. Steel Grp*., 96 F.3d at 1362).  Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute.  *Fujitsu General, Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

II.     **Commerce's Deduction Of Section 232 Duties From U.S. Price Is Supported By Substantial Evidence And In Accordance With Law**

Commerce's deduction of Section 232 duties from Noksel's U.S. price was supported by substantial evidence and in accordance with law.  IDM at 3-8.  The President explicitly referred to the Section 232 duties as "ordinary" customs duties, *id.* at Annex, supporting Commerce's determination that "Section 232 duties are treated as any other duties."  IDM at 4; *see* HTSUS, Revision 2, Chapter 99, subheading 9903.80.01 (Mar. 29, 2018) (table indicating that the rate of duty for steel imports is the duty provided in the regular, applicable subheading plus 25 percent). Noksel argues that Commerce should have determined Section 232 duties as "special duties" because of their "remedial" and "temporal" purpose, and that Commerce's interpretation of the statute is inconsistent with the Federal Circuit's analysis in *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1363 (Fed. Cir. 2007).  As demonstrated below, Noksel is wrong.

A.     **Commerce Reasonably Determined That Section 232 Duties Are "United States Import Duties" That Must Be Deducted From Export Price**

The goal of Commerce's statutorily prescribed antidumping calculation is to allow Commerce to compare the fair value of the merchandise to the price charged in the United States.  19 U.S.C. § 1677b(a)(1)(B); 19 U.S.C. § 1677a(c)(2); 19 U.S.C. § 1677b(a)(6); *see also*, *e.g.*, *Apex Exports v. United States*, 777 F.3d 1373, 1374-75 (Fed. Cir. 2015) (noting that "{t}he overall goal {of the antidumping calculation methodology} is to arrange an apples-to-apples comparison between the domestic and foreign price of merchandise.")  Accordingly, both export price and normal value are subject to adjustments "so that they closely reflect the price of subject merchandise at a common point in the chain of commerce."  *Id*. at 1734 (citing 19 U.S.C. § 1677b(a)(1)(B); 19 U.S.C. § 1677a(c)(2); 19 U.S.C. § 1677b(a)(6)).

Pertinent here, the antidumping statute directs Commerce to reduce a respondent's export price and constructed export price by "the amount, if any, included in such price, attributable to

10

any additional costs, charges, or expenses, and *United States import duties* . . . ."  19 U.S.C.

§ 1677a(c)(2)(A) (emphasis added).  The term "United States import duties" is not defined in the

statute, and Commerce's interpretation need only be reasonable to be sustained.  *See* 19 U.S.C.

§ 1677a(c)(2)(A); *Timken*, 354 F.3d at 1342; *Wheatland Tube*, 495 F.3d at 1359-60; *Borusan*

*Mannesmann Boru Sanayi v. Ticaret A.S.*, 494 F. Supp. 3d 1365, 1374-76 (Ct. Int'l Trade 2021).

Commerce's decision is consistent with the statute because it directs Commerce to adjust

export price for United States import duties, and Section 232 duties are import duties.  *See* IDM

at 3-4.  The President explicitly referred to the Section 232 duties as "ordinary" customs duties,

*id.* at Annex, supporting Commerce's determination that "Section 232 duties are treated as any

other duties."  IDM at 4; *see* HTSUS, Revision 2, Chapter 99, subheading 9903.80.01 (posted

Mar. 29, 2018) (table indicating that the rate of duty for steel imports is the duty provided in the

regular, applicable subheading plus 25 percent).  Commerce's interpretation of the phrase

"United States import duties" is reasonable and is entitled to deference because it is consistent

with the broad language of the statute and with the President's proclamation.  *See, e.g.*,

*Wheatland Tube*, 495 F.3d at 1359; *Zenith Electronics Corp. v. United States*, 77 F.3d 426, 430

(Fed. Cir. 1996) (noting that Court must interpret ambiguous statute "with deference to

Commerce's interpretation").

**B.    Commerce's Decision Not To Characterize Section 232 Duties As "Special
        Duties" Is In Accordance With Law**

Noksel's primary argument is that Commerce's decision not to characterize Section 232

duties as "special tariffs" is contrary "to Commerce's longstanding policy of excluding

adjustments for special tariffs, such as safeguards, antidumping, and countervailing ("CVD")

duties, which . . . unlawfully results in a double remedy."  *See* Pl. Br. at 19-29 (citing *Wheatland*

*Tube Co.*, 495 F.3d at 1363).  But this Court in *Borusan* already sustained Commerce's analysis

distinguishing Section 232 duties from the "special duties" addressed in *Wheatland Tube*, 495 F.3d 1355, so Noksel's arguments are unavailing.  *See Borusan*, 494 F. Supp. 3d at 1374-76. Nonetheless, we address Noksel's arguments below.

As an initial matter, Commerce's interpretation of the phrase "United States import duties" as not including antidumping duties has been consistently sustained.  *See AK Steel Corp. v. United States*, 988 F. Supp. 594, 607 (Ct. Int'l Trade 1997); *Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213, 1220 (Ct. Int'l Trade 1998); *U.S. Steel Grp.*, 15 F. Supp. 2d at 898-900; *Bethlehem Steel Corp. v. United States*, 27 F. Supp. 2d 201, 208 (Ct. Int'l Trade 1998); *PQ Corp. v. United States*, 652 F. Supp. 724, 737 (Ct. Int'l Trade 1987) (sustaining Commerce determination not to deduct antidumping duty cash deposits); *Federal Mogul Corp. v. United States*, 813 F. Supp. 856, 872 (Ct. Int'l Trade 1993) (same); *Wheatland Tube*, 495 F.3d at 1355.

In *Wheatland Tube*, the Federal Circuit sustained Commerce's interpretation of the phrase "United States import duties" as not including Section 201 safeguard[2] duties. 495 F.3d at 1355-60.  Comparing Section 201 duties with antidumping duties, the Federal Circuit made the following observations:

> (1) "{l}ike antidumping duties, {Section} 201 safeguard duties are remedial duties that provide relief from the adverse effects of imports;"
>
> (2) "{n}ormal customs duties, in contrast, have no remedial purpose;"
>
> (3) "antidumping duties and {section} 201 safeguard duties, unlike normal customs duties, are imposed based upon almost identical findings that domestic industry is being injured or threatened with injury due to the imported merchandise;" and

---

[2]  Section 201, 19 U.S.C. § 2251, "permits the President of the United States to impose safeguard duties on imported merchandise if the merchandise 'is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article.'"  *Wheatland Tube*, 495 F.3d at 1357.

(4) "{Section} 201 safeguard duties are like antidumping duties . . . because they provide only temporary relief from the injurious effects of imports," whereas normal customs duties "have no termination provision, and are permanent unless modified by Congress."

495 F.3d at 1362-63. The Federal Circuit also held that "{t}o assess both a safeguard duty and an antidumping duty on the same imports without regard to the safeguard duty, would be to remedy substantially overlapping injuries twice." *Id.* at 1365.

After a thorough analysis, Commerce determined that Section 232 duties are not akin to Section 201 or antidumping duties. IDM at 3-5; *see also Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 19,153, 19,159 (Dep't of Commerce Apr. 12, 2004) (*Stainless Steel Wire Rod from Korea*) ("Although the {antidumping duty} law does not define the term 'United States import duties,' the Senate Report that accompanied the Antidumping Act of 1921 (the '1921 Act') contrasts antidumping duties (which it refers to as 'special dumping duties') with normal customs duties (which it refers to as 'United States import duties'). . . . Thus, Congress has long recognized that at least some duties implementing trade remedies—including at least antidumping duties—are *special duties* that should be distinguished from ordinary customs duties.")); *see also Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 61,649 (Dep't of Commerce Oct. 20, 2004).

First, in *Wheatland Tube*, "Commerce found that antidumping duties and Section 201 safeguard duties, unlike *normal customs* duties, are imposed based on almost identical findings that domestic industry is being injured or threatened with injury due to the imported merchandise." 495 F.3d at 1362. Noksel argues that the distinction that Section 232 duties "'focus on threats to national security,' rather than {for} 'provid{ing} relief to U.S. companies from imports that threaten or injure their businesses,'" is a remedial distinction without

difference.  Pl. Br. at 24.  But even if Section 232 might be considered remedial in a "broad sense," *Borusan*, 494 F. Supp. 3d at 1374, Section 232 duties are not imposed because a domestic industry is being injured or threatened.  *See* IDM at 4-5; *Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. at 19,159 (finding that Section 201 duties were similar to antidumping duties and therefore special remedial duties because they are intended to provide "temporary relief for an industry suffering from serious injury").  Section 232 duties are imposed to address imports that threaten to impair national security, *see* 19 U.S.C. § 1862; IDM at 4, and can be "used to promote vital nascent industries, not just already established injured industries," *Borusan*, 494 F. Supp. 3d at 1374.  While an *effect* of the President's Section 232 duties may be to assist a weakened domestic injury, the *purpose* of the duties was to alleviate a national security concern—a purpose much broader than Section 201 or antidumping duties.  IDM at 4; *see also Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1323 (Fed. Cir. 2021) (explaining that "{t}he manifest purpose of this statute is to enable and obligate the President (in whom Congress vested the power to make the remedial judgments) to effectively alleviate the threat to national security identified in a finding . . . .").

    *Proclamation 9705* states that it "is necessary and appropriate to adjust imports of steel articles so that such imports will not threaten to impair the *national security* . . . ."  *Proclamation 9705*, 83 Fed. Reg. at 11,625 (emphasis added); *see also* IDM at 4 n.15-16.  The President sought to alleviate the national security risk that our country's steel "industry will continue to decline, leaving the United States at risk of becoming reliant on foreign producers of steel to meet our national security needs—a situation that is fundamentally inconsistent with the safety and security of the American people."  *Proclamation 9705*, 83 Fed. Reg. at 11,625. Antidumping duties and Section 201 safeguard measures, on the other hand, are "directed at the

same overarching purpose — protecting the bottom line of domestic producers." *See Wheatland Tube*, 495 F.3d at 1362.

Further, the text of Section 232 concerns itself with "the effects on the *national security* of imports of the article." *See* 19 U.S.C. § 1862(b)(1)(A) (emphasis added). The President may not act to adjust imports *unless* he concurs with the finding of the Secretary that articles are being imported in such quantities or under such circumstances as to threaten to impair the national security. *Id.* § 1862(c); *see also Transpacific Steel*, 4 F.4th at 1329 (explaining that the statutory text indicates that "Congress acted to "spur" governmental action, not "limit the scope of . . . authority"). By contrast, for an antidumping duty to be imposed, a domestic industry must be materially injured or threatened with material injury. *Wheatland Tube*, 495 F.3d at 1362. Likewise, Section 201 duties may only be imposed if a domestic producer is experiencing serious injury or threat. *Id.* (citing section 2251). The Federal Circuit stated that normal customs duties can be imposed "regardless of whether the U.S. industry is suffering adverse effects as a result of imports." *Wheatland Tube*, 495 F.3d at 1362. Section 232 duties may be imposed regardless of whether the United States industry is suffering.[3] Thus, Commerce reasonably determined that the law and purpose behind Section 232 duties differ from "special duties," such as Section 201 safeguard and antidumping duties. *See* IDM at 4-5.

Noksel argues that Section 232 duties are remedial because they focus on remedying "the impact of . . . imports on the economic welfare of U.S. domestic industries. . . ." Pl. Br. at 29.

---

[3] For example, President Reagan used his Section 232 authority to embargo oil imports from Libya due to concerns that the Libyan government supported terrorism. *See Presidential Proclamation 4907 of March 10, 1982: Imports of Petroleum*, 48 Fed. Reg. 10,507 (Mar. 10, 1982). *Proclamation 4907* was issued without regard to whether United States industries were suffering.

Although the statute indicates that the President shall consider, among numerous other factors, the impact of foreign competition on domestic industries, the President gives consideration to these factors "in the light of the requirements of national security." 19 U.S.C. § 1862(d). The statute's fundamental concern is national security; it does not prioritize the economic welfare of domestic industries. *See* 19 U.S.C. § 1862 (b)(1)(A)- (c)(1)(A)(ii) (providing that Secretary of Commerce shall investigate effects of imports on national security and allowing President to adjust imports "so that such imports will not threaten to impair the national security"). Thus, Commerce reasonably determined that Section 232 duties are focused on national security concerns, and not on remedying injury to a domestic industry in the same way that "special duties" like Section 201 and antidumping duties are focused. IDM at 4-5. Although the *Borusan* Court disagreed with some of Commerce's analysis, it ultimately upheld that Commerce's determination. *See* 494 F. Supp. 3d at 1374. The Court agreed that there are material differences between Section 232 and Section 201 duties. *Id.*

Second, in *Wheatland Tube*, the Federal Circuit sustained Commerce's reasoning that Section 201 and antidumping duties provide "only *temporary* relief from the injurious effects of imports" unlike normal customs duties. 495 F.3d at 1361. Section 201 duties are generally limited to four years, and antidumping duty orders provide for a termination after five years, with some exceptions. *Id.* (citing 19 U.S.C. §§ 2251 and 1675). "Normal customs duties, however, have no termination provision and are permanent unless modified by Congress." *Id.* Section 232 does not have a termination provision. IDM at 4. To the contrary, Congress granted the President discretion to determine the duration of Section 232 duties. *See* 19 U.S.C. § 1862(c) (providing that the President "shall . . . determine the nature and *duration of the action that* . . . must be taken to adjust the imports . . . so that such imports will not threaten to impair the

national security.") (emphasis added).  The Federal Circuit determined that history of

Section 232 indicated that the President's authority to adopt and pursue a continuing course of

action, with adjustment over a specified time, was intended not to temporally limit his power but

to prevent delayed action.  *Transpacific Steel,* 4 F.4th at 1319-29 (noting that *Proclamation*

*9772,* a modification of *Proclamation 9705*, was one of many steps in achieving the President's

goal of "increasing utilization of domestic steel plants capacity to try to improve their

sustainability for national-security reasons") (citations omitted).  In contrast, antidumping and

Section 201 duties have a statutory expiration date tied to the cessation of injury.  *See* 19 U.S.C.

§ 2251; 19 U.S.C. § 1675(d); *Wheatland Tube*, 495 F.3d at 1362 (affirming Commerce's

reasoning that normal customs duties are not temporary because, unlike antidumping duties,

relief is not tied to continued injury).

 Moreover, Congress did not describe Section 232 duties as "temporary" duties or set a

time limit on the duration of these duties, despite doing so for other duties delegated to the

President to implement.  *See*, *e.g.*, 19 U.S.C. § 2132 (providing that "President shall proclaim,

*for a period not exceeding 150 days* (unless such period is extended by Act of Congress) — a

*temporary* import surcharge" where problems with international payments arise) (emphasis

added).

 Noksel contends that because the circumstances described in the Presidential

Proclamations can change and because the President can remove or modify the duties,

Section 232 duties are temporary.  *See* Pl. Br. at 29.  Noksel also relies on the fact that the 50

percent heightened duties imposed under *Proclamation 9772* lasted for only nine months.  *See id.*

at 38.  These arguments are inconsistent with *Wheatland Tube.*  That the duties can be modified

at some point, to be extended or shortened, does not make them inherently temporary in the same

way antidumping and Section 201 duties are temporary.  Normal customs duties "have no termination provision and are permanent *unless modified by Congress*."  *Wheatland Tube*, 495 F.3d at 1362 (emphasis added).  Congress delegated this broad authority and discretion to the President to determine the duration of Section 232 duties.  What matters is that Section 232 provides no express time-limit on the imposition of duties.  Accordingly, Commerce determined that Section 232 duties are not analogous to special temporary safeguard Section 201 and antidumping duties, but rather they are more analogous to ordinary customs duties with no termination provision.  *See* IDM at 4.[4]

Noksel also claims that the placement of Section 232 duties in chapter 99 of the HTSUS demonstrates that the duties are more similar to special duties because that chapter is reserved for temporary actions such as proclamations or legislation.  Pl. Br. at 31-34.  This argument misses the mark.  Regardless of whether chapter 99 is usually reserved for temporary, remedial action, the President has statutorily provided discretion to decide when Section 232 duties terminate, the President himself referred to the Section 232 duties as "ordinary" customs duties, and he proclaimed that the Section 232 duties must be imposed in addition to antidumping duties.  *Proclamation 9705*, Annex (U.S. Note 16(a)); *Proclamation 9772*, Annex (U.S. Note 16(a)(ii)).  In fact, the President's new heading in chapter 99 placed the 25 percent rate under the "general" column, not the "special" column.  *See* HTSUS, Revision 2, Chapter 99, subheading 9903.80.01.  The mere title of chapter 99 cannot overcome the clear language of the President's proclamations and the text of the statute.  Indeed, Commerce explained in *Stainless Steel Wire Rod from Korea*

---

[4]  The Court found that "lack of permanence is not a viable reason to distinguish Section 201 duties from Section 232 duties."  *Borusan*, 494 F. Supp. 3d at 1374-75.  Notwithstanding the Court's reasoning, however, the Court sustained Commerce's determination to treat Section 232 duties as United States import duties, *id*. at 1375-76, and the Court should do so here as well.

that the placement of a duty in the HTSUS is not dispositive of the purpose of that tariff and that the HTSUS "is a pragmatic way of implementing. . . collection {of duties}." 69 Fed. Reg. at 19,160. And a similar argument was raised in *Borusan*, and the Court was "not persuaded that the placement of Section 232 duties within the {HTSUS} has an effect." *Borusan*, 494 F. Supp. 3d at 1376, n.8.

Finally, in *Wheatland Tube*, because Section 201 safeguard and antidumping duties effectively treat the same injury, Commerce found that deducting Section 201 duties from United States' price could improperly result in the collection of Section 201 duties twice. 495 F.3d at 1362-63. As explained by Commerce in *Stainless Steel Wire Rod from Korea*, the Statement of Administrative Action accompanying the 1921 Act states that "{i}n determining whether to provide {Section 201} relief, and, if so, in what amount, the President will continue the practice of taking into account relief provided under other provisions of law, such as the antidumping" law. 69 Fed. Reg. at 19,160 (quoting Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, at 964 (1994) *reprinted in* 1994 U.S.C.C.A.N. 3773). Congress explicitly intended that the President would take into account any potential overlap between Section 201 and antidumping duties when setting the level of Section 201 duties. *Id.*

In contrast, there is no similar authority demonstrating Congress's intent that the President would take into account potential overlap between Section 232 and antidumping duties. The President directed that Section 232 duties should be applied in addition to "any other duties, fees, exactions, and charges applicable to such imported steel articles." *Proclamation 9705*, 83 Fed. Reg. at 11,625. The Federal Circuit acknowledged that the President's Section 232 tariffs are to be applied "on top of already-applicable antidumping or countervailing duties." *See Am. Inst. for Int'l Steel, Inc. v. United States*, 806 F. App'x. 982, 986 (Fed. Cir.

19

2020).  Commerce was properly concerned about double-counting in *Wheatland Tube* because the legislative history indicated that Congress intended the President to take antidumping duties into account when setting Section 201 duties.  No similar concerns are present here.  In fact, for *Proclamation 9772*, the President emphasized that "the duty provided in this heading shall be collected *in addition to any special rate of duty*."  *Proclamation 9772*, Annex (U.S. Note 16(a)(ii) (emphasis added)).

Commerce determined that "the function of antidumping duties and Section 232 duties are separate and distinct; there is no overlap between the two distinct type of duties, and, thus, they do not provide multiple remedies for the same situation."  IDM at 5.  Section 232 duties are not limited to addressing injury, material or otherwise, to the relevant domestic industry caused by imports.  *See* 19 U.S.C. § 1862.  The focus of Section 232 duties is much different in that it addresses "the capacity of the United States to meet national security requirements."  *Id.*  Unlike the similarity in purpose and function of antidumping and Section 201 duties, Section 232 actions to "adjust imports" are not limited to addressing the injury to industries caused by import surges or unfairly traded imports.  This Court in *Borusan* agreed with Commerce that "{t}here is a clear statutory interplay between Section 201 duties and antidumping duties, while Section 232 does not reveal any such coordination concerns."  *Borusan*, 494 F. Supp. 3d at 1375-76.

Noksel disagrees with Commerce's statement that the function of antidumping duties and Section 232 duties are separate and distinct.  Pl. Br. at 34-35.  According to Noksel:

> President and Commerce have frequently indicated that the Section 232 tariffs were contemplated as an alternative to other special trade remedies, most notably antidumping duties.  For example, in its Report to the President, Commerce noted that "{d}espite efforts to level the playing field through AD/CVD orders, there are numerous examples of U.S. steel producers being unable to fairly compete with foreign suppliers."  Commerce clearly viewed the Section 232 tariffs as commensurate with other special provisions, stating that "{s}maller steel manufacturers are financially unable to afford {AD/CVD} cases, or are hesitant to

file cases in light of possible market entry retaliation in foreign markets for
finished steel products."

*Id*. at 35 (citing *Publication of a Report on the Effect of Imports of Steel on the National*

*Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962*, 85

Fed. Reg. 40,202 (Dep't of Commerce Jul. 6, 2020) (Section 232 Report)).  Commerce's

statements quoted above do not show that Section 232 duties are "alternative" to other remedies

such that they result in double remedy.  Indeed, the report cited by Noksel says:

> **Conclusion**
>
> Based on these findings, the Secretary of Commerce concludes that the present
> quantities and circumstance of steel imports are "weakening our internal
> economy" and *threaten to impair the national security* as defined in Section 232.
> The Secretary considered the Department's narrower investigation of iron ore and
> semi-finished steel imports in 2001, which recommended no action be taken, and
> finds that several important factors—the broader scope of the investigation, the
> level of global excess capacity, the level of imports, the reduction in basic oxygen
> furnace facilities since 2001, and the potential impact of further plant closures on
> capacity needed in a national emergency, support recommending action under
> Section 232.  In light of this conclusion, the Secretary has determined that the
> only effective means of removing the threat of impairment is to reduce imports to
> a level that should, in combination with good management, enable U.S. steel mills
> to operate at 80 percent or more of their rated production capacity.

Section 232 Report, 85 Fed. Reg. at 40,204 (emphasis added).  In any event, what matters here is

that Section 232 duties concern national security, and the existing remedy provided by

antidumping duties does not address national security concerns, so there is no double remedy

here.

In sum, Commerce thoroughly explained why it concluded that Section 232 and 201

duties are different such that *Wheatland Tube* is not controlling, and as this Court has already

determined.  *See Borusan*, 494 F.Supp. 3d at 1375.

**C.     Commerce Did Not Err By Failing To Limit Section 232 Deductions To 25 Percent**

The Court should reject Noksel's claim that Commerce unlawfully deducted Section 232 duties in excess of 25 percent.  Noksel contends that the duties imposed in excess of 25 percent were unlawful "{p}ursuant to *Proclamation 9705*"—the Presidential proclamation discussed above—not *Proclamation 9772*, which imposed the 50 percent heightened Section 232 duties on steel imports from Turkey.  Pl. Br. at 37.[5]  Noksel's claim fails for at least two reasons.

First, Noksel has failed to exhaust administrative remedies by failing to raise this claim during the administrative proceeding before Commerce.  Interested parties must raise their claims relevant to Commerce's final determination in their administrative case briefs.  *See* 28 U.S.C. § 2637(d); 19 C.F.R. §§ 351.309(b)-(e); *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010).  When a party fails to raise its claim before Commerce, this Court has the discretion to reject that argument.  *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 913 (Fed. Cir. 2017).  Given the statutory mandate that this Court "shall, where appropriate, require the exhaustion of administrative remedies," this Court insists that parties exhaust administrative remedies absent a "strong contrary reason."  *Id*. at 912.  Noksel did not claim in its case brief that Commerce should limit any deduction to 25 percent pursuant to *Proclamation 9705*.  *Compare* Pl. Br. at 37, *with* Noksel Case Br. at 6-25.  Nor does Noksel explain why it could not raise the claim in its case brief.

---

[5]  The Section 232 duties went into effect on March 23, 2018, pursuant to Proclamation 9705.  *See* 83 Fed Reg. at 11627-28.  The President later issued *Proclamation 9772*, imposing heightened duties of an additional 25 percent on Turkish steel imports, starting in August 2018.  *See Proclamation 9772*, 83 Fed. Reg. at 40,429.  Those additional duties were later removed by *Proclamation 9886* in May 2019, lowering the duties back to 25 percent.  *See Proclamation 9886 of May 16, 2019 Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. at 23,421 (May 16, 2019) (*Proclamation 9886*).

Second, *Proclamation 9772*, not *Proclamation 9705*, imposed the heightened 50 percent duties on steel imports from Turkey.  *See generally Transpacific Steel*, 4 F.4th at 1315-16. Noksel does not challenge the legitimacy of *Proclamation 9772*, which imposed the 50 percent heightened Section 232 duties on steel imports from Turkey.[6]  Even though Noksel claims that any reduction must be limited to 25 percent "{p}ursuant to *Proclamation 9705*,"  Pl. Br. at 37, Noksel does not explain how *Proclamation 9705* provides any basis to limit Section 232 reduction to 25 percent.

Separately, Noksel argues that "it is clear that the additional 25 percent tariffs applicable only to Turkish imports are more akin to special tariffs than to ordinary customs duties" but offers no explanation how this argument relates to *Proclamation 9705* or *Proclamation 9772*. Pl. Br. at 46.  According to Noksel, Section 232 duties are remedial "in the sense that they are specifically targeted at imports from Turkey."  *Id*.  But what matters here is that the focus of Section 232 is upon national security interests, as discussed above.  Whether Section 232 duties target imports from a particular country has no bearing on our analysis.

In sum, Commerce's determination to characterize the 50 percent Section 232 duty rate, pursuant to *Proclamation 9772*, as "U.S. import duties" and deduct them accordingly from Noksel's U.S. price was supported by substantial evidence and in accordance with law.

---

[6]  The Federal Circuit has recently rejected certain constitutional challenges against *Proclamation 9772*.  *See Transpacific Steel*, 4 F.4th at 1318-19.  In *Transpacific Steel*, the Federal Circuit denied the combined petition for panel rehearing and *en banc* rehearing on September 24, 2021, and issued its mandate on October 1, 2021.  *See Transpacific Steel*, No. 20-2157, ECF Nos. 76, 78 (Fed. Cir.).

**III.    Commerce's Denial Of Noksel's Request For A Duty Drawback Adjustment Is
Supported By Substantial Evidence And In Accordance With Law**

Commerce correctly denied Noksel's request for a duty drawback adjustment.  *See* IDM

at 5-8.  During the administrative review, Noksel indicated that it would submit record evidence

showing the Turkish government's approval of Noksel's application to close Noksel's inward

processing certificate (IPR, or Turkish acronym, DIIB).  *See* Section B-D Questionnaire

Response at C-35-37 (P.R. 42) (C.R. 15, 19).  Noksel never submitted such evidence, so

Commerce denied Noksel's request for a duty drawback adjustment, consistent with the

applicable statute, case law, and Commerce's practice.  *See* IDM at 5-8.  Commerce's denial of

Noksel's request for a duty drawback adjustment is supported by substantial evidence and in

accordance with law.

A duty drawback adjustment accounts for rebated or exempted import duties imposed on

the materials used to produce the merchandise.  *See* 19 U.S.C. § 1677a(c)(1)(B); *Saha Thai Steel

Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1338 (Fed. Cir. 2011).  The adjustment requires

Commerce to increase the merchandise's U.S. price by:

> the amount of any import duties imposed by the country of exportation
> which *have been rebated*, or which *have not been collected*, by reason of
> the exportation of the subject merchandise to the United States.

19 U.S.C. § 1677a(c)(1)(B) (emphasis added).  The purpose of the adjustment is to "account for

the fact that the producers remain subject to the import duty when they sell the subject

merchandise domestically, which increases home market sales prices and thereby increases

{normal value}."  *Saha Thai Steel Pipe*, 635 F.3d at 1338.  When a duty drawback is "granted

only for exported inputs, the cost of the duty is reflected in normal value but not in export price."

*Id*.  The adjustment "corrects this imbalance, which could otherwise lead to an inaccurately high

dumping margin, by increasing {export price} to the level it likely would be absent the duty

drawback." *Id*.

To decide whether to make a duty drawback adjustment, Commerce applies a two-

pronged test, which requires a party seeking the adjustment to demonstrate:

> (1) that the rebate and import duties are dependent upon one another, or in
> the context of an exemption from import duties, that the exemption is
> linked to the exportation of the subject merchandise, and (2) that there are
> sufficient imports of the raw material to account for the duty drawback on
> the exports of the subject merchandise.

*Saha Thai Steel Pipe*, 635 F.3d at 1340; *see also Fujitsu Gen. Ltd. v. United States*, 88 F.3d

1034, 1040 (Fed. Cir. 1996) (providing that party seeking adjustment bears burden of proof);

IDM at 7.  Commerce's use of this two-prong test has been upheld by courts.  *See*, *e.g.*, *Maverick*

*Tube Corp. v. United States*, 163 F. Supp. 3d 1345, 1358 (Ct. Int'l Trade 2016) (affording

*Chevron* deference to Commerce's two-prong test), *aff'd sub nom. Maverick Tube Corp. v.*

*Toscelik Profil*, 861 F.3d 1269 (Fed. Cir. 2017); *Arcelormittal USA Inc. v. United States*, 32

C.I.T. 440, 459 (Ct. Int'l Trade 2008).

## A.     Noksel Failed To Provide Record Evidence To Demonstrate That Its IPC Had Been "Closed"

Commerce correctly determined that Noksel had failed to produce evidence to show that

its IPC had been closed.  *See* IDM at 5-8.  Commerce explained that it considers an IPC to be

closed when a company is no longer permitted by the government of Turkey to add import or

export information.  PDM at 9.  In the *Final Results*, Commerce found that Noksel had failed to

support its request for a duty drawback adjustment with record evidence that the IPC had been

closed.  IDM at 7-8.  Commerce found, correctly, that Noksel's mere application for the IPC's

closure did not show that the IPC had been closed.  *Id*. at 7.

This case concerns how an IPC operates under Turkey's duty drawback program, Inward Processing Regime (IPR). In short, a closed IPC shows that the IPC holder is released of any liability for import duties otherwise payable on the entries under the IPC:

> Under Turkey's {IPR}, a company that imports raw materials and exports finished goods made from such raw materials may obtain an inward processing certificate (Turkish acronym, DIIB). A DIIB sets forth the quantity of raw material allowed to be imported without deposit of import duties under a given DIIB and the quantity of export required to close the DIIB, i.e., to satisfy the export commitment requirements of the DIIB. When a DIIB has been closed, and the closure is approved by Turkish customs, then the DIIB holder is released of any liability for import duties otherwise payable on the entries under the DIIB. The final approval of DIIB closures is within the jurisdiction of the Turkish Foreign Trade ministry; the process is generally completed 3 to 4 years after submission of a closed DIIB for approval.
>
> When a Turkish company imports or exports goods, it files an entry or exit declaration, respectively, with Turkish Customs. Customs verifies the accuracy of such import and export declarations and inserts the finalized quantities, values, and related information, including DIIB numbers, into a Customs database. A holder of a DIIB can then query the Turkish Customs database, via an internet e-portal, to ascertain the import and export movements under its DIIBs. DIIB holders can also download their DIIB usage tables from the Customs e-portal.

*Toscelik Profil v. Sac Endustrisi A.S.*, 321 F. Supp. 3d 1270, 1275-76 (Ct. Int'l Trade 2018); *see also* Section B-D Questionnaire Response at Exh. C-17 (C.R. 15, 19) (P.R. 42) (explaining Turkey's Resolution concerning IPR). Commerce requires evidence of a closed IPC for purposes of calculating a duty drawback adjustment for two reasons: (1) Turkish companies remain liable for the amount of import duties until they satisfy the export requirements under an IPC; and (2) Commerce "cannot be certain that a company has satisfied the export requirements under a {IPC} until the {IPC} is closed." *Light-Walled Rectangular Pipe and Tube: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 82 Fed. Reg. 47, 477 (Dep't of Commerce Oct. 12, 2017) (*LWRPT from Turkey 2015-16*), and accompanying IDM at cmt. 9.

Commerce's requirement for a closed IPC is supported by the applicable statute, case law, and agency practice.  The statutory text directs Commerce to increases United States price based on "import duties imposed by the country of exportation which *have been rebated*, or which *have not been collected*"—using past tense.  19 U.S.C. § 1677a(c)(1)(B) (emphasis added); *see also Borusan*, 222 F. Supp. 3d at 1261 (explaining that duty drawback adjustment accounts for "duty drawback that the foreign producer *received* pursuant to the duty drawback program in its home country") (emphasis added); S. Rep. No. 67-16, at 12 (1921) (Senate Report for the 1921 Antidumping Act stating that "any drawback *given by the country of exportation* upon the exportation of the merchandise, or any excise tax; which is *refunded or not collected* upon the exportation of the merchandise shall not constitute dumping, it is necessary also to add such items to the purchase price.") (emphasis added).  The statute does not provide the categories of evidence that Commerce must accept to evaluate whether certain import duties have been rebated or exempted, even though this Court has held that Commerce may not reject *verified* evidence of a closed IPC.  *See* 19 U.S.C. § 1677a(c)(1)(B); *Toscelik Profil v. Sac Endustrisi A.S.*, 348 F. Supp. 3d 1321, 1328 (Ct. Int'l Trade 2018).  Thus, to the extent consistent with the statutory text, Commerce's methodology warrants deference.  *See Maverick Tube*, 163 F. Supp. 3d at 1358 (affording *Chevron* deference).  Indeed, this Court has upheld the requirement of record evidence showing a closed IPC.  *See HabaS Sinai v. Tibbi Gazlar Istihsal Endustrisi, A.S.*, 439 F. Supp. 3d 1342, 1349 (Ct. Int'l Trade 2020) (upholding Commerce's requirement of closed IPC, which demonstrates that "Turkish government has forgiven the duty liability").  Further, Commerce has explained to Noksel during the 2015-2016 administrative review the need for record evidence showing a closed IPC.  *LWRPT from Turkey 2015-16*, 82 Fed. Reg. 47, 477 and accompanying IDM at 7-8; IDM at 7.

Here, Commerce correctly found that Noksel had failed to provide evidence showing that its IPC had been closed.  In its Sections B-D questionnaire responses, Noksel indicated that, for its IPC, the imports and exports were completed, the *application* to close the IPC had been presented to the Turkish government, and once closing is approved, Noksel would submit supporting documentation.  *See* Section B-D Questionnaire Response at C-35-37 (P.R. 42) (C.R. 15, 19); Noksel Case Br. at 24 ("{A} definitive decision on Noksel's application for closure has not yet been made.").  Because Noksel presented no evidence that its liabilities in connection with its IPC had been forgiven, Noksel failed to show its entitlement to the requested duty drawback adjustment.  Given Noksel's failure to provide record evidence supporting its request for a duty drawback adjustment, Commerce's denial of Noksel's request is supported by substantial evidence and in accordance with law.

Noksel contends that Commerce unlawfully denied the request for a duty drawback adjustment.  In support, Noksel argues that: (1) the Turkish government's IPR satisfies Commerce's two-pronged test, Pl. Br. at 7-10; (2) Commerce unlawfully introduced a third prong to the two-pronged test by requiring evidence of closure *from the Turkish government*, *id*. at 10; (3) Commerce's denial of Noksel's request for a duty drawback adjustment is inconsistent with this Court's precedent, *id*. at 13 (citing *Toscelik Profil*, 348 F. Supp. 3d at 1325-26); (4) the "closed" date of an IPC is the date of its expiration, according to a verification report filed in one of Commerce's prior administrative reviews, *id*. at 11; (5) Commerce's denial of Noksel's request is inconsistent with the agency's determinations in other cases, *id*. at 11-12; and (6) Commerce's denial of Noksel's request is inconsistent with the agency's own definition of a closed IPC in the instant administrative review, *id*. at 13-14.  The Court should reject these arguments.

As a preliminary matter, Noksel has failed to exhaust administrative remedies by failing

to raise these argument during the administrative proceeding before Commerce.  *See* 28 U.S.C.

§ 2637(d); 19 C.F.R. §§ 351.309(b)-(e); *Boomerang Tube LLC*, 856 F.3d at 913.  The parties

briefed the issue whether Commerce should grant Noksel's request for a duty drawback

adjustment, but Noksel did not raise the foregoing arguments in its case brief.  *Compare* Pl. Br.

at 6-19, *with* Noksel Case Br. at 20-24.  Instead, Noksel argued:

> Noksel believes the Commerce may have misunderstood the actual
> situation concerning this IPC, perhaps because there is an inherent
> ambiguity in the word "closure."  *The Commerce defines "closure" as we
> have quoted above, namely, "when the exporting company has applied to
> the Turkish government for closure of the IPC."*  However, when Noksel
> stated that these IPCs were still in the process of closing, the company
> meant that the Government had still not granted final approval of the
> application for closure.  The phrase '*under closure process*' means that all
> imports and exports have been completed; requirements have been met
> and Noksel has applied for closure; and that a definitive decision on
> Noksel's application for closure has not yet been made.

Noksel Case Br. at 23-24 (emphasis added).  In response to this argument in Noksel's case brief,

Commerce provided a simple explanation: applying for an IPC's closure does not mean that an

IPC has, in fact, been closed.  *See* IDM at 7.  Although Noksel now raises various new

arguments, with no satisfactory explanation from Noksel why it could not have raised the same

arguments in its case brief, the Court should decline to entertain those new arguments.

Even if the Court were to entertain Noksel's new arguments, the new arguments lack

merit.  The first and fourth arguments warrant little discussion.  The existence of the Turkish

government's IPR, by itself, does not satisfy Commerce's two-pronged test without evidence

showing that an IPC has been closed.  *See Rajinder Pipes*, 70 F. Supp. 2d at 1359-60 (upholding

Commerce's denial of request for duty drawback adjustment for Turkish exporter's failure to

provide evidence supporting that request).  Although Noksel relies on a single verification report

filed in one of Commerce's prior administrative reviews and says, "Commerce has *consistently*

accepted that the 'closed' date is the date the DIIB certification expires," Pl. Br. at 11 (emphasis added), a statement in a verification report does not constitute Commerce's determination, and Noksel does not cite the final results from the pertinent administrative review. *See id.* And in any event, Noksel does not explain how the cited verification report has been made part of the administrative record. *See id.*

Noksel's other arguments require more exposition, but they nonetheless lack merit. Noksel argues that Commerce unlawfully introduced a third prong to the two-pronged test by requiring evidence of closure from the Turkish government. *Id.* at 10. This argument misconstrues Commerce's reasoning, as the agency merely explained that Noksel had failed to present record evidence showing that its IPC had been closed—not that Noksel must provide a certain category of documents from any foreign government. *See* IDM at 7. Noksel argued that its IPC had closed, relying on its application to close the IPC, Noksel Case Br. at 23-24, and Commerce merely explained that applying for an IPC's closure was not enough, IDM at 7. Commerce made no change to the two-pronged test.

Commerce's denial of Noksel's request for a duty drawback adjustment is consistent with this Court's precedent. *See* Pl. Br. at 13. Noksel relies on *Toscelik Profil*, 348 F. Supp. 3d at 1325-26, in which this Court held that Commerce may not ignore *verified* information that an IPC has closed, but Commerce's determination here is consistent with that holding. During the administrative review, Noksel offered no verified information that could be considered by Commerce. Noksel does not explain how its application—or any other materials in the administrative record—could constitute such verified information.

Commerce's denial of Noksel's request is consistent with the agency's determinations in other cases. In *HWRPT from Turkey*, Commerce allowed a duty drawback adjustment for only a

closed IPC.  *See HWRPT from Turkey*, 81 Fed. Reg. at 47,355.  The same was true in *HabaS Sinai*.  *See* 439 F. Supp. 3d at 1349.  None of Commerce's determinations cited by Noksel supports the proposition that merely applying for an IPC's closure demonstrates an actual closure of an IPC has occurred.  *See* Pl. Br. at 12; *Steel Concrete Reinforcing Bar From Turkey*, 79 Fed. Reg. 54,965 (Dep't of Commerce Sept. 15, 2014) (Commerce obtaining documents submitted to Turkish government in "closing out of an IPC"); *Certain Oil Country Tubular Goods From the Republic of Turkey*, 79 Fed. Reg. 41,971 (Commerce relying on DIIB data obtained at sales verification).

Next, Noksel argues that Commerce's denial of the request for a duty drawback adjustment is inconsistent with Commerce's own definition used during the instant administrative review.  *See* Pl. Br.  at 13-14.  During the administrative review, Commerce defined a "closed" IPC as an IPC "to which the company was no longer permitted by the {the Turkish government} to add import or export information."  IDM at 8.  Noksel presented no evidence that its IPC had satisfied that definition.  Although Noksel states in passing that the Turkish government could take up to four years to grant a formal approval to close an IPC, Noksel offers no explanation of how the duration of formally approving an IPC's closure is relevant to Noksel's ability to add import or export information in connection with an IPC.

### B.  Commerce Did Not Err By Not Addressing Whether Noksel Had Satisfied The Second Part Of The Duty Drawback Test

As discussed above, Noksel has failed to satisfy the first step of Commerce's two-prong test by failing to support with record evidence that its duty liabilities had been forgiven.  *See* IDM at 7.  Although Noksel argues that Commerce ignored record evidence that Noksel had satisfied the second step of the test, Pl. Br. at 14, Commerce had no need to reach the second step because Noksel had failed to satisfy the first step.

A party seeking a duty drawback adjustment cannot satisfy Commerce's two-pronged test when the party fails to provide record evidence to satisfy the first step of the test.  In *Rajinder Pipes Ltd. v. United States*, Commerce denied a party's request for a duty drawback adjustment for failure of that party to provide record evidence in support of the request.  70 F. Supp. 2d at 1359-60.  This Court upheld Commerce's denial of the request, reasoning that substantial evidence supported Commerce's determination.  *See id*.  The Court explained that given the party's failure to provide record evidence in support of the request for a duty drawback adjustment, the party had failed the first part of the two-prong test.  *See id*.

Here, Commerce did not err by not addressing whether Noksel had satisfied the second part of the duty drawback test.  Commerce found that Noksel had failed to provide record evidence that its duties were forgiven or that "certain IPCs were related to exports of subject merchandise to the United States during the POR."  PDM at 9.  Noksel submitted on record the realized import and export list of IPCs, a copy of its IPC [

], and the law on Turkey's Inward Processing regime.  *See* Section B-D Questionnaire Response at C-36 (C.R. 15, 19) (P.R. 42).  Noksel argued that given the materials it submitted, "there *may* not be any additional exports and imports for the relevant IPC."  Noksel Case Br. at 23 (P.R. 109) (emphasis added).  None of Noksel's materials showed any closure of Noksel's IPC, as discussed above.  Indeed, Noksel acknowledged that the specified IPC "was still in the process of closing," so it could not show that it had *received* any duty drawback.  *See Id*. at 23 (P.R. 109).

Although Noksel asserts "that there were sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise," the fact remains that it did not satisfy the first prong of the duty drawback test.  Pl. Br. at 9.  Commerce's determination to deny

a duty drawback adjustment to Noksel is supported by substantial evidence and in accordance with law.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny plaintiff's motion for judgment upon the agency record and sustain Commerce's Final Results.

<table>
<tr><td></td><td>Respectfully Submitted,</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td>BRIAN M. BOYNTON<br>Acting Assistant Attorney General</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td>PATRICIA M. MCCARTHY<br>Director</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td>/s/ Frankling E. White, Jr.<br>FRANKLIN E. WHITE, JR.<br>Assistant Director</td></tr>
<tr><td></td><td></td></tr>
<tr><td>OF COUNSEL:</td><td>/s/ In K. Cho<br>In K. Cho</td></tr>
<tr><td>Ashlande Gelin</td><td>Trial Attorney</td></tr>
<tr><td>Staff Attorney</td><td>U.S. Department of Justice</td></tr>
<tr><td>Office of the Chief Counsel</td><td>Civil Division</td></tr>
<tr><td>for Trade Enforcement and Compliance</td><td>Commercial Litigation Branch</td></tr>
<tr><td>U.S. Department of Commerce</td><td>P.O. Box 480, Ben Franklin Station</td></tr>
<tr><td>Washington, D.C.</td><td>Washington, D.C. 20044<br>Telephone: (202) 616-0463<br>Facsimile:  (202) 305-7644<br>Email: In.K.Cho@usdoj.gov</td></tr>
<tr><td></td><td></td></tr>
<tr><td>December 3, 2021</td><td>*Attorneys for Defendant*</td></tr>
</table>

### <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Standard Chambers Procedure 2(B)(2) of the U.S. Court of International

Trade, I certify that this brief contains 11,404 words and complies with the word-count limit set

forth in Standard Chambers Procedure 2(B)(1).  To make this certification, I have relied on the

word-count feature of Microsoft Word.

/s/ In. K. Cho
IN K. CHO
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0463
Facsimile:  (202) 305-7644
Email:      In.K.Cho@usdoj.gov

December 3, 2021                                    *Attorneys for Defendant*