**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A. RESTANI, SENIOR JUDGE**

|  |  |
|---|---|
| NOKSEL CELIK BORU SANAYI A.S., | ) |
| *Plaintiff*, | ) |
| v. | ) |
| THE UNITED STATES, | ) Court No. 21-00140 |
| *Defendant*, | ) |
| and | ) |
| NUCOR TUBULAR PRODUCTS INC., | ) |
| *Defendant-Intervenor*. | ) |

**REPLY BRIEF OF PLAINTIFF NOKSEL CELIK BORU SANAYI A.S. TO DEFENDANT'S AND DEFENDANT-INTERVENOR'S RESPONSES TO RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Leah N. Scarpelli
Matthew M. Nolan
Arent Fox, LLP
1717 K Street, NW
Washington, DC 20006

December 23, 2021

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. SUMMARY OF THE ARGUMENT ......................................................................1

III. ARGUMENT ..........................................................................................................3

    A.     Commerce's Improperly Deducted "Special" Section 232 Tariffs From U.S. Price..............................................................................................................3

        1.     Section 232 Tariffs Are Imposed Via A Limited Delegation Of Authority By Congress ...........................................................................4

        2.     Section 232 Tariffs Have A Remedial Purpose Overlapping With AD Duties..........................................................................................6

    B.     Commerce Should Not Deduct Additional Tariffs Applicable Only To Imports From Turkey ........................................................................................9

        1.     Noksel Exhausted Administrative Remedies In Requesting That The Additional 25% Tariffs Be Excluded From Commerce's Calculation ..............................................................................10

        2.     Additional Tariffs Pursuant to *Proclamation 9772* Are Uniquely Remedial and Temporary ........................................................11

    C.     Commerce Should Have Granted Noksel A Full Duty Drawback Adjustment To U.S. Price.....................................................................................13

        1.     Noksel Exhausted Administrative Remedies In Arguing That Commerce Should Grant Its Duty Drawback Adjustment ......................13

        2.     Noksel Properly Included Citations to Commerce Verification Reports.......................................................................................15

        3.     Noksel Satisfied Commerce's Two Prong Duty Drawback Test ............17

        4.     Record Evidence Demonstrates that Noksel's IPC Was "Closed"...........19

IV. CONCLUSION AND PRAYER FOR RELIEF.....................................................22

AFDOCS/25099782.4

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Agro Dutch Indus. v. United States*,
    508 F.3d 1024 (Fed. Cir. 2007) ................................................................................ 10

*Am. Inst. for Int'l Steel, Inc. v. United States*,
    376 F.Supp.3d 1335 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed. Cir.
    2020), *cert denied*, 141 S. Ct. 133 (2020) ............................................................... 6

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
    494 F.Supp.3d 1365 (Ct. Int'l Trade 2021), *appeal docketed*, No. 21-2240
    (Fed. Cir. July 26, 2021) ................................................................................... 4, 9, 12

*Calcutta Seafoods Pvt. Ltd. v. United States*,
    495 F. Supp.3d 1318 (Ct. Int'l Trade 2021) ............................................................ 15

*China Steel Corp. v. United States*,
    264 F.Supp.2d 1339 (Ct. Int'l Trade 2003) ............................................................. 11

*Jinko Solar Co. v. United States*,
    229 F. Supp. 3d 1333 (Ct. Int'l Trade 2017), *aff'd*, 961 F.3d 1177 (Fed. Cir.
    2020) .......................................................................................................................... 20

*Luoyang Bearing Factory v. United States*,
    240 F.Supp.2d 1268 (2002) ..................................................................................... 11

*Ningbo Dafa Chem. Fiber Co. v. United States*,
    580 F.3d 1247 (Fed. Cir. 2009) ............................................................................... 11

*NSK Ltd. v. United States*,
    170 F. Supp. 1280 (Ct. Int'l Trade 2001) ................................................................ 14

*Toscelik Profil ve Sac Endustrisi A.S. v. United States*,
    348 F. Supp. 3d 1321 (Ct. Int'l Trade 2018) ........................................................... 20

*Saha Thai Steel Pipe (Pub.) Co. v. United States*,
    635 F.3d 1335 (Fed. Cir. 2011) ............................................................................... 20

*Solvay Solexis S.p.A. v. United States*,
    637 F. Supp.2d 1306 (Ct. Int'l Trade 2009) ...................................................... 14, 15

*Timken Co. v. United States*,
    201 F.Supp.2d 1316 (Ct. Int'l Trade 2002) ............................................................. 10

*Transpacific Steel LLC v. United States*,
    466 F. Supp. 3d 1246 (Ct. Int'l Trade 2020), *rev'd and remanded*, 4 F.4th
    1306 (Fed. Cir. 2021), *petition for cert. docketed,* No. 21-721 (US Nov. 16,
    2021) ................................................................................................................ 11, 12

*Wheatland Tube Co. v. United States*,
    495 F.3d 1355 (Fed. Cir. 2007) .................................................................. 4, 5, 7, 8

## Federal Statutes

19 U.S.C. § 1671 ................................................................................................................ 7

19 U.S.C. § 1673 ................................................................................................................ 7

19 U.S.C. § 1675 ................................................................................................................ 5

19 U.S.C. § 1677(7)(C)(iii) ................................................................................................ 7

19 U.S.C. § 1677a(c)(1)(B) .............................................................................................. 19

19 U.S.C. § 1677a(c)(2)(A) ................................................................................................ 6

19 U.S.C. § 1862(c)(1)(A)–(B) .......................................................................................... 5

19 U.S.C. § 1862 ................................................................................................................ 7

19 U.S.C. § 1862(d) ........................................................................................................... 7

19 U.S.C. § 2251 ............................................................................................................ 5, 7

## Regulations

19 C.F.R. § 351.102 .......................................................................................................... 15

19 C.F.R. § 351.307(c) ..................................................................................................... 16

## Administrative Determinations

*Certain Frozen Warmwater Shrimp From India*, 79 Fed. Reg. 51309 (Dep't
    Commerce Aug. 28, 2014) (final AD rev. results; 2012-2013) ............................... 16

*Certain Hardwood Plywood Products from the People's Republic of China*, 82
    Fed. Reg. 53460 (Dep't Commerce Nov. 16, 2017) (final LTFV determ.; final
    critical circum., in part), and accompanying Issues and Decision
    Memorandum ........................................................................................................... 16

*Certain Oil Country Tubular Goods from the Republic of Turkey*, 79 Fed. Reg.
    41973 (Dep't Commerce July 18, 2014) (final affirm. LTFV determ. & critical
    circum., in part), and accompanying Issues and Decision Memorandum .............. 17

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey*, 81 Fed. Reg. 47355 (Dep't Commerce July 21, 2016) (final LTFV determ.), and accompanying Issues and Decision Memorandum ..........14, 21, 22

*Light-Walled Rectangular Pipe and Tube From Turkey*, 86 Fed. Reg. 11230 (Dep't Commerce Feb. 24, 2021) (final AD results & determ. no shipments; 2018-2019), (final LTFV determ.), and accompanying Issues and Decision Memorandum .................................................................................................*passim*

*Steel Concrete Reinforcing Bar From Turkey*, 79 Fed. Reg. 54965 (Dep't Commerce Sept. 15, 2014) .........................................................................17

*Welded Line Pipe From the Republic of Turkey*, 80 Fed. Reg. 61362 (Dep't Commerce Oct. 13, 2015) ..................................................................21

**Presidential Documents**

*Proclamation 9705 of March 8, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11625 (Mar. 15, 2018) ..........................................2, 8

*Proclamation 9740 of April 30, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 20683 (May 7, 2018) ........................................6

*Proclamation 9772 of August 10, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 40429 (Aug. 15, 2018) ............................2, 9, 12, 13

**Other Authorities**

*Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40202 (Dep't Commerce Jul. 6, 2020) ................................8

*Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46026, 46054-55 (Dep't Commerce Sept. 11, 2018) .................................................................................................6

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A. RESTANI, SENIOR JUDGE**

| | |
|---|---|
| NOKSEL CELIK BORU SANAYI A.S., | ) |
| *Plaintiff,* | ) |
| v. | ) |
| THE UNITED STATES, | ) Court No. 21-00140 |
| *Defendant,* | ) |
| and | ) |
| NUCOR TUBULAR PRODUCTS INC., | ) |
| *Defendant-Intervenor.* | ) |

**REPLY BRIEF OF PLAINTIFF NOKSEL CELIK BORU SANAYI A.S. TO DEFENDANT'S AND DEFENDANT-INTERVENOR'S RESPONSES TO RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

## I.      INTRODUCTION

On behalf of Plaintiff Noksel Celik Boru Sanayi A.S. ("Noksel"), a foreign manufacturer and foreign exporter of Light-Walled Rectangular Pipe and Tube ("LWRPT") from Turkey, we hereby submit this brief in reply to the December 3, 2021 responses to Noksel's Memorandum in Support of Its Rule 56.2 Motion for Judgment on the Agency Record, ECF Nos. 24, 25 ("Noksel Br.") filed by Defendant, the United States ("Defendant"), ECF Nos. 30, 31 ("DOJ Br."), and Defendant-Intervenor, Nucor Tubular Product Inc. ("Nucor"), ECF Nos. 27, 28 ("Nucor Br.").

## II.      SUMMARY OF THE ARGUMENT

Noksel's reply addresses the three issues raised by the Defendant and Nucor (collectively, "the parties"): (1) whether the Department of Commerce's ("Commerce") deduction of the Section 232 tariffs from U.S. price is supported by substantial evidence; (2) whether Commerce

1

erred by failing to limit the Section 232 tariffs to 25%, rather than the 50% tariffs imposed on imports from Turkey only; and (3) whether Commerce's decision not to grant Noksel's request for a full duty drawback adjustment to U.S. price.

First, Commerce's determination to deduct Section 232 tariffs Noksel's U.S. sales price is contrary to law and unsupported by substantial evidence on the record. *Light-Walled Rectangular Pipe and Tube From Turkey*, 86 Fed. Reg. 11230 (Dep't Commerce Feb. 24, 2021) (final AD results & determ. no shipments; 2018-2019), ECF No. 18-4, P.R. 125 ("*Final AD Results*"), and accompanying Issues and Decision Memorandum at Comment 1 ("*Final IDM*"), ECF No. 18-5, P.R. 115. Section 232 tariffs are imposed pursuant to a specific congressional delegation of tariff making authority, which is conditional on specific timing provisions outlined in the statute, and have the same remedial purpose as antidumping and countervailing ("AD/CVD") duties. Treatment of special Section 232 tariffs as "ordinary" import duties within the meaning of the antidumping statute therefore results in a double remedy and artificially inflates the calculated dumping margin.

Second, Commerce's deduction of the 25% tariffs assessed under *Proclamation 9772*, in addition to the 25% tariffs assessed pursuant to *Proclamation 9705*, is contrary to law and unsupported by substantial evidence on the record. *See Proclamation 9772 of August 10, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 40429 (Aug. 15, 2018) ("*Proclamation 9772*"); *Proclamation 9705 of March 8, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11625 (Mar. 15, 2018) ("*Proclamation 9705*"). The additional tariffs applicable to Turkey alone are uniquely remedial and temporary such that they should be treated as "special" tariffs. The legality of *Proclamation 9772* is still also being considered and may result in the refund of additional tariffs paid on imports from Turkey. As such, these

"special" tariffs should not be deducted from Noksel's U.S. price or, alternatively, this proceeding should be stayed pending a final decision as to the legality of *Proclamation 9772*.

Finally, Commerce's decision to deny Noksel's claimed duty drawback adjustment in the *Final AD Results* on the basis that its inward processing certificate ("IPC") was not "closed" is contrary to law and unsupported by substantial evidence on the record. Noksel has demonstrated that it qualifies for a full duty drawback adjustment under Commerce's well-established two-prong test because all imports and exports under the IPC have been completed and Noksel is no longer permitted by the Government of Turkey ("GOT") to add import or export information. Accordingly, Commerce should have granted Noksel's claimed duty drawback adjustment, regardless of whether final certification had been received by the GOT.

## III.   <u>ARGUMENT</u>

### A.   Commerce's Improperly Deducted "Special" Section 232 Tariffs From U.S. Price

In the *Final AD Results*, Commerce found that "section 232 duties are analogous to U.S. import duties that are properly deducted from EP and CEP pursuant to the statute." *Final IDM* at 4, P.R. 115. Commerce's determination was based on its conclusion that the tariffs "are not special remedial duties akin to antidumping or section 201 duties" because they "focus on threats to national security." *Id.* However, as detailed in Noksel's opening brief, Commerce's deduction of the Section 232 tariffs from U.S. price unlawfully increases Noksel's AD margin and results in a double remedy. Noksel Br. at 19.

In its reply, Nucor notes that, "{i}n determining whether a particular duty is deductible under this statutory provision, the Courts have considered factors such as the remedial purpose of the duty, whether the duty has a set termination date, and whether the purpose of the duty overlaps with that of antidumping duties." Nucor Br. at 25. Consideration of these factors

continues to demonstrate that the Section 232 tariffs are distinguishable from ordinary customs duties and should not be treated as such by Commerce. The Court should thus reconsider its ruling that Commerce's rationale for "differentiating its treatment of Section 232 and Section 201 duties is {not} so lacking in merit that the court must say it is arbitrary." *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 494 F.Supp.3d 1365, 1375-76 (Ct. Int'l Trade 2021), *appeal docketed*, No. 21-2240 (Fed. Cir. July 26, 2021).

### 1. *Section 232 Tariffs Are Imposed Via A Limited Delegation Of Authority By Congress*

Congress has the sole authority to impose ordinary customs duties, which are implemented "regardless of whether the U.S. industry is suffering adverse effects as a result of imports." *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1362 (Fed. Cir. 2007); *see also* Noksel Br. at 31-34. However, in certain cases, Congress has delegated authority to the Executive Branch to investigate and impose tariffs to remedy, amongst other things, the damaging effects of dumped imports and subsidies (AD/CVD), import surges (Section 201), and to protect national security (Section 232).

In each case, the Executive Branch's authority to act is dependent on a legislated grants of specific authority to impose duties on imports to remediate specific adverse effects from imports. Congress's delegation of authority is conditional on specific provisions outlined in the statute. Here, Defendant finds it significant that "Congress did not . . . set a time limit on the duration of these duties, despite doing so for other duties delegated to the President to implement." DOJ Br. at 17. According to Defendant, the fact that the Section 232 tariffs can be modified at some point, as they have repeatedly been since their original implementation,[1] "does

---

[1] Since the publication of *Proclamation 9705,* the President has modified the Section 232 tariffs, including by changing the number of countries covered, by raising and then lowering

not make them inherently temporary in the same way antidumping and Section 201 duties are temporary." *Id.* at 17-18.

Defendant's argument ignores specific timing factors underlying implementation of the Section 232 tariffs. While "Congress granted the President discretion to determine the duration of Section 232 duties," *id.* at 16, the statute does not grant the President limitless authority to act. Rather, the statute meaningfully constrains the President's authority, in terms of what the President can do and when the President can do it, by providing specific deadlines for presidential action. Under Section 232, the President has 90 days following a report issued by the Secretary within which to concur with the findings in that report, determine to take action, and determine the nature and duration of that action. 19 U.S.C. § 1862(c)(1)(A)–(B). If the President decides some action is required, he then has 15 days to implement that action. *Id.* These procedural requirements, including strict time limits, on presidential action under Section 232, are analogous to other "special" tariffs like Section 201 and AD duties. *Id.* §§ 2251, 1675. By contrast, ordinary customs duties having no such restrictions; they are in no way tied to the finding or cessation of injury and are "permanent unless modified by Congress." DOJ Br. at 16-17 (quoting *Wheatland*, 495 F.3d at 1361).

As Nucor acknowledges, the delegation of authority "was not addressed in *Borusan*," Nucor Br. at 28, and the parties decline to reckon with the legal significance of its implementation in their responses. The particular manner in which the Section 232 tariffs are imposed, and the time restrictions governing their imposition, highlights the difference between these special tariffs and ordinary customs duties. In deducting the Section 232 tariffs, Commerce likewise unlawfully failed to recognize the critical legal distinction between special duties

---

the applicable duty rates, and by expanding the scope to include certain downstream derivative products. Noksel Br. at 30.

imposed by the President under U.S. trade remedy statutes like AD/CVD, Section 201, and

Section 232, and ordinary customs duties imposed by Congress.

2.   ***Section 232 Tariffs Have A Remedial Purpose Overlapping With AD Duties***

In the *Final AD Results*, Commerce emphasized that the Section 232 tariffs are referred

to as "'ordinary customs duties'" in the "Annex to *Proclamation 9740*, which is the Presidential

Proclamation that established the nature and treatment of section 232 duties." *Final IDM* at 3-4,

P.R. 115; *Proclamation 9740 of April 30, 2018: Adjusting Imports of Steel Into the United States*,

83 Fed. Reg. 20683 (May 7, 2018) ("*Proclamation 9740*"). The parties similarly highlight that

"{t}he President explicitly referred to the Section 232 duties as 'ordinary' customs duties" in

*Proclamation 9740*, which they claim "support{s} Commerce's determination that Section 232

duties are treated as any other duties." DOJ Br. at 10 (quoting *Final IDM* at 4, P.R. 115); *see also*

Nucor Br. at 27. However, the President's own labeling of the Section 232 tariffs is not the

relevant inquiry.[2] As Nucor notes, "the salient question is whether Section 232 duties overlap so

closely with antidumping duties that deducting them would result in the same policy concerns

that have driven Commerce to treat Section 201 duties as non-deductible under 19 U.S.C.

§ 1677a(c)(2)(A)." Nucor Br. at 28.

To that end, public documentation demonstrates that Commerce and the President viewed

the Section 232 tariffs as an alternate means to remedy the same injury to a domestic industry

targeted by special tariffs like AD, CVD, and Section 201. Noksel Br. at 27-29. The imposition

---

[2] If self-characterization of the Section 232 tariffs has any weight, it is relevant that both
Commerce and this Court have recognized the Section 232 tariffs as "remedial" outside the
context of antidumping calculations. *Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F.Supp.3d
1335, 1343 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed. Cir. 2020), *cert denied*, 141 S.
Ct. 133 (2020); *see, e.g., Submissions of Exclusion Requests and Objections to Submitted
Requests for Steel and Aluminum*, 83 Fed. Reg. 46026, 46054-55 (Dep't Commerce Sept. 11,
2018) (interim final rule).

of the tariffs was based on those same factors considered by the International Trade Commission

("ITC") in AD/CVD cases, including "the impact of foreign competition on the economic

welfare of individual domestic industries;" "any substantial unemployment . . . loss of skills or

investment;" and "other serious effects resulting from the displacement of any domestic products

by excessive imports." 19 U.S.C. § 1862(d); *compare id.* § 1677(7)(C)(iii) (directing the ITC to

consider conditions of competition in the U.S. market, U.S. producers' financial experience and

employment levels, and other effects related to displacement from imports, including U.S.

production, shipments, apparent consumption, market shares, and pricing data). Importantly,

unlike ordinary customs duties, Section 232 tariffs cannot be imposed absent a finding that the

"U.S. industry is suffering adverse effects as a result of imports." DOJ Br. at 15 (quoting

*Wheatland*, 495 F.3d at 1362).

The parties' attempts to distinguish the Section 232 tariffs on that basis that their purpose

is "to alleviate a national security concern—a purpose much broader than Section 201 or

antidumping duties," DOJ br. at 14, are unavailing. *See also* Nucor Br. at 27. Neither party

addresses why this particular remedial "purpose" makes Section 232 tariffs more akin to normal

customs duties than other trade remedy statutes like AD/CVD and Section 201. Indeed, for each

provision, "something more" than mere injury to domestic producers must be demonstrated in

order for remedial tariffs to be imposed – AD duties require not only a finding of injury to the

domestic industry, but also that imports are sold at below fair (19 U.S.C. § 1673); CVD duties

require a finding of injury, but also that imports benefit from government subsidies (*Id.* § 1671);

and Section 201 tariffs require a finding of injury, but also a surge in imports (*Id.* § 2251).

Likewise, Section 232 tariffs require Commerce to find injury, but also that imports threaten

national security. *Id.* § 1862. The addition of national security considerations does not negate the

fact that the Section 232 tariffs, like AD/CVD and Section 201 tariffs, are "directed at the same

overarching purpose — protecting the bottom line of domestic producers." DOJ Br. at 14-15 (quoting *Wheatland*, 495 F.3d at 1362).

Further, Commerce's *Section 232 Report* repeatedly references AD orders, contemplating the Section 232 tariffs on steel as an alternative to AD/CVD cases to protect the "financial viability" of U.S. steel producers. *See Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40202, 40204, 40225-26 (Dep't Commerce Jul. 6, 2020). Commerce notes that while "antidumping and countervailing duty actions can address specific instances of unfairly traded steel products," that "given the large number of countries from which the United States imports steel and the myriad of different products involved, it could take years to identify and investigate every instance of unfairly traded steel{.}" *Id.* at 40211. Commerce further emphasizes that the "U.S. industry has already spent hundreds of millions of dollars in recent years on AD/CVD cases, with seemingly no end in sight," and claims that "{s}maller steel manufacturers are financially unable to afford these type of cases, or are hesitant to file cases in light of possible market entry retaliation{.}" *Id.* Commerce's report clearly indicates that the Section 232 tariffs are intended as substitute for AD/CVD orders to remedy perceived inequities and "level the playing field" for domestic steel producers to compete against imports. *Id.* at 40216.

Then President Trump likewise indicated that the Section 232 tariffs were "contemplated as an alternative to other special trade remedies, most notably {AD} duties." Noksel Br. at 35. As with AD/CVD duties, the Section 232 tariffs were imposed "in response to specific requests from affected domestic parties" for the explicit purpose of protecting "domestic steel producers" and to prevent "further closures of domestic steel production facilities." *Proclamation 9705*, at 11625. *Proclamation 9705* specifically noted that the goal of the tariffs was "to reduce imports to

a level that . . . would enable domestic steel producers to use approximately 80 percent of existing domestic production capacity and thereby achieve long-term economic viability through increased production." *Id.*

In this context, it is unreasonable for Commerce to conclude that the Section 232 tariffs are now "separate and distinct" from other special provisions like AD duties. *Final IDM* at 5, P.R. 115. The Section 232 tariffs on steel are not just remedial in a "broad sense," *Borusan*, 494 F.Supp.3d at 1374; the tariffs were specifically imposed to remedy perceived injury to the domestic steel industry. Contrary to the Defendant's claims, this remedy– "to assist a weakened domestic injury" – was not only the effect of the Section 232 tariffs, but also their underlying purpose. DOJ Br. at 14.

Because the Section 232 tariffs were implemented to remedy injury to the domestic steel industry, their deduction from U.S. price in Commerce's dumping calculation results in a double remedy and artificially inflates the dumping margin calculated for Noksel. Having collected Section 232 tariffs on Noksel's imports of LWRPT, it is unlawful for Commerce to collect those tariffs a second time in the form of an increased antidumping margin based on their collection. Noksel Br. at 36-37.

**B.      Commerce Should Not Deduct Additional Tariffs Applicable Only To Imports From Turkey**

Though Noksel maintains that no Section 232 tariffs should be deducted from Commerce's antidumping calculations, any contemplated deduction should be based on the standard 25% rate of the Section 232 tariffs on steel from all countries. The additional 25% tariffs applicable to imports from Turkey alone, which resulted in a 50% rate during a portion of the period of review ("POR"), were uniquely remedial and temporary. *See* Noksel Br. at 37-38 (citing *Proclamation 9772*, at 40429). Further, the legality of *Proclamation 9772*, which

implemented the additional tariffs, is still being challenged with the reviewing counts and may result in the refund of any tariffs paid. Noksel Br. at 39.

1.   ***Noksel Exhausted Administrative Remedies In Requesting That The Additional 25% Tariffs Be Excluded From Commerce's Calculation***

As an initial matter, the parties claim that Noksel has failed to exhaust administrative remedies before Commerce because it "did not claim in its case brief that Commerce should limit any deduction to 25 percent pursuant to *Proclamation 9705*." DOJ Br. at 22; Nucor Br. at 24-25. This is factually inaccurate. In its case brief to Commerce, Noksel addresses the deduction of special Section 232 tariffs from U.S. price. Noksel's Case Brief at 6-20 (Aug. 24, 2020), P.R. 109 ("Noksel Case Br."). Noting that the Section 232 tariffs were increased to 50% on August 2018, Noksel argues that "Commerce, *at the very least should not deduct the additional 25% from the export price*, which was imposed during the POR." *Id.* at 16 (emphasis added). This is the exact argument that Noksel makes in its opening brief to the Court. Noksel Br. at 37-40.

Nevertheless, the parties contend that the "claim is . . . unexhausted and not properly before this Court" because "Noksel did not develop this argument before Commerce." Nucor Br. at 24-25, 29. However, the standard governing exhaustion does not demand that an argument be "fully develop{ed} and present{ed}" to Commerce, as the parties claim. *Id.* at 29. Instead, the exhaustion doctrine requires only that Noksel "present its claims to {Commerce} for the agency's consideration before raising these claims to the Court." *Timken Co. v. United States*, 201 F.Supp.2d 1316, 1340 (Ct. Int'l Trade 2002).

"The application of 'exhaustion principles in trade cases is subject to the discretion of the judge of the Court of International Trade.'" *Agro Dutch Indus. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007) (citation omitted). Historically, this Court has found that a "plaintiff's brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable

10

clarity and avails the agency with an opportunity to address it." *Luoyang Bearing Factory v. United States*, 240 F.Supp.2d 1268, 1297 (2002). The Court of Appeals for the Federal Circuit has agreed that a party satisfies exhaustion requirements where the record "contain{s} at least a suggestion" of the argument. *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1259 (Fed. Cir. 2009)).

Here, Noksel challenged Commerce's deduction of the Section 232 tariffs from its U.S. price in its case brief to Commerce. Noksel Case Br. at 6-20, P.R. 109. Regarding the tariffs on imports from Turkey pursuant to *Proclamation 9772*, Noksel explicitly stated that "Commerce should not deduct the additional 25% from the export price." *Id.* at 25. "Even though {Noksel}'s statement of its position was brief, {Noksel} articulated its . . . challenge with reasonable clarity{.}" *China Steel Corp. v. United States*, 264 F.Supp.2d 1339, 1364 (Ct. Int'l Trade 2003). This clear statement, which goes well beyond a mere "suggestion of the argument," provided Commerce with an opportunity to address the issue in the final determination and thus satisfies the exhaustion requirement.

### 2. *Additional Tariffs Pursuant to Proclamation 9772 Are Uniquely Remedial and Temporary*

As is true of the 25% Section 232 tariffs addressed in Section III.A., *supra*, the additional 25% tariffs on imports from Turkey cannot properly be considered regular customs duties and should not be deducted from U.S. price. This Court previously found the "decision to increase the tariffs on imported steel products from Turkey, and Turkey alone, without any justification, {to be} arbitrary and irrational." *Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246, 1258 (Ct. Int'l Trade 2020), *rev'd and remanded*, 4 F.4th 1306 (Fed. Cir. 2021), *petition for cert. docketed,* No. 21-721 (US Nov. 16, 2021). The legality of the Turkish-specific tariffs is still being considered on appeal and may result in the reimbursement of any additional Section 232

11

tariffs paid pursuant to *Proclamation 9772*. Though the parties imply that the "legal status" of *Proclamation 9772* is irrelevant to Commerce's analysis, if the additional tariffs are ultimately found to be unlawful and refunded, it follows that they should not be deducted from Noksel's U.S. price. DOJ Br. at 23; Nucor Br. at 30.[3]

Regardless, substantial record evidence demonstrates that the additional tariffs on imports from Turkey are uniquely remedial and temporary such that they should be considered "special". The tariffs on Turkish imports were specifically imposed to "further reduce imports of steel articles and increase domestic capacity utilization." *See Proclamation 9772* at 40429. Similar to country-specific AD/CVD and safeguard investigations, imports from Turkey were targeted because it "is among the major exporters of steel to the United States for domestic consumption." *Id.* In consideration of this purpose, the reviewing courts have consistently categorized the additional tariffs on Turkish steel as "remedial measures." *Transpacific*, 4 F.4th at 1326. Tariffs implemented pursuant to *Proclamation 9772* are thus not remedial only in a "broad sense," *Borusan*, 494 F.Supp.3d at 1374, but rather are in response to Commerce's specific finding of injury from Turkish imports.

The additional tariffs, which were in effect for a 9-month period, are also uniquely temporary. Noksel Br. at 37-38. Noksel had no notice of the tariffs prior to their implementation, resulting in the payment of 50% tariffs on a shipment already en route to the United States when the rate was increased. *See* Supp. A-D QR at S7-12, Exh. S7-7, C.R. 124, P.R. 98. The temporary increase "was not foreseen and therefore it was not included in the invoice." *Id.* at S7-12. The brief duration further implements the tariff's temporariness and distinguishes it from ordinary customs duties, which have no set duration or termination provision. DOJ Br. at 18.

---

[3] Alternatively, the Court should stay this proceeding pending a final decision regarding the legality of the additional tariffs on imports from Turkey in *Transpacific*.

As with AD/CVD, Section 201, and the 25% Section 232 tariffs on imports from all countries, the additional Section 232 tariffs on imports from Turkey are intended to "ensur{e} the viability of the domestic steel industry." *Proclamation 9772*, at 40429. The deduction of the 50% Section 232 tariffs is therefore unlawful and uniquely prejudicial to Turkish respondents like Noksel in this review.

### C. Commerce Should Have Granted Noksel A Full Duty Drawback Adjustment To U.S. Price

In the *Final AD Results*, Commerce did not grant Noksel a duty drawback adjustment on the basis that "Commerce is not satisfied that an IPC has been closed until a respondent can provide sufficient documentation establishing its closure by the GOT" and Noksel did not provide "documentation on the record indicating that the GOT closed the IPC at issue here." *Final IDM* at 7, P.R. 115. In its opening brief, Noksel explained that it was entitled to a full duty drawback adjustment for the IPC, which is also referred to as a DIIB, because it had applied for closure to the GOT, certifying that it had fulfilled its import and export requirements and was no longer permitted to add import or export information. Noksel Br. at 6-7. In their replies, the parties first seek to detract from the substance of Noksel's claim by arguing that Noksel has not exhausted administrative remedies and has relied on non-record evidence. DOJ Br. at 29-30; Nucor Br. at 10-11. Both parties further contend an IPC cannot be considered closed absent documentation of formal approval by the GOT. The arguments of the parties are without merit.

### 1. *Noksel Exhausted Administrative Remedies In Arguing That Commerce Should Grant Its Duty Drawback Adjustment*

At the outset, the parties claim that Noksel has failed to exhaust administrative remedies for its arguments regarding Commerce's determination to deny its duty drawback adjustment. However, as both parties acknowledge, Noksel "briefed the issue {of} whether Commerce should grant Noksel's request for a duty adjustment," DOJ Br. at 29, specifically "argu{ing} in

its case brief that Commerce should treat the IPC that was the basis for its claim as closed." Nucor Br. at 11.

At the time of briefing, Noksel believed the denial of the drawback adjustment was based on confusion stemming from "inherent ambiguity in the word 'closure.'" Noksel Case Br. at 23, P.R. 109. Noksel thus clarified in its case brief that imports and exports had been completed under the IPC and that Noksel had applied for closure, but that the GOT had not granted final approval of the application. *Id.* at 24. Citing Commerce's definition of "closed" as "when the exporting company has applied to the Turkish government for closure of the DIIB," Noksel concluded that "the DIIBs are closed as the Commerce defines the term" and that, as such, Commerce "should grant Noksel's drawback adjustment in full." *Id.* at 24 (quoting *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey*, 81 Fed. Reg. 47355 (Dep't Commerce July 21, 2016) (final LTFV determ.) and accompanying Issues and Decision Memorandum at 28 ("*HWRPT IDM*")).

Following briefing, Commerce "specifically addressed Noksel's argument that the company's application for closure of an IPC should be deemed sufficient." Nucor Br. at 12. Noksel is raising this same issue – whether final approval from the GOT is required for an IPC to be considered closed – on appeal. Noksel Br. at 6-19. Nevertheless, the parties baselessly argue that Noksel has failed to exhaust administrative remedies because it "now raises various new arguments" in support of its position. DOJ Br. at 29. These arguments are unsupported by the record and the precedent of the reviewing courts.

As detailed above, the Court has consistently held that administrative remedies are exhausted where the issue is "brought forth … in {a parties'} case brief" *NSK Ltd. v. United States*, 170 F. Supp. 1280, 1291 (Ct. Int'l Trade 2001), and that parties may introduce "an extension of {such} previously made arguments" on appeal. *Solvay Solexis S.p.A. v. United*

14

*States*, 637 F. Supp.2d 1306, 1309 n.2 (Ct. Int'l Trade 2009); *see also* Section III.B.1., *supra*. In recent cases, the Court has found remedies to be exhausted where issues raised on appeal were "closely related arguments to the issues raised in the administrative proceedings." *Calcutta Seafoods Pvt. Ltd. v. United States*, 495 F. Supp.3d 1318, 1327 n.4 (Ct. Int'l Trade 2021). Commerce likewise "had an opportunity to address these issues below, and in fact did so" in this case, *id.*, providing additional detail regarding the closure of IPCs and its denial of Noksel's claimed duty drawback adjustment in the *Final AD Results*. *Final IDM* at 6-8, P.R. 115.

Now that Noksel better understands Commerce's determination as a change of position in what constitutes IPC closure, rather than a "misunderst{anding of} the actual situation concerning {its} IPC" status, Noksel Case Br. at 23, P.R. 109, it has included additional, related arguments to support that an IPC is closed when a party applies for closure to the GOT. Because these arguments are "an extension of th{e} same issue" of whether Noksel is entitled to a duty drawback adjustment to U.S. price, it has satisfactorily exhausted administrative remedies. *Solvay*, 637 F.Supp.2d at 1309 n.2.

### 2.    *Noksel Properly Included Citations to Commerce Verification Reports*

The parties next take issue with Noksel's citation to certain verification reports issued by Commerce in past cases involving the Turkish drawback system. Noksel Br. at 11, 13-15, 17-18. The parties claim that "a statement in a verification report does not constitute Commerce's determination," that "Noksel does not explain how the cited verification report has been made part of the administrative record," and that, as such, "{t}he Court should decline to consider Noksel's arguments to the extent that they are rooted in non-record information." DOJ Br. at 30; Nucor Br. at 2.

In determining whether information falls within the definition of "factual information" under 19 C.F.R. § 351.102, Commerce considers if it is "akin to the citation of court cases,

federal register notices, and issues and decision memoranda." *Certain Hardwood Plywood Products from the People's Republic of China*, 82 Fed. Reg. 53460 (Dep't Commerce Nov. 16, 2017) (final LTFV determ.; final critical circum., in part), and accompanying Issues and Decision Memorandum at 45. Verification reports are publicly available documents that are equivalent to issues and decision memorandum ("I&D memos") issued by Commerce and regularly cited by parties in appeals to the Court as legal support, despite not being part of the administrative record. *See, e.g.*, Nucor Br. at 5, 13-14. Like I&D memos, verification reports are official documents issued by Commerce and serve as legal precedent for future determinations. Indeed, Commerce's regulations require that Commerce "report the methods, procedures, *and results of a verification*." 19 C.F.R. § 351.307(c) (emphasis added).

Further, though Commerce will reject "new data submitted for the purpose of the facts contained therein," it has found that "{c}itations which provide support for a practice or decision is not considered new factual information." *Certain Frozen Warmwater Shrimp From India*, 79 Fed. Reg. 51309 (Dep't Commerce Aug. 28, 2014) (final AD rev. results; 2012-2013), and accompanying Issues and Decision Memorandum at 42. Noksel's citations to Commerce's own verification reports, which Commerce relies on and cites liberally in its I&D memos, provide support for Commerce's practice in previous cases involving the same issue. These citations to Commerce precedent, which are akin to I&D memos, cannot be considered "new data submitted for the purpose of the facts contained therein." *Id.*

Because the verification reports issued by Commerce are published documents similar to I&D memos, and because those reports were cited by Noksel for the purpose of providing support for Commerce's historic practice regarding the Turkish drawback system, they are not new factual information. The position of the parties that a party cannot cite Commerce's practice

16

in past cases unless it is explicitly documented in an I&D memo is not reasonable and should be rejected by the Court.[4]

### 3.    *Noksel Satisfied Commerce's Two Prong Duty Drawback Test*

Turning to the substance of the arguments regarding duty drawback, all parties agree that Noksel must meet Commerce's "two-pronged" test in order to qualify for an adjustment to U.S. price. Noksel Br. at 7; DOJ Br. at 8-9; Nucor Br. at 3-4; *see also Final IDM* at 7, P.R. 115.

In its response, Defendant inexplicably claims that Noksel did not satisfy the first prong of the drawback test. DOJ Br. at 32. However, Commerce has consistently accepted that the structure of Turkey's drawback program, the import processing regime ("IPR"), necessarily satisfies the first prong. Noksel Case Br. at 21 (citing *Steel Concrete Reinforcing Bar From Turkey*, 79 Fed. Reg. 54965 (Dep't Commerce Sept. 15, 2014) (final neg, LTFV determ. & critical circum.), and accompanying Issues and Decision Memorandum at 16 ("*Rebar from Turkey*") ("{W}e find the GOT's system provides a direct linkage that satisfies the first prong of the Department's test."); *Certain Oil Country Tubular Goods from the Republic of Turkey*, 79 Fed. Reg. 41973 (Dep't Commerce July 18, 2014) (final affirm. LTFV determ. & critical circum., in part), and accompanying Issues and Decision Memorandum at 15 ("*OCTG from Turkey…*") ("{T}he requirements under the IPR via DIIB documentation, if met by Turkish companies, satisfy{y} the statute with respect to duty drawback adjustments under U.S. law."). In accordance with these previous findings, which examine the same IPR program utilized by Noksel, the first prong is satisfied because the Turkish IPR "specifies and restricts that only

---

[4] Alternatively, Nucor argues that these reports have no value because they were "all issued in 2014 and 2015, and they necessarily relate to review periods that predate 2014 and 2015." Nucor Br. at 21. However, these documents provide "insight into how Turkey's IPR operated during the 2018-2019 POR," *id.*, because the Turkish IPR has not changed. Noksel Br. at 8. Commerce has considered the same Turkish drawback system for more than 15 years and its previous determinations involving the IPR system remain relevant. *Id.*

exports that contain qualifying incorporated imported inputs may be used to claim drawback" and "strictly 'requires' that the exported product contain the imported raw material inputs to qualify for drawback," with the IPC number providing the necessary linkage for the imports and exports. *See* Noksel Section B-D Questionnaire Response at C-36-37 and Exh. C-17 (Sept. 20, 2019), C.R. 15, 19, P.R. 42 ("B-D QR") (citing Turkish Inward Processing Law at Articles 2, 8).

The record demonstrates that Noksel also satisfied the second prong of Commerce's test when it completed imports and exports under the relevant IPC and certified that there were sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise to the GOT. Noksel Br. at 9-10. Despite this, Commerce denied Noksel's claimed adjustment on the basis that Noksel's application for closure of the IPC had not been formally approved. *Final IDM* at 7, P.R. 115. The parties contend that "Commerce found, correctly, that Noksel's mere application for the IPC's closure did not show that the IPC had been closed," arguing that "{w}hile the closure application is pending before the Turkish Government, the IPC may be suspended or modified." DOJ Br. at 25; Nucor Br. at 4-5. However, there is no evidence on the record or in Commerce precedent that an IPC may be modified, nor that imports/ exports under an IPC may continue after it has expired or been submitted for closure. Noksel Br. at 11 (citing *Final IDM* at 7-8, P.R. 115).

To the contrary, the "contingent liability for import duties inherent in an IPC" is practically extinguished when exports under the IPC have been completed and the company applies to the Turkish government for closure. Nucor Br. at 5. As Nucor acknowledges, a company only files an application with the Turkish Government to close the IPC "{a}fter the inputs are imported and *sufficient exports are made to account for them*{.}" Nucor Br. at 4 (emphasis added). In other words, a company cannot apply to the GOT for closure until there are "sufficient imports of the relevant raw materials to account for the duty drawback or exemption

granted for the exportation of the manufactured product" – satisfying the second prong of

Commerce's test. *Final IDM* at 7, P.R. 115. Despite the parties' claims, the "lack of the Turkish

government's approval" has no bearing on and is not "indicative of a failure to satisfy the

established two-prong test." Nucor Br. at 14.

### 4.    *Record Evidence Demonstrates that Noksel's IPC Was "Closed"*

As Defendant notes, the drawback statute "does not provide the categories of evidence

that Commerce must accept to evaluate whether certain import duties have been rebated or

exempted." DOJ Br. at 27 (citing 19 U.S.C. § 1677a(c)(1)(B)). Though Defendant argues that

Commerce does not mandate "that Noksel must provide a certain category of documents from

any foreign government," DOJ Br. at 30, Commerce clearly states that "{s}hort of certification

from the GOT indicating that the IPC has been formally closed. . . . there is no evidence on the

record to support a finding that Noksel's IPC has been closed." *Final IDM* at 7-8, P.R. 115.

Indeed, as Nucor acknowledges, "Commerce's current practice . . . . requires evidence that the

Turkish Government has acted on the closure application, and specifically, that the Turkish

Government has approved closure." Nucor Br. at 15. Stated another way, absent formal GOT

certification, a party will not qualify for a drawback adjustment. This new requirement

improperly adds an additional prong to Commerce's two-prong test for granting a drawback

adjustment. Noksel Br. at 10.

Commerce's new requirement that Noksel provide specific documentation from the GOT

to qualify for a drawback adjustment in all cases is also unreasonable given that Noksel cannot

control the timeline for final GOT approval, nor ensure that it coincides with submission of

questionnaire responses to Commerce. Though the Defendant alleges that "Noksel offers no

explanation of how the duration of formally approving an IPC's closure is relevant," DOJ Br. at

31, the relevance of the length of time associated with official GOT closure is self-evident given

that formal approval is now a prerequisite to Commerce granting the drawback adjustment. *Final IDM* at 7-8, P.R. 115. This is especially true given the underlying purpose of the drawback adjustment, which, as Defendant notes, is necessary to "correc{t} . . . imbalance{s}, which could otherwise lead to an inaccurately high dumping margin, by increasing {export price} to the level it likely would be absent the duty drawback." DOJ Br. at 24-25 (quoting *Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1338 (Fed. Cir. 2011)).

Moreover, as Defendant admits, this Court has held that "Commerce may not reject verified evidence of a closed IPC." DOJ Br. at 27 (citing *Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 348 F. Supp. 3d 1321, 1328 (Ct. Int'l Trade 2018)). It is disingenuous for Defendant to highlight Noksel's failure to offer "verified information that could be considered by Commerce" or to "explain how its application . . . could constitute such verified information." *Id.* at 30. As Defendant well knows, Noksel was not afforded an opportunity for on-site verification due to travel restrictions resulting from the COVID-19 pandemic. As the CIT has affirmed, physical meetings between company and Commerce officials enable Commerce to make "credibility determinations in person during the verification procedure." *Jinko Solar Co. v. United States*, 229 F. Supp. 3d 1333, 1358 (Ct. Int'l Trade 2017), *aff'd*, 961 F.3d 1177 (Fed. Cir. 2020). These same credibility determinations cannot be made "based on a cold paper record," as Noksel, by no fault of its own, has in this review. *Id.*

Nevertheless, record evidence provided by Noksel demonstrates that imports and exports under the IPC at issue have been completed, and the application to close the IPC has been presented to the GOT. B-D QR at Exh. C-16 (p. 5), C.R. 15, 19, P.R. 42; Noksel Br. at 16. The realized import and export list for the IPC, as well as the fact that the IPC expired during the POR, highlights that imports and exports were not able to continue and the IPC has been "closed

out" by Noksel. B-D QR at Exhs. C-15, C-16, C.R. 15, 19, P.R. 42.[5] According to the parties,

"{n}one of Commerce's determinations cited by Noksel supports the proposition" that the

documentation provided is sufficient to "demonstrate{}{ that} an actual closure of an IPC has

occurred." *See* DOJ Br. at 31. However, the Defendant's own parentheticals indicate that

Commerce has historically accepted documentation other than formal certification from the GOT

as evidence of closure. For example, in *Rebar from Turkey*, as Defendant notes, "Commerce

obtain{ed} documents submitted to Turkish government in 'closing out of an IPC'"; likewise, in

*OCTG from Turkey*, "Commerce rel{ied} on DIIB data obtained at sales verification" as

evidence of closure. DOJ Br. at 31. In a third case, *Welded Line Pipe From the Republic of*

*Turkey*, 80 Fed. Reg. 61362 (Dep't Commerce Oct. 13, 2015) (final LTFV determ.), and

accompanying Issues & Decision Memorandum ("*WLP IDM*"), Defendant challenges Noksel's

citation to a verification report without citing "the final results from the pertinent administrative

review." DOJ Br. at 30 (citing Noksel Br. at 11). But those final results specifically acknowledge

"the lag time between the company's closing of the DIIB and Turkish customs' finalization."

*WLP IDM* at 15. Further, Commerce defined closed IPCs as those with "U.S. sales of subject

merchandise made by a respondent which were included on DIIBs and reported in the U.S. sales

listing." *Id.* at 11, 13-14; *see also id.* at 6-7.

Indeed, the cases cited by all parties confirm that Commerce's definition of "closed" is

inconsistent and has changed over time.[6] While there may be "inherent ambiguity" in the word

---

[5] Even if the GOT excludes a portion of Noksel's exports pursuant to the formal liquidation
process, Noksel would still meet the criteria for closure under due to the high closing ratio. B-D
QR at Exh. C-15, C.R. 15, P.R. 42.

[6] Commerce has previously defined "closed" as "when the exporting company has applied to the
Turkish government for closure of the DIIB." *HWRPT IDM* at 28.Though Nucor attempts to
dismiss this clear statement because "the duty drawback adjustment that Commerce {granted}. . .
was for the only IPC that had been closed by the {Turkish Government}," Nucor Br. at 16, this

"closed," Noksel Case Br. at 23, P.R. 109, there is no such ambiguity in Commerce's two prong

test, which Noksel has clearly satisfied in this case. For the IPC at issue, the record is clear that

Noksel completed all imports and exports; that Noksel applied to the GOT for closure; and that,

while the GOT has not yet issued its final certification, the IPCs are closed as Commerce defines

the term because Noksel is no longer "permitted by the GOT to add import or export

information." *Final IDM* at 8, P.R. 115. Commerce should therefore have granted

Noksel's claimed drawback adjustment.

## IV.   <u>CONCLUSION AND PRAYER FOR RELIEF</u>

For the foregoing reasons, Noksel respectfully requests that this Court find that

Commerce's *Final AD Results* were not based on substantial evidence, nor were they in

accordance with the law with respect to the issues set forth in this brief and in Noksel's Brief in

Support of Its Motion for Judgment on the Agency Record.

Respectfully submitted,

<u>**/s/ Leah N. Scarpelli**</u>
Leah N. Scarpelli
Matthew M. Nolan
Arent Fox LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6013

*Counsel for Noksel Celik Boru Sanayi A.S.*

December 23, 2021

---

ignores relevant facts. Commerce ultimately denied the adjustment for certain IPCs where the
company had (1) "yet to apply for closure" or (2) "requested suspension of closure." *HWRPT IDM*
at 27-28. No party alleges that either of those scenarios exist here.

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that

Plaintiffs' Reply Brief filed on December 23, 2021 complies with the word limitation

requirement. The word count for Plaintiff's Reply Brief, as computed by Arent Fox LLP's word

processing system is 6,967.


  **/s/ Leah N. Scarpelli**
Leah N. Scarpelli

*Counsel for Noksel Celik Boru Sanayi A.S.*