Slip Op. 23-125

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NOKSEL CELIK BORU SANAYI A.S., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> NUCOR TUBULAR PRODUCTS INC., <br><br> Defendant-Intervenor. | Before: Jane A. Restani, Judge <br><br> Court No. 21-00140 |

## OPINION

[Antidumping Duty Determination in Review of Order on Light-Walled Rectangular Pipe and Tube from Turkey Sustained.]

Dated: August 23, 2023

Leah N. Scarpelli and Jessica R. DiPietro, ArentFox Schiff LLP, of Washington, DC, argued for Plaintiff Noksel Celik Boru Sanayi A.S. With them on brief was Matthew M. Nolan.

Eric J. Singley, Trial Attorney, Civil Division, U.S. Department of Justice, of Washington, DC, argued for the Defendant. With him on the brief were Brian M. Boynton, Acting Assistant Attorney General, Patricia M. McCarthy, Director, and Franklin E. White, Jr., Assistant Director. Of counsel on the brief was Ashlande Gelin, Staff Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Maureen Elizabeth Thorson, Wiley Rein LLP, of Washington, DC, argued for Defendant-Intervenor Nucor Tubular Products Inc. With her on the brief were Alan H. Price, Robert E. DeFrancesco, III, and Theodore P. Brackemyre.

Restani, Judge: Before the court is a motion for judgment on the agency record pursuant to

United States Court of International Trade ("USCIT") Rule 56.2, in an action challenging a final

determination of the United States Department of Commerce ("Commerce"). The final determination at issue resulted from Commerce's findings during an administrative review of the antidumping ("AD") order covering steel light-walled rectangular pipe and tube from Turkey. Plaintiff Noksel Celik Boru Sanayi A.S. ("Noksel") challenges the calculation.

## BACKGROUND

a.   **Antidumping Administrative Review and Determination**

On July 15, 2019, Commerce initiated an antidumping duty administrative review of light-walled rectangular pipe and tube products from Turkey for the period of May 1, 2018, through April 30, 2019.  Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 33,739, 33,748 (Dep't Commerce July 15, 2019).

On July 24, 2020, Commerce issued its preliminary results and accompanying Preliminary Decision Memorandum, and published the results in the Federal Register.  Light-Walled Rectangular Pipe and Tube From Turkey: Preliminary Results of Antidumping Duty Administrative Review; 2018-2019, 85 Fed. Reg. 44,861 (Dep't Commerce July 24, 2020) ("Preliminary Results"); Decision Memorandum for Preliminary Results of the Antidumping Duty Administrative Review: Light-Walled Rectangular Pipe and Tube from Turkey; 2018-2019, A-489-815, POR 5/1/2018-4/30/2019 (Dep't Commerce July 20, 2020).  Commerce issued the final results on May 27, 2021.  Light-Walled Rectangular Pipe and Tube from Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019, 86 Fed. Reg. 11,230 (Dep't Commerce Feb. 24, 2021), and accompanying 2018-2019 Antidumping Duty Administrative Review of Light-Walled Rectangular Pipe and Tube from

Turkey: Issues and Decision Memorandum for the Final Results, A-489-815, POR 5/1/2018-4/30/2019 (Dep't Commerce Feb. 16, 2021) ("IDM").

  b.  **Background of Section 232 Duties**

On March 8, 2018, the President exercised his authority under Section 232 of the Trade Expansion Act of 1962, as amended, and mandated the imposition of a global tariff of 25 percent on imports of steel articles from all countries, except Canada and Mexico. Proclamation No. 9705 of March 8, 2018, 83 Fed. Reg. 11,625, 11,626 (Mar. 15, 2018) ("Proclamation 9705"). The Section 232 duties went into effect on March 23, 2018, and applied "in addition to any other dut[y]." Id. at 11,627–28. By its terms, Proclamation 9705 was issued in order to "enable domestic steel producers to use approximately 80 percent of existing domestic production capacity and thereby achieve long-term economic viability through increased production" and to "ensure that domestic producers can continue to supply all the steel necessary for critical industries and national defense." Id. at 11,625–26; see also 19 U.S.C. § 1862(d).

On August 10, 2018, the President issued another proclamation, increasing the tariff on Turkish steel imports from 25 percent to 50 percent, effective August 13, 2018. Proclamation No. 9772 of August 10, 2018, 158 Fed. Reg. 40,429 (Aug. 15, 2018) ("Proclamation 9772").[1] In the proclamation, the President stated that he increased the tariffs because Turkey was a major exporter of steel, and the increased tariff would "be a significant step toward ensuring the viability of the domestic steel industry." Id. at 40,429. On May 16, 2019, the President issued a proclamation

---

[1] The lawfulness of the Proclamation 9772 increased tariffs on Turkey has been affirmed by the U.S. Court of Appeals for the Federal Circuit. See Transpacific Steel LLC v. United States, 4 F.4th 1306 (Fed. Cir. 2021), cert. denied, 142 S. Ct. 1414 (2022).

ending the increased Section 232 tariff on Turkish steel imports.  Proclamation No. 9886 of May 16, 2019, 84 Fed. Reg. 23,421 (May 16, 2019).

In the final results, Commerce treated the Section 232 duties paid by Noksel as "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) and therefore deducted the Section 232 duties on the United States price side of the dumping comparison from export ("EP") and constructed export price ("CEP").  IDM at 4–5.  Commerce determined that Section 232 duties were more akin to normal customs duties than to antidumping or countervailing duties or Section 201 duties, codified as 19 U.S.C. § 2251, which are not deducted.  Id.  Commerce reasoned that the President indicated that national security was the concern when issuing Proclamation 9705 and stated that the duties were to be imposed in addition to other duties.  Id. at 4.

        **c.**        **Challenge to AD Review Determination**

On March 26, 2021, Noksel commenced the instant action against the United States pursuant to 19 U.S.C. § 1516a(a)(2).  Compl., ECF No. 4 (Mar. 26, 2021).  Noksel claims that the AD determination is unsupported by substantial evidence or is otherwise contrary to law because Commerce incorrectly treated Section 232 duties as normal U.S. customs duties and denied a duty-drawback adjustment.  Compl. ¶¶ 19–24; Pl. R. 56.2 Mot. For J. on the Agency R., ECF Nos. 24–25 (Sept. 3, 2021) ("Pl. Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2). The court sustains Commerce's results of an administrative review of an AD duty order unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i).

# DISCUSSION

### I.　Section 232 Duties May Be Deducted From United States Price

Noksel raises two issues related to whether Section 232 duties may be deducted from United States price. First, Noksel argues that Commerce erred by treating the Proclamation 9705 Section 232 duties as a United States import duty under § 1677a(c)(2)(A). Pl. Br. at 19–37. This argument is foreclosed, however, by binding precedent from the U.S. Court of Appeals for the Federal Circuit. Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 63 F.4th 25, 37 (Fed. Cir. 2023) ("Borusan Mannesmann II") ("[W]e conclude that the specific duty imposed by the President in Proclamation 9705 was properly treated by the President's subordinate, the Secretary of Commerce, as a 'United States import dut[y]' under § 1677a(c)(2)(A)."). Noksel's remaining argument is that Proclamation 9772's temporary increase of Section 232 duties on Turkey is sufficiently distinct, and thus, that those increased duties cannot be treated as a United States import duty under § 1677a(c)(2)(A) because the increase was temporary and remedial. Pl. Br. at 37–39.[2]

Antidumping duties depend on the "dumping margin," 19 U.S.C. § 1677(35)(A), which is the difference between "the normal value," (or home country value) and the EP or CEP[3] for the

---

[2] The government and Defendant-Intervenor argue that Noksel did not exhaust administrative remedies for the temporarily increased duties, and, thus, the court should not consider the issue. Gov't Resp. Br. at 22, ECF Nos. 30–31 (Dec. 3, 2021); Defendant-Intervenor Resp. Br. at 29, ECF Nos. 27–28 (Dec. 3, 2021). During the administrative proceeding, Noksel asserted that Commerce should "at the very least" not deduct the additional 25 percent. Noksel's Case Brief at 16, P.R. 109 (Aug. 24, 2020). Noksel sufficiently raised the issue by presenting it to Commerce, and the court will consider it. See Timken Co. v. United States, 26 CIT 434, 460, 201 F. Supp. 2d 1316, 1340 (CIT 2002).

[3] EP and CEP may be referred to as the "U.S. price" in the dumping margin comparison. See United States Steel Corp. v. United States, 621 F.3d 1351, 1353 & n.1 (Fed. Cir. 2010).

merchandise, id. § 1673.  The adjustments of EP and CEP are set forth in section 772(c) of the Tariff Act of 1930, codified at 19 U.S.C. § 1677a(c).  EP and CEP are to be reduced by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States . . . ." 19 U.S.C. § 1677a(c)(2)(A) (emphasis added).  These adjustments are made "in an attempt to get back to an ex-factory price that is comparable to the price of goods in the home market." Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 45 CIT __, __, 494 F. Supp. 3d 1365, 1373 (2021) ("Borusan Mannesmann I"), aff'd on other grounds, Borusan Mannesmann II, 63 F.4th at 33; see also S. Rep. No. 67-16, at 12 (1921); H.R. Rep. No. 67-1, at 23–24 (1921); H.R. Rep. No. 67-79, at 2–3 (1921).[4]

Regarding Section 201 safeguard duties, Commerce has previously concluded that they should not be deducted as import duties under § 1677a(c)(2)(A).  Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review, 69 Fed. Reg. 19,153, 19,157–61 (Dep't Commerce Apr. 12, 2004) ("SSWR from Korea").  Commerce reached this because Section 201 duties were remedial and temporary in nature, and deducting from EP and CEP would result in an inappropriate double remedy. Id. at 19,160–61.  In Wheatland Tube Co. v. United States, the Federal Circuit held that Commerce's construction of "United States

---

[4] "Antidumping duties cannot be subtracted in the calculation of dumping margins (and hence antidumping duties), because doing so would produce a spiraling circularity." Borusan Mannesmann II, 64 F.4th at 35; see also Borusan Mannesmann I, 494 F. Supp. 3d at 1372–73 (citing S. Rep. No. 67-16, at 4 (1921)) ("[S]uch duties were 'special duties,' not the import duties that were to be deducted from price in the United States market.").

import duty" statute was reasonable in the light of the specific Section 201 duties. 495 F.3d 1355, 1359–66 (Fed. Cir. 2007); but see Borusan Mannesmann II, 63 F.4th at 36–37 (declining to decide whether intervening developments in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.[5] affect Wheatland Tube).

More recently, in Borusan Mannesmann II, the Federal Circuit stated that "[n]othing in § 1677a(c)(2)(A) requires the uniform treatment of all duties prescribed under a particular statutory authorization," and more specifically, there is nothing "in the § 232 framework that requires the uniform treatment of all duties imposed by the President under § 232." 63 F.4th at 33. The Federal Circuit, accordingly, declined to "make a statute-wide categorical determination regarding all duties imposed on imports by presidential action under § 232." Id. at 34. Instead, Borusan Mannesmann II requires courts to use a "proclamation-specific approach" that focuses "on the character" of the proclamation to determine if the President intended a specific duty to qualify as a United States import duty. Id.

The Federal Circuit proceeded to analyze the text of Proclamation 9705, emphasizing that the text made "clear that the duty newly being imposed was to add to, not partly or wholly offset, the antidumping duties[.]" Id. (referring to Proclamation 9705, 83 Fed. Reg. at 11,627 ("This rate of duty, which is in addition to any other duties . . . .")); see also Proclamation 9705, 83 Fed. Reg. at 11,629, Annex ("All anti-dumping, countervailing, or other duties and charges applicable to such goods shall continue to be imposed."). Based on this, the Federal Circuit concluded that the

---

[5] 467 U.S. 837 (1984).

Court No. 21-00140                                                                                                   Page 8

specific Proclamation 9705 duty was properly treated as a United States import duty under § 1677a(c)(2)(A).  <u>Borusan Mannesmann II</u>, 63 F.4th at 37.

Now, the court is tasked with following this "proclamation-specific approach" and analyzing the character of Proclamation 9772.  <u>See</u> <u>id.</u> at 34.  Similar to Proclamation 9705, Proclamation 9772 provides:

> Further, except as otherwise provided in notices published pursuant to clause 3 of this proclamation, all steel articles imports from Turkey specified in the Annex shall be subject to a 50 percent ad valorem rate of duty with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on August 13, 2018.  <u>These rates of duty, which are in addition to any other duties</u>, fees, exactions, and charges applicable to such imported steel articles, shall apply to imports of steel articles from each country as specified in the preceding two sentences."

<u>Proclamation 9772</u>, 158 Fed. Reg. at 40,430 (emphasis added).  As the court explained in <u>Icdas Celik Enerji Tersane ve Ulsasim Sanayi A.S. v. United States</u>, the same language that the Federal Circuit emphasized is present in Proclamation 9772.  For a more complete analysis, <u>see</u> <u>Icdas Celik Enerji Tersane ve Ulsasim Sanayi A.S. v. United States</u>, No. 21-00140, Slip Op. No. 23-124, at *8–9 (CIT Aug. 23, 2023), issued simultaneously with this opinion.  There is no reason to vary here.  Accordingly, Commerce's treatment of the Section 232 duties is sustained.

## II.   Duty Drawback Adjustment

Another adjustment Commerce must make to calculate the dumping margin, known as the duty drawback adjustment, calls for U.S. price to be increased by the amount of any "import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States."  19 U.S.C. § 1677a(c)(1)(B).  In determining whether a duty drawback adjustment is warranted, Commerce

applies a two-pronged test in which respondent must demonstrate 1) that the rebate and import duties, or exemption from import duties, are directly linked to, and dependent upon, the exportation of the subject merchandise; and 2) that there are sufficient imports of the raw material to account for the drawback upon exportation of subject goods.  <u>Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback</u>, 71 Fed. Reg. 61,716, 61,723 (Dep't Commerce Oct. 19, 2006); <u>see also</u> <u>Saha Thai Steel Pipe (Pub.) Co. v. United States</u>, 635 F.3d 1335, 1340 (Fed. Cir. 2011).

The government of Turkey's ("GOT") duty drawback program, the Inward Processing Regime ("IPR") involves exemptions from duties, rather than rebates.  <u>Noksel Section B-D Questionnaire Response</u> at C-35, P.R. 42, C.R. 15, 19 (Sept. 20, 2019) ("<u>Noksel QR</u>").  Under the program, a company that imports raw materials and exports finished goods made from such raw materials may obtain an inward processing certificate ("IPC") (also known by its Turkish acronym, "DIIB"), which sets forth the quantity of raw material allowed to be imported duty-free and the quantity of export required to close the IPC.  <u>Noksel QR</u> at C-35, Ex. C-15.  Noksel submitted an application to the GOT to close an IPC, which the GOT was then reviewing.  <u>Noksel QR</u> at C-35.  Noksel stated that it would "submit documentation substantiating the IPR completion" when the closing was approved.  <u>Noksel QR</u> at C-35.

In the final results, Commerce found that it should not grant Noksel a duty drawback adjustment.  <u>IDM</u> at 6.  Commerce proceeded to explain that its current practice for the IPR was to require "sufficient documentation establishing [the IPC's] closure by the GOT."  <u>IDM</u> at 7.  Commerce reasoned that an application for closure is not sufficient because "an IPC may be modified or suspended even after it has been submitted to the GOT."  <u>IDM</u> at 7.  Following that

practice, Commerce declined to grant Noksel the duty drawback adjustment because there was no record documentation that Noksel could not suspend or modify its IPC application. IDM at 7–8.

The court has long relied on the duty drawback adjustment's two-prong test, and has rejected attempts to "add a new hurdle to the drawback test that is not required by the statute." Chang Tieh Industry Co. v. United States, 17 CIT 1314, 1320, 840 F. Supp. 141, 147 (1993); see also Arcelormittal USA Inc. v. United States, 32 CIT 440, 463 n.23 (2008) (declining plaintiff's "invitation to alter Commerce's reasonable interpretation of 19 U.S.C. § 1667a(c)(1)(B)"). Commerce's requirement of IPC closure is not new, but Commerce's evaluation of when an IPC is closed has evolved. Toscelik Profil ve Sac Endustrisi A.S. v. United States, 42 CIT __, __, 348 F. Supp. 3d 1321, 1328 n.1 (2018); Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States, 44 CIT __, __, 439 F. Supp. 3d 1342, 1349 (2020).

In Toscelik, for a period of investigation ("POI") of October 1, 2013, through September 30, 2014, Commerce considered an IPC closed after it "expired" because then the company "could no longer apply any additional imports or exports to the DIIB," regardless of whether the GOT may have officially closed the IPC. Toscelik, 348 F. Supp. 3d at 1328 n.1.[6] At some point after the Toscelik investigation, Commerce defined closure as when "the DIIB holder applies for closure of the DIIB with the Turkish Government." Id. Subsequently, during a POI of July 1, 2015,

---

[6] In Toscelik, the Turkish plaintiffs argued that Commerce's requirement that IPCs must be closed during the POI was unreasonable. 348 F. Supp. 3d at 1325. The court agreed, holding that limiting the acceptance of IPCs to those closed during the POI ignored "verified record information" when plaintiffs had IPCs that Commerce considered closed but only after the conclusion of the POI. Id. at 1327–28.

Court No. 21-00140                                                                                           Page 11

through June 30, 2016,[7] Commerce stated its practice was to provide a duty drawback adjustment only "upon evidence that the subject country's government has forgiven those duties." Habas, 429 F. Supp. 3d at 1347.[8]  The court sustained Commerce's rationale as reasonable because duty drawback eligibility required record evidence that showed the GOT had "forgiven the duty liability." Id. at 1349.

As indicated, Commerce has not been consistent in how it defines closure of IPCs.  In one proceeding, Commerce considered an IPC closed "[f]or practical purposes . . . when the exporting company has applied to the Turkish government for closure." Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 47355 (Dep't Commerce July 21, 2016) ("HWRP from Turkey"), and accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey at Comment 4, A-489-824, POI 7/1/2014-6/30/2015 (Dep't Commerce July 14, 2016).  But in a later proceeding, Commerce explained that applying for IPC closure is insufficient because "a company's application to close a DIIB may be modified or suspended." Light-Walled Rectangular Pipe and Tube from the Republic of Turkey, 82 Fed.

---

[7] The investigation at issue was for steel concrete reinforcing bar from Turkey.  Steel Concrete Reinforcing Bar From the Republic of Turkey, 82 Fed. Reg. 23,192 (Dep't Commerce May 22, 2017).

[8] As Commerce explained in its remand results in the Habas case, Commerce needed more record evidence than that "Habas had exports under these IPCs during POI."  Redetermination Pursuant to Court Remand Order, Habas Sinai Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States, Consol. Ct. No. 17-00204, ECF No. 83 (Jan. 15, 2020).  Instead, Commerce required record evidence that the GOT "actually refund[ed] any paid duties or ha[d] forgiven the imputed duties." Id. at 8–9.

Reg. 47,477 (Dep't Commerce Oct. 12, 2017) ("LWRPT from Turkey"), and accompanying 2015–2016 Antidumping Duty Administrative Review of Light-Walled Rectangular Pipe and Tube from Turkey: Issues and Decision Memorandum for the Final Results at Comment 9, A-489-815, POR 5/1/2015-4/30/2016 (Dep't Commerce Oct. 12, 2017) ("LWRPT from Turkey IDM").  Further, Commerce noted in LWRPT from Turkey that, in HWRPT from Turkey, Commerce actually "disallowed two of the three DIIBs under which the respondent requested a duty drawback adjustment because one DIIB remained open and the other DIIB was suspended after the respondent had applied for closure."  LWRPT from Turkey IDM at Comment 9.

Here, the court recognizes that Commerce has not always been clear as to when it will consider an IPC closed.  In two recent instances though, LWRPT from Turkey and Habas, Commerce clearly stated that it required more than closure application and instead required "evidence that the subject country's government has forgiven those duties."  See Habas, 429 F. Supp. 3d at 1347; LWRPT from Turkey IDM at Comment 9 ("Thus the Department is not satisfied that a DIIB has been closed until a respondent can provide sufficient documentation establishing its closure by the GOT.").  As the court explained in Icdas, it appears that in recent years Commerce's practice has been to require some indication from the GOT that the IPC was approved, and Noksel should have been on notice that this was likely the requirement.  See Icdas, No. 21-00140, Slip Op. No. 23-124, at *16.  It is not unreasonable for Commerce to require more proof than it has in the past cases.  See Huvis Corp. v. United States, 570 F.3d 1347, 1353 (Fed. Cir. 2009) ("Commerce need only show that its methodology is permissible under the statute and that it had good reasons for the new methodology.").  Noksel's statement that it would "submit the documentation substantiating the IPR completion" indicates that Noksel likely was aware

Commerce required the GOT's approval. See Noksel QR at C-35. Accordingly, Commerce's rejection of Noksel's request for a duty drawback adjustment is sustained.

## CONCLUSION

The court sustains Commerce's determination regarding the AD order for light-walled rectangular pipe and tube from Turkey.

/s/      Jane A. Restani
Jane A. Restani. Judge

Dated: August 23, 2023
       New York, New York